Michael D. Warner, Esq. (TX Bar No. 792304)
Rachel R. Obaldo, Esq. (TX Bar No. 24041617)
Cole, Schotz, Meisel, Forman & Leonard, P.A.
301 Commerce Street, Suite 1700
Fort Worth, Texas 76102
817-810-5250
817-810-5255 Facsimile
Email: mwarner@coleschotz.com
Email: robaldo@coleschotz.com

COUNSEL TO DEBTORS,
MCGINNIS LAND PARTNERS I, LP
AND CANYON FALLS LAND PARTNERS, LP

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re | Chapter 11 |
| McGinnis Land Partners I, LP. and<br>Canyon Falls Land Partners, LP | Case No. 10-BK-24654-SGJ<br>Case No. 10-BK-24655-SGJ |
| Debtors. | **Bid Procedures Hearing Date:**<br> September 9, 2010 at 9:30 a.m. *(proposed)*<br><br>**Sale Hearing Date:**<br> December 16, 2010 at 10:00 a.m. *(proposed)*<br>**Sale Objection Deadline:**<br> December 14, 2010 at 5:00 p.m. *(proposed)* |

**DEBTORS' MOTION FOR (I) ORDER (A) APPROVING BIDDING PROCEDURES
FOR THE SALE OF ALL OR SUBSTANTIALLY ALL OF DEBTORS' ASSETS, (B)
AUTHORIZING DEBTORS TO OFFER CERTAIN BID PROTECTIONS, AND (C)
SCHEDULING FINAL SALE HEARING AND APPROVING FORM AND MANNER OF
NOTICE THEREOF, AND (II) ORDER AUTHORIZING AND APPROVING (A) THE
SALE OF SUCH ASSETS FREE AND CLEAR OF LIENS AND OTHER INTERESTS
AND (B) THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS TO
<u>SUCCESSFUL BIDDER(S) AT AUCTION</u>**

McGinnis Land Partners I, LP and Canyon Falls Land Partners, LP, the debtors and debtors in possession in the above-captioned cases ("McGinnis", "Canyon Falls" and collectively, the "Debtors"), by and through their undersigned counsel, hereby submit this motion (the "Motion"), pursuant to sections 105(a), 363 and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), Rules 2002, 6006, 9008 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for (a) entry of an order (the "Bidding Procedures Order"), *inter alia*, (i) approving bidding procedures (the "Bidding Procedures") in connection with the sale of all or substantially all of the Debtors' assets; (ii) authorizing the Debtors to offer certain bidder protections; and (iii) scheduling a final sale hearing (the "Sale Hearing") to consider entry of an order approving the sale of the assets, and (v) approving the form and manner of notice of the auction for the assets (the "Auction") and the Sale Hearing (the "Sale Notice"); and (b) an order authorizing and approving (i) the sale of all or substantially all of the assets free and clear of liens, encumbrances and other interests, and (ii) subject to the terms of a successful bid(s) received and accepted at the Auction, the assumption and assignment of one or more executory contracts to the successful bidder(s) at the Auction.  In support of this Motion, the Debtors respectfully represent as follows:

## I.
## JURISDICTION

1.    This Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 1334 and 157(b).  This is a "core" proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (O).

2.    Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.    The statutory bases for the relief requested herein are Sections 105(a), 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6006, 9008 and 9014.

## II.
## BACKGROUND

### A.      Introduction

4.      On July 2, 2010 (the "<u>Petition Date</u>"), both of the Debtors filed a voluntary petition for relief pursuant to chapter 11 of title 11 of the Bankruptcy Code.

5.      The Debtors continue in possession of their properties and continue to operate and manage their business as debtors in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

6.      No request has been made for the appointment of a trustee or examiner, and a Committee of Creditors has not been appointed.

### B.      Factual Background

7.      The Debtors are each limited partnerships formed under the laws of the State of Texas on March 20, 2005.  Canyon Falls GP, LLC is the General Partner of both McGinnis and Canyon Falls.   HCREA Canyon Falls, L.P. is the Class A Limited Partner of each of the Debtors with a 50% partnership interest in each Debtor.  SSM Investors, L.P. ("<u>SSM</u>") is the Class B Limited Partner of each of the Debtors with a 49.9% partnership interest in each Debtor.  II Stephens/Canyon Falls, LLC is the Class C Limited Partner of Canyon Falls with a .1% partnership interest.  II Stephens/Falls Construction, LLC is the Class C Limited Partner of McGinnis with a .1% partnership interest.

8.      Originally, the Debtors owned two contiguous tracts of vacant land consisting collectively of approximately 1,245 acres in Denton County, Texas in the Towns of Flower Mound, Northlake and Argyle (the "<u>Property</u>").  The Property is planned to be developed for

both residential and commercial use and is more commonly known in the real estate development community as the "The Canyon Falls Development."

9. The Canyon Falls Development is a master planned community that has frontage along I-35W, Hwy 1171, Hwy 377 and access to FM 407. There are approximately 1,941 single family residences planned with an additional 100 acres of mixed use property that allows for a variety of commercial, retail, office and other uses. The Canyon Falls Development is divided by a 135 acre green belt that is a section of the Graham Branch Tributary located at the northern edge of Lake Grapevine. The green belt will be the centralized amenity of the development with miles of hiking and biking trails, multiple lakes and parks.

10. The architecture within The Canyon Falls Development will consist of a french country combined with an old european design. Hardscape construction will implement a wide variety of natural stones and rock formations. The main entry located at the southern end of The Canyon Falls Development at Hwy 1171 will include a $1,200,000 entry feature. The entry feature will include a large waterfall that feeds a small lake and a stream bed that will continue under the main parkway and terminate down in the green belt. The main parkway will continue along the green belt through large groves of oak trees that leads to the 23 lot model home park that sits above a large lake with two 25 foot fountains. The model home park is located directly across the street from a 10 acre amenity center that will include two large pools, a club house, playground and athletic courts. Throughout the entire Canyon Falls Development will be miles of hiking and biking trails that will give pedestrian access back to the amenity center and throughout the 135 acre green belt.

11. The Debtors' acquisition and initial development of the Property was financed through two separate loans with American Bank of Texas, secured by the Property. On June

4

16, 2010, American Bank of Texas sold, for the full face amount, and assigned all of its rights, title and interest in the two loans to SLF IV/Hanover Canyon Falls, L.P., (the "<u>Secured Lender</u>")[1]. The Secured Lender holds liens against the Property securing an aggregate debt obligation of approximately $19.38 Million (the "<u>Secured Lender Debt</u>")[2]. As of the Petition Date, the Secured Lender Debt was all due and payable.

12. On September 29, 2010, the Debtors intend to commence monthly interest payments to the Secured Lender, in the approximate amount of $62,757 (on the Canyon Falls obligation) and $5,189 (on the McGinnis obligation), for an aggregate of $67,946. As noted below (Section II.D.), the Debtors are concurrently filing a motion to borrow funds, on an unsecured basis, to fund the monthly interest payments to the Secured Lender, as well as having available funding for administrative obligations. The proposed borrowing, in the amount of $360,000, is sufficient to cover interest payments to the Secured Lender, through December 31, 2010.

13. Further, the Debtors anticipate the closing of the TxDOT Transaction and the Denton Easement Transaction (each as defined and addressed below – Section II.E.), in the next 45 days, and from which the net proceeds thereof will be paid to the Secured Lender, and applied against the Secured Lender Debt.

14. In July 2009, the Debtors obtained a collective appraisal of their entire property owned at the time, which resulted in an estimated value of $33.64 Million. As noted below

---

[1]    The Debtors understand and believe that SLF IV/Hanover Canyon Falls, L.P., acquired the interests of American Bank of Texas on June 16, 2010 (just 16 days prior to the Petition Date) by paying to American Bank of Texas, the full par amount, plus accrued and unpaid interest due and owing by the Debtors on the underlying notes, secured by the Property.

[2]    Nothing herein should be deemed or constructed to be the Debtors' acknowledgement that the alleged liens of the Secured Lender against the Property are valid and/or properly perfected. The Debtors take no position herein with respect to such issues. The question of the validity and extent of the alleged liens are the subject of an on going investigation by the Debtors and their counsel.

48467/0001-6948826v7

(Section II.C.), since the July 2009 appraisal, the Debtors have sold a portion of their land. Also as noted below (Section II.D), the Debtors have commissioned a new appraisal of the Property, and expect to have the same in September 2010.

## C.      Prepetition Sale Transactions

15.     Prior to the Petition Date, the Debtors sold to Argyle Independent School District ("AISD") a certain parcel of land containing approximately 108 acres (the "AISD Sold Property") for $8,124,675 (the "AISD Purchase Price"). $6,153,538.99 of the AISD Purchase Price (the "AISD Escrowed Funds") was established to fund an escrow with American Bank of Texas (the "Escrow Agent") pursuant to an Improvement and Escrow Agreement dated November 17, 2009, among Canyon Falls, AISD and the Escrow Agent (the "Escrow Agreement").

16.     Also prior to the Petition Date, the Debtors sold a portion of the Property to Denton County, Texas ("Denton") containing approximately 5 acres (the "Denton Sold Property," which together with the AISD Sold Property are collectively referred to as the "Sold Property"). Denton funded an escrow in the amount of $490,699 (the "Denton Escrowed Funds," which together with the AISD Escrowed Funds are collectively referred to as the "Escrowed Funds") with the Escrow Agent pursuant to an Improvement and Escrow Agreement dated March 25, 2010 among Canyon Falls, Denton and the Escrow Agent (the "Denton Escrow Agreement," which together with the AISD Escrow Agreement are collectively referred to as the "Escrow Agreements").

17.     Pursuant to the Escrow Agreements, Canyon Falls agreed to make certain improvements to the Sold Property as identified in the Escrow Agreements using the Escrowed Funds in accordance with an agreed-upon budget (the "Budget"). The Budget is the maximum

amount of money Canyon Falls is obligated to spend on the improvements and Canyon Falls is entitled to receive any remaining AISD Escrowed Funds after all improvements are made. The Debtors are hopeful that the costs and expenses relating to the improvements will be less than the AISD Escrowed Funds and thus the Debtors will receive the net remaining funds. While clearly not a certainty, the Debtors estimate that such amount could exceed $250,000, which amount is free and clear (not subject to the liens of the Secured Lender). Denton is entitled to receive any funds remaining from the Denton Escrowed Funds after all improvements are made.

18.     Canyon Falls contracted with SSM[3] to supervise and manage the planning, design and construction of the improvements[4]. More specifically, the engineering plans and specifications for the improvements have been completed (the "<u>Improvement Plans</u>").

19.     SSM and the Debtors circulated the Improvement Plans to various contractors, and established a bid deadline of August 16, 2010. The bids sought in connection with the Improvement Plans include seeking contractors for: (i) excavation, (ii) sanitary sewer lines, (iii) water lines, (iv) drainage lines, (v) paving of roads and easements, (vi) erosion control, and (vii) landscaping.

20.     SSM and the Debtors' project engineer have and continue to reviewed approximately 13 separate bids received in connection with the Improvement Plans, and anticipate awarding, in the next 30 days, subject to Bankruptcy Court approval, various contracts to implement the Improvement Plans.

---

[3]     SSM is the Class B Limited Partner of each of the Debtors.

[4]     The agreements by and between Canyon Falls and SSM are executory contracts. This Motion addresses executory contracts in Section IV.C., below.

48467/0001-6948826v7

21.     The Debtors anticipate construction pursuant to the Improvement Plans to commence early October 2010, and have an expected completion date of June 2011.

**D.      Existing Orders of the Court and Other Relief Requested**

22.     Filed concurrently herewith is the Debtors' Application to employ John Blackburn and Lane Bennett Partners, as Real Estate Broker to assist the Debtors in marketing the Property (the "Real Estate Broker").  The procedures, timelines and structures proposed in this Motion have been discussed with and are supported by the Real Estate Broker as being reasonable and designed to be in the best interests of the Debtors' estates' and their stakeholders.

23.     Filed concurrently herewith is the Debtors' Application to employ Steve Kaplan and Steve Kaplan, PC, as the Debtors' special real estate counsel, to assist in, *inter alia*, the transactions addressed in this Motion (the "Real Estate Counsel").

24.     On August 4, 2010, the Court entered its Order Approving and Authorizing the Debtors' employment of Cole, Schotz, Meisel, Forman & Leonard, P.A., as counsel to the Debtors (the "Bankruptcy Counsel").

25.     On August 13, 2010, the Court entered its Order Approving and Authorizing the Debtors' employment of the Butler Berger Group, as Real Estate Appraiser for the Debtors (the "Real Estate Appraiser").

26.     In connection with the Debtors' proposed marketing of the Remaining Property (as defined and addressed below – Section II.F.) and the sale procedures, timelines, and structures, all as more fully discussed below, the Debtors have consulted with and utilized the advice and guidance, of the Real Estate Broker, the Real Estate Appraiser, the Bankruptcy Counsel, and the Real Estate Counsel (collectively, the "Debtors' Professionals").

48467/0001-6948826v7

27.     Also filed concurrently herewith is the Debtors' Motion to borrow, on an unsecured basis, funds to cover, *inter alia*, interest payments to the Secured Lender, and administrative obligations.  The proposed borrowing, in the amount of $360,000, is sufficient to cover interest payments to the Secured Lender, through December 31, 2010, plus anticipated administrative obligations.

**E.     Pending Post-Petition Sale Transactions**

28.     Filed concurrently herewith is the Debtors' Motion to grant an easement to a portion of the Property to Denton for approximately $306,000 (the "Denton Easement Transaction").  As noted in such motion, the easement is to be granted to Denton for use in connection with the Graham Branch Regional Sanitary Sewer System that will provide service to, *inter alia*, the Debtors' Property.  The Debtors anticipate that the closing of the Denton Easement Transaction could occur within 45 days hereof.

29.     The Debtors anticipate filing in the very near future a Motion to sell approximately 2.3 acres of the Property to the Texas Department of Transportation ("TxDOT") (the "TxDOT Transaction").  The acreage proposed to be sold to TxDOT is for right of ways to augment roadways in, around and contiguous to the Property.  The Debtors anticipate that the closing of the TxDOT Transaction could occur within 45 days hereof.

30.     In connection with the TxDOT Transaction and the Denton Easement Transaction, the Debtors propose that the net proceeds to be received by the Debtors will be paid to the Secured Lender, concurrent with the closing of such transaction.

48467/0001-6948826v7

**F.** **Proposed Sale of Remaining Property**

31.     The Debtors have determined that a sale of the Property, less (i) the Sold Property (as addressed in Section II.C.), (ii) the acreage in connection with the TxDOT Transaction, and (iii) the easement to be granted pursuant to the Denton Easement Transaction (hereinafter, the "Remaining Property") is in the bests interests of the Debtors and their stakeholders. The Debtors' believe that a significant amount of equity, over and above the amount of the Secured Lender Debt, exists in the Remaining Property. Such equity is best maximized, preserved and realized by a sale of the Remaining Property, as structured below.

32.     The Debtors have also determined, in their business judgment, in consultation with the Debtors' Professionals, that the equity is best maximized, preserved and realized by soliciting bids for a "stalking horse" purchaser and then conducting an auction to sell the Remaining Property to the bidder making the highest or otherwise best bid. The Debtors have had productive discussions with at least two possible bidders, each interested in a significant portion of the Remaining Property, but have not been able to reach an acceptable agreement yet with either one. The Debtors are hopeful that they will reach an acceptable agreement to sell some portion or all of the Remaining Property to one of the current interested entities. However, given the Debtors' belief that now is the time to sell the Remaining Property and certain liquidity and other concerns, the Debtors wishes to put in place a sale process that will permit them to either (1) enter into an agreement with one of the current parties as a stalking horse or, in the alternative and in the event that such an agreement cannot be accomplished in the near future, (2) conduct an open auction process.

33.     While the Debtors' currently believe that a sale structure as provided for in this Motion is in the best interest of the Debtors' and their stakeholders. The Debtor's continue other alternatives including restructuring their financial affairs pursuant to a plan of reorganization.

Further, as the sale process progresses the Debtor's will continue to evaluate other options including incorporating the sale into a plan of reorganization.

34. The Debtors propose the following timeline to effectuate the sale transaction(s) contemplated herein, subject to the Court's availability and wishes:

| Event | Date[5] |
|---|---|
| Hearing to approve Bid Procedures | September 9, 2010 @ 9:30 a.m. |
| Deadline to File & Serve Notice of Proposed Cure Amounts | September 23, 2010 |
| Deadline to File & Serve Motion Objecting to Credit Bid Right | October 26, 2010 |
| Deadline to File & Serve Response to Motion Objecting to Credit Bid | November 10, 2010 @ 5:00 p.m. |
| Hearing on Motion Objecting To Credit Bid | November 12, 2010 @ 10:00 a.m. |
| Due Diligence Period Ends for Potential Buyers | November 30, 2010 @ 12:00 p.m. |
| Deadline for Potential Buyers to submit Bids | December 1, 2010 @ 10:00 a.m. |
| Deadline to Notify Potential Buyers of Baseline Bid | December 6, 2010 @ 10:00 a.m. |
| Auction | December 9, 2010 @ 10:00 a.m. |
| Deadline to File & Serve Notice of "Highest and Best" Bid(s) | December 10, 2010 @ 5:00 p.m. |
| Deadline to File & Serve Objections to Motion to Sell | December 14, 2010 @ 5:00 p.m. |
| Hearing on Motion to Sell | December 16, 2010 @ 10:00 a.m. |
| Deadline to Close sale(s) transaction | December 28, 2010 @ 9:00 a.m. |

35. The Debtors seeks authority to conduct an auction for all types of bids (each, a "Bid") for all or substantially all of the Remaining Property, including, but not limited to, Bids for specific legally identifiable parcels of the Property. A copy of the prepared form of Bidding Procedures Order for the Remaining Property is attached as **Exhibit A** and is incorporated herein. The Debtors, with the assistance of the Debtors' Professionals, have already begun to solicit expressions of interest in the Remaining Property.

36. The Debtors also recognize that in the event the Successful Bidder's winning bid contemplates an assumption and assignment of any executory contract to the successful Bidder,

---

[5] These dates are subject to change by the Bankruptcy Court; and all stated times are Central Time.

the Debtors must satisfy their obligations under Section 365 of the Bankruptcy Code. Any order approving the Bid Procedures shall, therefore, also accommodate the requirement for the Debtors to supply any affected contract counter-parties with notice of the identity of the Successful Bidder, and the ability of the Successful Bidder to provide adequate assurance of future performance, as well as the ability of any affected party to conduct expedited discovery with respect thereto. Between the filing of this Motion and the hearing to be held in connection with the approval of the Bid Procedures, the Debtors intend to formulate procedures that address each of these issues.

## III.
## GROUNDS FOR APPROVAL OF THE MOTION

**A.** **Section 363(b) of the Bankruptcy Code Authorizes the Sale of Remaining Property Under the Circumstances Present Here**

37. Pursuant to Section 363 of the Bankruptcy Code, a debtor in possession may sell property of its estate outside of the ordinary course of its business, subject to the approval of the court after notice and a hearing. See, 11 U.S.C. § 363(b)(1). In the Fifth Circuit and elsewhere, it is well settled that a decision to sell assets outside the ordinary course of business, prior to confirmation of a plan, be based upon the sound business judgment of the debtor. See, In re Continental Air Lines, Inc., 780 F.2d 1223 (5th Cir. 1986), Richmond Leasing Co. v. Capital Bank, N.A., 762 F.2d 1303, 1311 (5th Cir. 1985). See, e.g., In re Martin, 91 F.3d 389 (3d Cir. 1996), citing, In re Schipper, 933 F.2d 513 (7th Cir. 1991); Stephens Indus., Inc. v. McClung, 789 F.2d 386 (6th Cir. 1986); In re Lionel Corp., 722 F.2d 1063 (2d Cir. 1983); Licensing By Paolo, Inc. v. Sinatra (In re Gucci), 126 F.3d 380, 387 (2d Cir. 1997) ("A sale of a substantial part of a Chapter 11 estate may be conducted if a good business reason exists to support it."); Comm. of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071

12

(2d Cir. 1983); In re Chateaugay Corp., 973 F.2d 141, 143 (2d Cir. 1992); Stephens Indus. v. McClung, 789 F.2d 386, 390 (6th Cir. 1986) ("bankruptcy court can authorize a sale of all a Chapter 11 Debtor's assets under [section] 363(b)(1) when a sound business purpose dictates such action."); Comm. of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.), 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) ("Where the Debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the Debtor's conduct.").

38.     Courts typically consider the following four factors in determining whether a proposed sale satisfies this standard:

    (a)    whether a sound business justification exists for the sale;

    (b)    whether adequate and reasonable notice of the sale was given to interested parties;

    (c)    whether the sale will produce a fair and reasonable price for the property; and

    (d)    whether the parties have acted in good faith.

See, e.g., In re Weatherly Frozen Food Group, Inc., 149 B.R. 480, 483 (Bankr. N.D. Ohio 1992); In re Delaware & Hudson Ry. Co., 124 B.R. 169, 176 (D. Del. 1991).

39.     Here, each of these four factors is satisfied. First, sound business reasons exist for the Debtors' efforts to sell all or substantially all of the Remaining Property in the proposed manner. The Debtors and the Debtors' Professionals have analyzed the viable options for the Remaining Property and determined for a number of reasons that a sale of the Remaining Property is in the best interest of the Debtor's and their stakeholders. Notwithstanding the foregoing, a plan of reorganization, including one that includes a sale structure of some or all of the Remaining Property is an option that continues to be explored. Notwithstanding the foregoing and to facilitate the reorganization of the Debtors' financial affairs, the Debtors have

determined that a sale of some or all of the Remaining Property should be explored.  Second, as discussed elsewhere in this Motion, the Debtors will be providing adequate and reasonable notice of the opportunity to bid on the Remaining Property and of the opportunity to object to the sale of the Remaining Property to all interested parties.  See, e.g., Folger Adam Security Inc. v. DeMatteis/MacGregor, 209 F.3d 252, 265 (3d Cir. 2000) (stating that notice is sufficient if it includes "the time and place of any public sale, the terms and conditions of any private sale, states the time for filing objections and, if real estate is being sold, provides a general description of the property"); In re WBQ Partnership, 189 B.R. 97, 103 (Bankr. E.D. Va. 1995) ("'notice is sufficient if it includes the terms and conditions of the sale, if it states the time for filing objections, and if the estate is selling real estate, it generally describes the property'") (quoting In re Karpe, 84 B.R. 926, 929 (Bankr. M.D. Pa. 1988)).  Third, the Bidding Procedures proposed herein will provide for an open and competitive bidding process for the Remaining Property.  Fourth, the Debtors are proceeding in good faith and will make a showing at the Sale Hearing that the purchaser or purchasers of the Remaining Property have acted in good faith.

**B.**     **Sale of the Debtors' Remaining Property Should be Free and Clear of Liens**

40.     Pursuant to Section 363(f) of the Bankruptcy Code, a debtor in possession may sell property "free and clear of any interest in such property of an entity other than the estate" if any one of the following conditions is satisfied:

(a)     applicable non-bankruptcy law permits the sale of such property free and clear of such interest;

(b)     such entity consents;

(c)     such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(d)     such interest is in bona fide dispute; or

14

      (e)      such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

41. To facilitate the sale of the Remaining Property, the Debtors proposes that the liens, claims and encumbrances, including those of the Secured Lender, asserted against the Remaining Property be transferred, and attach, to the sale proceeds received by the Debtors. All liens on the Remaining Property will be satisfied or will attach to the proceeds of the sale of the Remaining Property with the same force, effect and priority as such liens have on the Remaining Property, subject to the rights and defenses, if any, of the Debtors and any party in interest with respect thereto. Accordingly, the Debtors submit that the sale of the Remaining Property free and clear of liens, claims and encumbrances satisfies the statutory prerequisites of Section 363(f) of the Bankruptcy Code.

42. Notwithstanding the Debtors' proposal that liens, claims and encumbrances shall attach to the proceeds of sale, to the extent that prior to the closing of the sale transactions, the Debtors' and the Secured Lender agree pursuant to an order of the Court, that a portion of the proceeds of the sale can be paid to the Secured Lender concurrent with closing the same will be incorporated into the order approving the sale transactions.

48467/0001-6948826v7

**IV**.

**THE COURT SHOULD AUTHORIZE THE DEBTORS' IMPLEMENTATION
OF THE BID SOLICITATION AND SALE PROCESS**

**A.      The Proposed Bid Procedures Are Appropriate In the Circumstances.**

43.      In view of the above-described circumstances, the Debtors requests that the Court approve its proposed Bidding Procedures for the Remaining Property, in substantially the form annexed hereto as **Exhibit C** and incorporated herein, with a final sale hearing to occur on or before December 16, 2010, as the Court's calendar may permit[6].   The salient terms and provisions of the Bidding Procedures are summarized below and should be read and considered in conjunction with the timetable outlined in Paragraph 34 above:

a      Qualification.  In order to perform due diligence and be allowed to submit a bid for all or substantially all of the Remaining Property, a party expressing an interest in the offered Remaining Property (a "Potential Bidder") must provide to the Debtors:  (a) an executed confidentiality agreement in form and substance satisfactory to the Debtors, and (b) a statement demonstrating to the Debtors' satisfaction a bona fide interest in purchasing all or substantially all of the Remaining Property and describing the Potential Bidder's proposed transaction.  A Potential Bidder that satisfies these requirements will become a "Qualified Bidder".

b      Bid Requirements.   A Bid is a signed letter from a Qualified Bidder offering to purchase all or substantially all of the Remaining Property that is not subject to any due diligence contingency and is irrevocable until two (2) business days after the earlier of (a) the closing of the sale of the applicable Remaining Property, whether or not the sale is to such Qualified Bidder or (b) 45 days after the conclusion of the Sale Hearing.

c      Required Supporting Materials.  A Qualified Bidder shall accompany its Bid with:

•      an asset purchase agreement (including a blacklined version showing all proposed changes to the Debtors' proposed form of agreement, copies of which will be filed prior to the Bidding Procedures Hearing), and other deal documentation detailing all of the terms and conditions of the proposed transaction;

---

[6]      The proposed form of Bidding Procedures Order contains proposed dates from the Debtors.  These dates are subject to the approval by, and availability of, the Court and are subject to change.

48467/0001-6948826v7

- written evidence of available cash, a commitment for financing or ability to obtain a satisfactory commitment if selected as the Successful Bidder (as defined in the Bidding Procedures Order), and such other evidence of ability to consummate the transaction as the Debtors may reasonably request;

d    <u>Good Faith Deposit</u>.  In order to participate in the Auction a Qualified Bidder must accompany its bid with a good faith deposit equal to 5% of the cash purchase price offered in the form of a wire transfer or certified or cashier's check.  If the Secured Lender is entitled to Credit Bid (as addressed below), the Secured Lender will not be required to submit a Good Faith Deposit.

e    <u>Baseline Bid</u>.  As soon as practicable after the Bid Deadline, the Debtors may select the bid or bids that will serve as the "Baseline Bid" for the Auction, and may file with the Court a notice of the Debtors' selection of the Baseline Bid (or Bids) for the Auction.  The Baseline Bid may be the Stalking Horse Bid, if the Debtors elect to proceed with a Stalking Horse bidder (as addressed below – Section IV.F.).

f    <u>Bidding at the Auction</u>.  The Debtors retain discretion with respect to how to conduct the Auction if bids are received on differing packages or configurations of the Remaining Property.

g    <u>Bidding Increment</u>.  The minimum Bidding Increment at the Auction shall be announced at the commencement of the Auction and shall be in such amount as the Debtors, in consultation with the Secured Lender and the Debtors' Professionals, determine, in the Debtors' discretion, is appropriate.  If the Debtors have entered into any agreement to provide a Qualified Bidder with a Break-up Fee (as defined below), the Qualified Bidder shall be entitled to credit bid the amount of its Break-up Fee at the Auction.

h    <u>Selection of Highest or Best Bid</u>.  The Debtors, after consultation with the Secured Lender and the Debtors' Professionals, will determine, in the Debtors' discretion, which Bids should be selected as the highest or otherwise best Bid or Bids.

i    <u>Return of Deposits</u>.  The Good Faith Deposit of a Qualified Bidder shall be returned within three (3) business days of the earlier of (a) the closing of a sale transaction on the portion of the Remaining Property on which the Qualified Bidder made a bid or (b) 45 days after the Sale Hearing.

44.    The Bidding Procedures set forth a flexible process by which the Debtors will be soliciting bids for all or a portion of the Remaining Property.  This flexible process will allow

the Debtors to maximize the value of the Remaining Property given the liquidity constraints and accompanying time pressure the Debtors currently face.

45.     The Debtors expressly reserve the right, after consultation with the Secured Lender and the Debtors' Professionals, in their discretion, to modify the relief requested in this Motion prior to or at the applicable Hearings, including modifying the proposed Bidding Procedures.  Moreover, the Debtors reserve the right to adjourn the Auction or the Sale Hearing or remove any portion of the Remaining Property, from the sale process if the Debtors determine, upon consultation with the Secured Lender and the Debtors' Professionals, in their discretion, that such action will maximize value to their estates for the benefit of all interested stakeholders.

**B.      The Court Should Authorize the Debtors to Offer a Break-Up Fee**

46.     The Debtors have determined, in their reasonable business judgment, that a sale of the Remaining Property at this time, even without a traditional "stalking horse" bidder, is warranted, and indeed, necessary.  The Debtors, however, request that they be authorized in their discretion to enter into an agreement that provides a bidder who is willing to serve as a stalking horse bidder a break-up fee of up to 3%, at the Debtors' discretion, of the guaranteed value offered by such stalking horse bidder in its Bid (the "Break-Up Fee").  In the event that the Debtors agree to a Break-Up Fee, and the successful Bidder is the Secured Lender (rather than the entity to which the Debtors agreed to provide a Break-Up Fee) pursuant solely to a Credit Bid (as opposed to an all cash Bid or a Bid consisting of part cash and part Credit Bid, and assuming the Secured Lender is entitled to make a Credit Bid), the Break-Up Fee will not be paid by the Debtors or the estates (and no administrative obligation will be created), and any agreement by the Debtors to pay a Break-Up Fee will provide the same.

18

47.     The ability of the Debtors to offer potential purchasers bidding protections is beneficial to the Debtors' estates and stakeholders because the Debtors can provide the incentive required to induce a bidder to submit or increase its Bid prior to the Auction.  The ability to offer the Break-Up Fee may induce bids for some or all of the Remaining Property that would not otherwise be made.  In addition, to the extent Bids can be improved prior to the Auction, a higher floor is established for further bidding at the Auction.  Thus, even if a Qualified Bidder is awarded a Break-Up Fee, and that Qualified Bidder is not a winning bidder, the Debtors and their estates will have benefited from the higher floor established by such Bid.  The Debtors will exercise prudent business judgment before offering or agreeing to any bidding protection and will only do so if such protection, in the reasonable business judgment of the Debtors, will likely result in the realization of greater value for the Debtors and their estates.  The Debtors will address the incremental bidding at the Auction to take into account any Break-Up Fee agreed to such that the Break-Up Fee is consumed or *covered* by the incremental increase in Bids.

48.     Break-up and other termination fees are a normal, and in some cases necessary, component of sales outside the ordinary course of business under Section 363 of the Bankruptcy Code.  See, In re ASARCO LLC, Case No. 05-21207 (RSS) (Bankr. S.D. Tex. July 1, 2008).  See, e.g., In re Integrated Resources, Inc., 147 B.R. 650, 660 (S.D.N.Y. 1992) (noting that Break-up fees may be legitimately necessary to convince a single "white knight" to enter the bidding by providing some form of compensation for the risk it is undertaking); In re Financial News Network, Inc., 126 B.R. 152 (S.D.N.Y. 1991), *appeal dismissed*, 931 F.2d 217 (2d Cir. 1991); In re Crowthers McCall Pattern, Inc., 114 B.R. 877, 879 (Bankr. S.D.N.Y. 1990) (Break-up fees in merger agreement approved); In re 995 Fifth Ave. Assoc., L.P., 96

B.R. 24, 28-9 (Bankr. S.D.N.Y. 1989) (payment of $500,000 Break-up fee to outbid contract vendee following sale of debtor's property was not unreasonable absent evidence that fee chilled bidding).

49.     In considering whether to approve a break-up fee, courts generally consider the following three factors:  (i) the relationship between the initial bidder and the seller; (ii) whether the fee is designed to encourage bidding; and (iii) the size of the fee in relation to the purchase price.  See In re Integrated Resources, 147 B.R. at 657-63.

50.     Some courts have decided that an application for a break-up fee, should not be treated any differently from other applications for administrative expenses under Section 503(b)(1)(A).  These courts hold that the determination of whether Break-up fees or expenses are allowable under Section 503(b)(1)(A) is made in reference to general administrative expense jurisprudence, and "depends upon the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate."  Calpine Corporation v. O'Brien Environmental Energy, Inc. (In re O'Brien Environmental Energy, Inc.), 181 F.3d 527, 532 (3d Cir. 1999).

51.     This prong of the analysis can be presumed in a sale situation between the debtor and a third party.  The O'Brien court stated, "[w]e assume that bidding at the sale of O'Brien's assets constituted a transaction with the debtor-in possession for purposes of § 503(b)(1)(A)."  Id. at 533.  Similarly, bidding at a sale of the debtor's assets, where the seller is the debtor-in-possession, constitutes a transaction that may entitle a party to an administrative expense.

52.     In examining the break-up fee at issue in O'Brien, the bankruptcy court identified nine (9) factors that it viewed as relevant in making its Break-up fee determination.  While not expressly adopting the factors considered by the bankruptcy court as a "test" for all break-up

fee determinations, the Third Circuit nevertheless considered those same factors.  O'Brien, 181

F.3d at 536.  The bankruptcy court's nine O'Brien factors are as follows:

a.  the relationship of the parties who negotiated the break-up fee;
b.  effect of break-up fee on bidding;
c.  reasonableness of amount of the break-up fee;
d.  importance of fee to competitive bidding;
e.  will the fee serve to attract other bidders;
f.  maximization of value to debtors' estates;
g.  creditor support for the break-up fee;
h.  availability of safeguards; and
i.  impact on unsecured creditors.

53.    Given the relatively short due diligence period that parties will have in these

cases, any stalking horse will likely expend substantial resources in negotiating a stalking horse

agreement and performing due diligence on an expedited basis.  Approval of a break-up fee in

connection with the sale of significant assets in a situation such as the Debtors face here is an

established practice that will facilitate the Debtors' efforts to assure a sale to a contractually-

committed bidder at a price(s) the Debtors believe is fair, while at the same time providing the

Debtors with the potential of even greater benefit to the estates.

54.    A break-up fee which constitutes a fair and reasonable percentage of the proposed

purchase price and which is reasonably related to the risk, effort, and expenses of the

prospective purchaser is generally permissible.  See, e.g., In re 995 Fifth Ave. Assoc., 96 B.R.

at 28.  Accord In re Integrated Resources, Inc., 147 B.R. at 662 (Break-up fee reasonable

percentage of proposed purchase price and in accord with industry averages).

55.    In the present case, the Break-Up Fee payable in the event that a stalking horse

bidder is outbid at the Auction would not exceed 3% of the projected guaranteed value of the

stalking horse's bid.  This percentage is of the same order of magnitude as break-up fees

approved in other cases.  See e.g., In re VarTec Telecom, Inc., Case No. 04-81694 (SAF)

(Bankr. N.D. Tex., November 23, 2004 and April 15, 2005) (court approved a break-up fee of

21

approximately 3% with respect to two sales of assets); <u>In re Ameriserve</u>, Case No. 00-0358 (PJW) (Bankr. D. Del., September 27, 2000) (Court approved a break-up fee of 3.64% or $4,000,000 in connection with $110,000,000 sale); <u>In re Montgomery Ward Holding Corp., et al.</u>, Case No. 97-1409 (PJW) (Bankr. D. Del., June 15, 1998) (Court approved termination fee of 2.7%, or $3,000,000, in connection with $110,000,000 sale of real estate assets); <u>See</u>, <u>e.g.</u>, <u>Consumer News & Business Channel Partnership v. Financial News Network, Inc.</u> (<u>In re Financial News Network, Inc.</u>), 980 F.2d 165, 167 (2d Cir. 1992) (noting without discussion $8.2 million Break-up fee on $149.3 million transaction (5.5% of consideration offered)); <u>Cottle v. Stores Communications</u>, 849 F.2d 570, 578-79 (11th Cir 1988) (approving $29 million fee on $2.5 billion transaction, 1.16%); <u>see</u> <u>also</u> <u>LTV Aerospace & Defense Co. v. Thomson-CSF, S.A.</u> (<u>In re Chateugay Corp.</u>), 1998 B.R. 848, 861 (S.D.N.Y. 1996) (enforcing $20 million "reverse Break-up fee" payable to debtor on $450 million offer (4.4% of consideration)). The Debtors believe that the ability to offer a Break-Up Fee to induce a Qualified Bidder to submit a significant and valued Bid in advance of the Auction, and thereby establish a committed baseline, or floor, upon which all other Bids can be compared and evaluated, is beneficial to the Debtors' estates and thier stakeholders. If any such Break-Up Fee is ultimately payable to a stalking horse bidder -- by definition, because the Debtors have received a higher or otherwise better offer and have closed on a superior transaction -- the stalking horse's bid will have benefited the estates, particularly in the context of the total consideration received.

56. The Debtors submit that the proposed Break-up Fee will not chill bidding and is reasonable and therefore meets the requirements of the business judgment rule, as well as the Third Circuit's standards as set out in <u>O'Brien</u>. The Debtors also submit that granting prospective authority to provide the Break-up Fee is appropriate given the expedited nature of

the auction process in these cases, as the Debtors may not have a sufficient time and ability to obtain a separate, subsequent Court order approving an agreement to provide a Break-up Fee between the time such an agreement is reached and the Bid Deadline.

57.     Finally, as noted in Paragraph 45 above, in the event that the Secured Lender is the successful purchaser, pursuant to a Credit Bid, the Secured Lender will not have to *come out of pocket* with a cash payment to the Debtors to pay the Break-Up Fee, nor will the Debtors' estates incur or create an administrative obligation.

## C.     <u>Assumption and Assignment of Executory Contracts</u>

58.     To facilitate and effectuate the sale(s) of the Remaining Property, depending upon the terms of any successful bid(s) received and accepted at the Auction, the Debtors may also seek to assume and assign certain executory contracts to the purchaser(s) of the Remaining Property to the extent required by a Successful Bid(s) at the Auction.

59.     Section 365 of the Bankruptcy Code authorizes a debtor to assume and/or assign their executory contracts subject to the approval of the Court:

> (a) Except as provided in . . . subsections (b), (c), and (d) of this section, the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtors.
>
> (b)(1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee:
>
> (A) cures, or provides adequate assurance that the trustee will promptly cure, such default other than a default that is a breach of a provision relating to the satisfaction of any provision (other than a penalty rate or penalty provision) relating to a default arising from any failure to perform non-monetary obligations under an expired lease of real property, if it is impossible for the trustee to cure such default by performing non-monetary acts at and after the time of assumption, except that if such default arises from a failure to

operate in accordance with a nonresidential real property lease, then such default shall be cured by performance at and after the time of assumption in accordance with such lease, and pecuniary losses resulting from such default shall be compensated in accordance with the provisions of this paragraph;

(B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

(C) provides adequate assurance of future performance under such contract or lease. . . .

(f)(2) The trustee may assign an executory contract or unexpired lease of the debtor only if —

(A) the trustee assumes such contract or lease in accordance with the provisions of this section; and

(B) adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

See 11 U.S.C. §§ 365(a), (b)(1), (f)(2). Accordingly, Section 365 of the Bankruptcy Code authorizes the proposed assumptions and assignments of executory contracts, provided that the defaults under such contracts are cured and adequate assurance of future performance is provided.

60. It is well settled that the meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but that a contract counterparty is not required to receive an absolute guarantee of future performance. See, e.g., In re: PRK Enterprises, Inc., 235 B.R. 597 (Bankr. E.D. Tex. 1999); In re Glycogensys, Inc., 352 B.R. 568, 578 (Bankr. D. Mass. 2006) ("[I]t is appropriate to evaluate the financial condition of the assignee and the likelihood that the non-Debtor party will receive the benefit of its bargain from the assignee"); Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.), 103 B.R. 524, 538 (Bankr. D.N.J. 1989) (adequate assurance of future performance does not mean absolute assurance that Debtors will thrive and pay rent); In re Natco Indus., Inc., 54 B.R. 436, 440

24

(Bankr. S.D.N.Y. 1985) (same). As set forth above, any Bid that is conditioned upon the assumption and assignment of executory contracts must (a) be submitted with adequate assurance packages containing the identity of such contracts and (b) provide evidence of such bidder's ability to provide adequate assurance of future performance under Section 365 of the Bankruptcy Code. The Debtors will provide all parties to executory contracts to be assumed and assigned pursuant to the Sale Motion with such adequate assurance packages and an opportunity to be heard, and in connection with the Sale Hearing, the Debtors will provide evidence that all requirements for the assumption and assignment of the executory contracts proposed to be assigned to the purchaser(s) of the assets will be satisfied. Thus, the Debtors respectfully submit that, by the conclusion of the Sale Hearing, assumption and assignment of the executory contracts should be approved.

## D. The Court Should Fix a Deadline to Object to (i) the Assumption and Assignment of Executory Contracts and (ii) the Cure Amounts as Set Forth in a Cure Schedule

61. In connection with the assumption and assignment of executory contracts, pursuant to any sale transactions for the Remaining Property, the Debtors believe it is necessary to establish a process by which the Debtors and the counterparties to executory contracts that will be assumed can establish the cure obligations, if any, to be paid in accordance with Section 365 of the Bankruptcy Code and for the counterparties of such assumed contracts to assert any objection they may have to the assumption and assignment of same. As soon as practicable, but no later than September 23, 2010, the Debtors will file a schedule of such cure obligations (the "Cure Schedule") with the Court and serve such schedule by first class mail on the parties to executory contracts that may be assumed and assigned in connection with a sale of the Remaining Property. The Debtors propose that any objections (other than objections to

adequate assurance of future performance for executory contracts to be assumed and assigned pursuant to a Successful Bid) to the assumption and assignment of any executory contract identified on the Cure Schedule, must be in writing, filed with the Court, and be actually received on or before December 14, 2010, at 5:00 p.m. (Central Time) upon those parties identified for receipt of such notice in the Bidding Procedures Order (including the Debtors' Counsel and the Secured Lender's Counsel, collectively, the "Notice Parties").

62.    The Debtors request that any party failing to object to the proposed transactions be deemed to consent to the treatment of their executory contract or unexpired lease under Section 365 of the Bankruptcy Code (including the proposed cure amount) and this Sale Motion.  See Hargrave v. Twp. of Pemberton (In re Tabone, Inc.), 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (by not objecting to sale motion, creditor deemed to consent); Pelican Homestead v. Wooten (In re Gabeel), 61 B.R. 661, 667 (Bankr. W.D. La. 1985) (same).  Moreover, the Debtors request that each such party be deemed to consent to the assumption and assignment of its executory contract notwithstanding any anti-alienation provision or other restriction on assignment.  See 11 U.S.C. §§ 365(c)(1)(B), (e)(2)(A)(ii), and (f).

**E.    The Debtors' Proposed Form and Manner of Notice of the Auction and Sale Hearing is Appropriate**

63.    Pursuant to Bankruptcy Rule 2002(a), the Debtors are required to provide their creditors with 21 days' notice of the Sale Hearing.  Pursuant to Bankruptcy Rule 2002(c), such notice must include the date, time and place of the Auction and the Sale Hearing, and the deadline for filing any objections to the relief requested herein.

64.    Courts have held that the notice of a proposed sale of all of the assets of the estate should "(a) place all parties on notice that the debtor is liquidating his business; (b) disclose

accurately the full terms of the sale; (c) explain the effect of the sale as terminating the debtor's ability to continue in business; and (d) explain why the proposed price is reasonable and why the sale is in the best interest of the estate." <u>Delaware & Hudson Ry.</u>, 124 B.R. at 180; <u>accord In re Naron & Wagner, Chartered</u>, 88 B.R. 85, 88 (Bankr. D. Md. 1988).

65.     The proposed form of the Sale Notice (attached hereto as **<u>Exhibit D</u>**) includes, among other things, the date, time and place of the Auction and the Sale Hearing and information for how to learn the deadline for filing any objections to the relief requested herein once they are set by the Court, and, therefore, complies with Bankruptcy Rule 2002(c).  Subject to approval of the Court, it is the Debtors' intention to serve the Sale Notice, on all creditors and the other parties in interest within three (3) business day after entry of the Bidding Procedures Order. The Sale Notice also includes instructions for how to obtain a copy of this Sale Motion and the Bidding Procedures Order.

66.     The Debtors submit that the methods of notice described herein comply fully with Bankruptcy Rules 2002 and 9006 and constitute good and adequate notice of the proposed Bidding Procedures and the sale of its Remaining Property.  Therefore, the Debtors respectfully request that this Court approve the proposed notice procedures.

**F.     The Secured Lender's Credit Bid Right**

67.     Pursuant to Section 363(k) of the Bankruptcy Code, absent an Order of the Court to the contrary, the Secured Lender is afforded the right to *credit bid* at the Auction with respect to its collateral.

68.     Section 363(k) of the Bankruptcy Code provides:

> At a sale under subsection (b) of this section of property that is subject to a lien that secured an allowed claim, unless the court for cause orders otherwise the holder of such claim may bid at such sale, and, if the holder of such claim

purchases such property, such holder may offset such claim against the purchase price of such property.

69.     As of the date of this Motion the Debtors have not completed an analysis of the validity, priority or extent of the Secured Lenders liens, encumbrances or the Secured Lender Debt.  Thus, the Debtors reserve the right to assert an objection to the Secured Lender's right to credit bid pursuant to Section 363(k) of the Bankruptcy Code.

70.     As noted in the proposed timetable in Paragraph 34 above, the Debtors will file any such objection to the Secured Lender's right to credit bid, no later than October 26, 2010, and propose a response date to any such objection of November 10, 2010, with a hearing, if such an objection is filed, on November 12, 2010 (subject to the Court's calendar).

71.     With a proposed Bid deadline of  November 30, 2010, the foregoing schedule to address the Secured Lender's credit bid right, is preserved and consistent with providing the Secured Lender the timely right to credit bid.

72.     If the Secured Lender is entitled to Credit Bid and chooses to do so, the Secured Lender shall be deemed a Qualified Bidder, provided that its Bid is an all Credit Bid.  Further, in the event of an all Credit Bid from the Secured Lender, the Secured Lender will not be required to provide a Good Faith Deposit.


## V.
## REQUEST FOR WAIVER OF STAY

73.     By this Motion, the Debtors also seek a waiver of any stay of the effectiveness of the Orders approving the relief requested in this Motion.  Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  For the reasons, described above, the Debtors submit that ample cause exists to justify a waiver of

28

the 14-day stay imposed by Bankruptcy Rules 6004(h) and 6006(d), to the extent that they apply.

**VI.**
**NOTICE**

74. Notice of this Motion has been provided to: (i) the Office of the United States Trustee for the Northern District of Texas; (ii) counsel to the Secured Lender; (iii) all parties with executory contracts for the Remaining Property; (iv) all parties entitled to receive notices in these chapter 11 case pursuant to Bankruptcy Rule 2002; (v) various federal and state taxing authorities, including the Internal Revenue Service; and (vi) all other parties who have expressed a bona fide interest in purchasing the Remaining Property. In light of the nature of the relief requested, the Debtors submit that no further notice is required.

75. No prior request for the relief sought in this Motion has been made to this or any other Court.

WHEREFORE, the Debtors respectfully requests that the Court (a) enter the Bidding Procedures Order, in substantially the form attached hereto as **Exhibit A**; (b) enter an Order or Orders approving the sale of Remaining Property to the highest bidder(s) at the Auction and (c) grant such other and further relief to the Debtors as the Court may deem proper.

Dated: August 27, 2010

COLE, SCHOTZ, MEISEL,
FORMAN & LEONARD, P.A.

By: /s/ Michael D. Warner
Michael D. Warner (TX Bar No. 792304)
Rachel R. Obaldo (TX Bar No. 24041617)
301 Commerce Street, Suite 1700
Fort Worth, TX 76102
(817) 810-5250
(817) 810-5255 (Fax)

Counsel for the Debtors
and Debtors in Possession

# Exhibit A

**[Proposed Form of Order Approving Bidding Procedures]**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| In re | Chapter 11 |
| McGinnis Land Partners I, LP. and Canyon Falls Land Partners, LP, | Case No. 10-BK-24654-SGJ CASE NO. 10-bk-24655-SGJ |
| Debtors. | Related to Docket No. ____ |

**ORDER (A) APPROVING BIDDING PROCEDURES FOR THE SALE OF ALL OR SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS, (B) AUTHORIZING DEBTORS TO OFFER CERTAIN BID PROTECTIONS, (C) AND SCHEDULING FINAL SALE HEARING AND APPROVING FORM AND  MANNER OF NOTICE THEREOF**

This matter coming before the Court on the Motion of the Debtors for (I) Order (A) Approving Bidding Procedures for Sale of All or Substantially all of the Debtors' Assets, (B) Authorizing Debtors to Offer Certain Bid Protections, and (C) Scheduling Final Sale Hearing and Approving Form and Manner of Notice Thereof, and (II) Order Authorizing and Approving (A) the Sale of Such Assets Free and Clear of Liens and Other Interests and (B) the Assumption and Assignment of Executory Contracts to Successful Bidder(s) at Auction [Docket No. __] (the "Motion"),[1] filed by the Debtors; the Court having reviewed the Motion and having considered the statements of counsel with respect to the bidding procedures relief requested in the Motion at a hearing before the Court (the "Bid Procedures Hearing");

IT IS HEREBY FOUND AND DETERMINED THAT:

A.     This Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157(b)(1) and 1334(a), and this matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (N) and (O).  Venue of this case and the Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

---

[1]     Capitalized terms not otherwise defined herein shall have the meanings given to them in the Motion.

B.     The Debtors have articulated good and sufficient reasons for, and the best interests of its estates will be served by, this Court granting certain of the relief requested in the Motion, including approval of:  (i) the Bidding Procedures; (ii) the Debtor's ability to offer prospective bidders who are willing to serve as a stalking horse bidder a Break-Up fee of up to 3% of the total guaranteed value proposed by such stalking horse bidder in its bid (the "Break-Up Fee"); and (iii) the form and manner of notice of the Auction and Hearing Notice described in the Motion.

C.     The proposed notice of the sale of the Assets and the Bidding Procedures, as set forth in the Motion, is good, appropriate, adequate and sufficient, and is reasonably calculated to provide all interested parties with timely and proper notice of the Sale and the Bidding Procedures, and no other or further notice is required for the sale of the Assets to the Successful Bidder(s) and the assumption and assignment of any executory contracts contemplated in the Successful Bid, or the Bidding Procedures, as set forth herein and in the Motion.

D.     The Debtors have articulated good and sufficient reasons for, and the best interests of their estates will be served by, this Court scheduling a subsequent Sale Hearing to consider granting other relief requested in the Motion, including approval of the sale of the Remaining Property to the Successful Bidder(s) free and clear of all liens, claims, interests and encumbrances pursuant to Section 363(f) of the Bankruptcy Code and the assumption and assignment of any executory contracts contemplated by a Successful Bid pursuant to Section 365 of the Bankruptcy Code.

E.     Authorizing the Debtors to offer the Break-Up Fee to induce bids at the Auction (as such term is defined in the Bidding Procedures) represents a sound exercise of the Debtors' business judgment and will allow the Debtors to maximize the value of the Remaining Property.

2

IT IS HEREBY ORDERED THAT:

1.     The bidding procedures relief requested in the Motion are approved to the extent provided herein.

2.     The Bidding Procedures, attached hereto as **Exhibit 1**, are approved in all respects.  The Debtors are authorized to take any and all actions necessary or appropriate to implement the Bidding Procedures.

3.     The form and service of the Sale Notice described in the Motion are approved in all respects.  As soon as practicable, but no later than September 23, 2010, the Debtors shall file on the Court's docket a schedule setting forth the proposed Cure Costs for any executory contracts (the "Cure Schedule") which may be assigned to a Successful Bidder(s) in connection with a sale of the Remaining Property.

4.     The Debtors are hereby authorized, and in consultation with the Secured Lender, in the exercise of its sound business judgment, to offer the Break-Up Fee in an amount not to exceed 3% of the total guaranteed value offered by such stalking horse bidder in its bid who agrees to provide a non-contingent bid for a substantial portion of the Remaining Property that can serve as a stalking horse bid at the Auction.  Any agreement to provide a Break-Up Fee shall be expressly conditioned on the consummation of a sale of the applicable Remaining Property to another party.  The Break-Up Fee shall be an administrative expense claim against the Debtors' estates under Section 503(b) of the Bankruptcy Code; provided, however, in the event that the Debtors agree to a Break-Up Fee, and the successful Bidder is the Secured Lender (rather than the entity to which the Debtors agreed to provide a Break-Up Fee) pursuant solely to a Credit Bid (as opposed to an all cash Bid or a Bid consisting of cash and a Credit Bid, and assuming the Secured Lender is entitled to make a Credit Bid), the Break-Up Fee will not be paid by the

3

Debtors or the estates, and no administrative obligation will be created, and any agreement by the Debtors to pay a Break-Up Fee will provide and acknowledge the same.

5.      The Auction is scheduled for 10:00 a.m. (Central Time) on  December 6, 2010, at the offices of Cole, Schotz, Meisel, Forman & Leonard, P.A., 301 Commerce Street, Suite, 1700, Fort Worth, Texas 76102, or such other place as the Debtors may designate at least three (3) days prior to the Auction.

6.      The hearing (the "Sale Hearing") to consider approval of the Debtors' entry into and consummation of a transaction with a Successful Bidder shall be held on December 14, 2010 at 10:00 a.m. (Central Time), unless rescheduled to a later date in accordance with the Bidding Procedures; provided, however, that if any Adequate Assurance Objections (defined below) are filed, the Sale Hearing shall be treated as a status conference to determine appropriate discovery issues and the date and time of a final hearing with respect to Adequate Assurance Objections only.

7.      Objections (other than an objection to adequate assurance of future performance for executory contracts and unexpired leases to be assigned in connection with a Successful Bid) to (a) the sale of the Remaining Property to a Successful Bidder, or (b) the assumption and assignment of any executory contracts in connection therewith, shall be in writing, shall state the basis of such objection with specificity and shall be filed with the Court, and served so as to be received on or before December 10, 2010 at 5:00 p.m. (Central Time) by:  (a)  counsel to the Debtors, Cole, Schotz, Meisel, Forman & Leonard, P.A., 301 Commerce Street, Suite, 1700, Fort Worth, Texas 76102   (Attn: Michael D. Warner); (b) counsel to the Secured Lender, Gardere Wynne Sewell LLP, 1601 Elm Street, Suite 3000, Dallas, Texas 75201-4761  (Attn:

Richard M. Roberson) and (f) the Office of the United States Trustee, 1100 Commerce Street, Room 9C60, Dallas, Texas 75242 (Attn: Nancy Resnick) (collectively, the "Notice Parties").

8.     Objections to adequate assurance of future performance for the assumption and assignment of executory contracts and unexpired leases to a Successful Bidder shall be in writing, shall state the basis of such objection with specificity and shall be filed with the Court, and served so as to be received by the Notice Parties on or before December 10, 2010, at 5:00 p.m. (Central Time).

9.     This Order does not satisfy and the Court has not determined that the Debtors have satisfied the requirements of Section 365 of the Bankruptcy Code, including those relating to cure of existing default or providing adequate assurance of future performance.  No executory contract will be deemed assumed and assigned until the later of (a) the date the Court has entered an order authorizing the assumption and assignment of a particular executory contract and (b) the date the applicable sale transaction has closed.  However, the failure of any objecting person or entity to timely file its objection in accordance with paragraphs 7 or 8 shall be a bar to the assertion, at the Sale Hearing or thereafter, of any objection to the sale of the Remaining Property (including the transfer free and clear of all liens, claims encumbrances and interests and the assumption and assignment of any executory contracts contemplated by a Successful Bid).

10.     This Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation of this Order.

Dated: ____, 2010

_____
The Honorable Stacey G. Jernigan,
United States Bankruptcy Judge

48467/0001-6948826v7

# Exhibit B

**[Bidding Procedures]**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re | Chapter 11 |
| McGinnis Land Partners I, LP. and<br>Canyon Falls Land Partners, LP, | Case No. 10-bk-24654-SGJ<br>Case No. 10-bk-24655-SGJ |
| Debtors. | Related to Docket No. _____ |

## BIDDING PROCEDURES

By motion dated August __, 2010 (Docket No. __) (the "Motion"), McGinnis Land Partners I, LP and Canyon Falls Land Partners, debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors"), has sought, among other things, approval of the process and procedures through which they will seek proposals for a transaction or transactions that alone or in combination will allow the Debtors to maximize the value of their estates. On September___, 2010, the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Bankruptcy Court") entered its Order (the "Bidding Procedures Order"), which, among other things, authorized and directed the Debtors to market their assets to persons that may be interested in acquiring all or substantially all of their Remaining Property (the "Remaining Property"), consisting of approximately 1,100 acres of land in Denton County, Texas, in the cities of Flower Mound, Northlake and Argyle, through the process and procedures set forth below (the "Bidding Procedures").

## Important Dates

The Debtors shall, in consultation with the Secured Lender:

- Assist Qualified Bidders (as defined herein) in conducting their respective due diligence investigations and accept Bids Packages (as defined herein) from Potential Bidders;
- Negotiate with Qualified Bidders in preparation for an auction (the "Auction") to be held on December 6, 2010 at 10:00 a.m. Central Time; and
- Select the Successful Bidder(s) (as defined herein) at the conclusion of the Auction and seek authority to sell the Remaining Property to such Successful Bidder(s) at a hearing (the "Sale Hearing") to be held by the Bankruptcy Court on December 14, 2010 at 10:00 a.m. (Central Time).

## Participation Requirements

Any person or entity wishing to bid on some or all of the Remaining Property (each a "Potential Bidder") must deliver (unless previously delivered) to the Debtors (a) an executed confidentiality agreement in form and substance satisfactory to the Debtors and (b) a statement

demonstrating to the Debtors' satisfaction a bona fide interest in purchasing some or all of the Assets and describing the Potential Bidder's proposed transaction. A party that has delivered such materials shall be known as a "Qualified Bidder."

## Due Diligence

The Debtors will afford any Qualified Bidder such due diligence access or additional information as may be reasonably requested by the Qualified Bidder that the Debtors, in their business judgment, determine to be reasonable and appropriate. The Debtors will designate a representative to coordinate all reasonable requests for additional information and due diligence access from such Qualified Bidders, which representative may be the Debtors' Real Estate Broker. Notwithstanding anything contained herein to the contrary, the Debtors will decide what, if any, diligence information to make available to a particular Qualified Bidder in their business judgment, and in consultation with the Secured Lender, and, subject to such consultation requirements, neither the Debtors nor their representatives will be obligated to furnish any information of any kind whatsoever to any party.

Interested persons requesting information about the qualification process, and Qualified Bidders (as such term is defined below) requesting information in connection with their due diligence, should contact _____ at _____, the Debtors' Real Estate Broker.

## Bid Requirements

1.  <u>Delivery of Bids</u>. No later than 5:00 p.m. (Central Time) on November 30, 2010, (such date or the date of the last extension as provided below, the "<u>Bid Deadline</u>"), each Potential Bidder interested in maintaining its participation in the bidding process must deliver copies of the bid and supporting materials described below to counsel to the Debtors, Cole, Schotz, Meisel, Forman & Leonard, P.A., 301 Commerce Street, Suite 1700, Fort Worth, Texas 76102 (Attn: Michael D. Warner).

2.  <u>Form and Content of Bid</u>. A Bid is a signed letter from a Qualified Bidder stating that:

    a.  The Qualified Bidder offers to purchase all or any portion of the Remaining Property; and

    b.  The Qualified Bidder's offer is not subject to any due diligence contingency and is irrevocable until two (2) business days after the earlier of: (i) the closing of the sale of the applicable Remaining Property, whether or not to such Qualified Bidder; or (ii) 45 days after the Sale Hearing.

48467/0001-6948826v7

3.     Required Supporting Materials.   A Qualified Bidder shall accompany its bid with:

  a.    an asset purchase agreement detailing all of the terms and conditions of the proposed transaction;[1]

  b.    written evidence of available cash, a commitment for financing or ability to obtain a satisfactory commitment if selected as the Successful Bidder (as defined below), and such other evidence of ability to consummate the transaction as the Debtors may reasonably request;

  c.    to the extent that the Qualified Bidder proposes to condition its bid upon the assumption and assignment of executory contracts, a schedule showing such contracts to be assumed and assigned together with evidence of the Qualified Bidder's ability to provide adequate assurance of future performance of such contracts (e.g., audited financial statements of the Qualified Bidder, information regarding the capitalization of the Qualified Bidder and/or information allowing the Debtors to evaluate the value of any guaranties being provided by affiliates of a Qualified Bidder of their obligations under any assumed and assigned executory contracts) (an "Adequate Assurance Package").

4.     Required Good Faith Deposit.   By the Bid Deadline, a Qualified Bidder must provide a good faith deposit (the "Good Faith Deposit") equal to five percent (5%) of such Qualified Bidder's guaranteed purchase price.   The Good Faith Deposit must be made by certified check or wire transfer and will be held by the Debtors in a segregated account. The Secured Lender is not required to provide a Good Faith Deposit.

5.     Qualified Bid.   A Bid received from a Potential Bidder that meets the requirements above is considered a "Qualified Bid."  The Debtors reserve the right, in their sole and exclusive discretion, after consultation with the Secured Lender, to waive noncompliance with any one or more of these requirements and deem an otherwise not Qualified Bid to be a Qualified Bid.  The Debtors will advise all Qualified Bidders of any such waiver and the basis for which it was granted at the Auction.

## Conduct and Termination of Bidding Process

The Debtors will, in their reasonable discretion, after consultation with the Secured Lender:  (a) determine whether any Potential Bidder satisfies the requirements specified above to become a Qualified Bidder; (b) coordinate the efforts of Qualified Bidders in conducting their respective due diligence investigations regarding the Remaining Property; (c) determine whether to remove any of the Remaining Property from the sale process under these Bidding Procedures; (d) evaluate bids from Qualified Bidders and determine whether any such bid is a Qualified Bid; (e) negotiate any bid made to purchase some or all of the Remaining Property and

---

[1]     The Debtors will file a form agreement prior to the hearing on the Bidding Procedures Order and Qualified Bidders are to provide copies of their Bids which are marked to show changes from the form agreement.

negotiate any related transaction issues; and (f) make such other determinations as are provided in these Bidding Procedures.

## Auction Participation – Qualified Participants and Baseline Bid

Unless otherwise ordered by the Bankruptcy Court for cause shown, only a Qualified Bidder that has submitted a Qualified Bid is eligible to participate at the Auction. The Debtors will determine, based on the nature of the Qualified Bids received and their reasonable discretion, after consultation with the Secured Lender, whether to (a) conduct separate Auctions for the sale of individual parcels of the Remaining Property and/or (b) conduct a single Auction of all of the Remaining Property. For each such Auction to be conducted, the Debtors will select, in their reasonable discretion, after consultation with the Secured Lender, the highest or otherwise best bid (the "Baseline Bid") to serve as the starting point for the Auction. The Baseline Bid may be comprised of a combination of Qualified Bids.

## The Auction

1.  <u>Time and Place</u>. The Auction will be conducted at 10:00 a.m. (Central Time) on December 6, 2010 at the offices of Cole, Schotz, Meisel, Forman & Leonard, P.A., 301 Commerce Street, Suite 1700, Fort Worth, Texas 76102, or such other place as the Debtors may designate at least three (3) days prior to the Auction.

2.  <u>Competitive Bidding</u>. At the Auction, participants will be permitted to increase their bids and will be permitted to bid based only upon the terms of the Baseline Bid (except to the extent otherwise authorized by the Debtors). The bidding will start at the purchase price and terms proposed in the Baseline Bid, and continue in increments to be announced on the record at the Auction (or such other increment announced by the Debtors, in consultation with the Secured Lender, during the Auction). To the extent that the Debtors agree to provide a Qualified Bidder with a Break-Up Fee, such Qualified Bidder shall be entitled to credit bid the amount of its Break-up Fee at the Auction.

3.  <u>Evaluation of Qualified Bids</u>. For the purpose of determining the Baseline Bid and whether a Qualified Bid submitted at the Auction is higher or otherwise better, the Qualified Bid will be valued based upon factors such as: (a) the purported amount of the Qualified Bid; (b) the fair value to be provided to the Debtors under the Qualified Bid; (c) the risks associated with any non-cash or non-guaranteed consideration in any Qualified Bid; (d) the ability to consummate any proposed sale transaction; and (e) any other factors that the Debtors, in consultation with the Secured Lender, may deem relevant. Upon the submission of any bid at the Auction, the Debtors, after consultation with the Secured Lender, shall announce to all participants whether the bid submitted is higher or otherwise better than the previously submitted bid and the basis for that determination.

4.  <u>Designation of Successful Bidder</u>. Immediately prior to the conclusion of any Auction, the Debtors, after consultation with the Debtors' Professionals and the Secured Lender, will: (a) review each bid made at the Auction on the basis of financial and contractual terms and such factors relevant to the sale process, including those factors affecting the speed and certainty of consummating the proposed sale; (b) in their discretion, identify the highest or otherwise best

bid for the applicable Remaining Property at the Auction (the "Successful Bid"); and (c) notify all Qualified Bidders participating in the Auction, prior to its adjournment, of the name or names of the Qualified Bidder(s) making the Successful Bid for the applicable Remaining Property (the "Successful Bidder"), and the amount and other material terms of the Successful Bid. At the closing of the transaction contemplated by the Successful Bid, the Successful Bidder will be entitled to a credit for the amount of its Good Faith Deposit. Absent irregularities occurring in the course of the Auction, no further bids will be accepted after the close of the Auction.

5.  Presentation of Successful Bids to the Bankruptcy Court. At the Sale Hearing, the Debtors will present each Successful Bid to the Bankruptcy Court for approval.

## Acceptance of Qualified Bids

The Debtors presently intends to sell the Remaining Property to the Qualified Bidder(s) that submit(s) the highest or otherwise best bid(s). The Debtors' presentation to the Bankruptcy Court for approval of any Successful Bid does not constitute the Debtors' acceptance of such bid. The Debtors will be deemed to have accepted a bid only when it has been approved by the Bankruptcy Court at the Sale Hearing.

## Return of Good Faith Deposit

The Good Faith Deposit of a Qualified Bidder shall be returned within three (3) business days of the earlier of (a) the closing of a sale transaction on the portion of the Remaining Property on which the Qualified Bidder made a bid or (b) 45 days after the Sale Hearing. If the Successful Bidder does not close the approved sale, the Debtors will have the right to present any other bid, whether made prior to or at the Auction, to the Bankruptcy Court for approval, and retain the Good Faith Deposit as liquidated damages.

## Modifications

The Debtors may adopt rules for the bidding process at the Auction that, in their discretion, after consultation with the Secured Lender, will best promote the goals of the bidding process. Without limiting the forgoing, the Debtors reserve their rights, in the exercise of their fiduciary obligations, in consultation with the Debtors' Professionals and the Secured Lender, to modify the Bidding Procedures or impose, at or prior to the Auction, additional customary terms and conditions on the sale of the Remaining Property, including, without limitation, adjourning the Auction at the Auction and/or adjourning the Sale Hearing in open Court without further notice, and withdrawing from the Auction any or all of the Remaining Property at any time prior to or during the Auction or canceling the Auction.

Furthermore, the Debtors, in consultation with the Secured Lender, may: (1) determine, in their business judgment, which bid or bids, if any, constitute the highest or otherwise best offer for the applicable Remaining Property; and (2) reject, at any time before entry of an order of the Bankruptcy Court approving any bid as the Successful Bid, any bid that, in the Debtors' sole discretion, is (a) inadequate or insufficient; (b) not in conformity with the requirements of the Bankruptcy Code or the Bidding Procedures; or (c) contrary to the best interests of the Debtors and their estates and creditors. The Debtors may extend or alter any deadline contained herein that will better promote the maximization of their estates.

48467/0001-6948826v7

**The Sale Hearing**

The Sale Hearing is scheduled to be conducted on December 14 at 10:00 a.m. (Central Time). If any Successful Bidder is selected by the Debtors, in their discretion after consultation with the Secured Lender, the Debtors will seek the entry of an order from the Bankruptcy Court at the Sale Hearing approving and authorizing the proposed sale to the Successful Bidder on the terms and conditions of the Successful Bid.

48467/0001-6948826v7

# Exhibit C

**[Sale Notice]**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re | Chapter 11 |
| McGinnis Land Partners I, LP. and Canyon Falls Land Partners, LP, | Case No. 10-bk-24654-SGJ Case No. 10-bk-24655-SGJ |
| Debtors. | |
| | Related to Docket No. _____ |

## NOTICE OF HEARING TO APPROVE THE SALE OF ALL OR SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS AND RELATED OBJECTION DEADLINES

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

1.     By a Motion dated August __, 2010 (Docket No. __) (the "<u>Sale Motion</u>"), McGinnis Land Partners I, LP and Canyon Falls Land Partners, LP, debtors and debtors in possession in the above-captioned cases (the "<u>Debtors</u>") sought approval of certain bidding procedures for, and the ultimate sale of all or substantially all of their assets (the "<u>Remaining Property</u>"), consisting of approximately 1,100 acres of land in Denton County, Texas, in the cities of Flower Mound, Northlake and Argyle.  A copy of the Sale Motion may be obtained by written request to counsel to the Debtors, Cole, Schotz, Meisel, Forman & Leonard, P.A., 301 Commerce Street, Suite 1700, Fort Worth, Texas 76102, Attention: Rachel R. Obaldo, Esquire, Email: robaldo@coleschotz.com Fax: (817) 810-5255.

2.     In the Sale Motion, the Debtors requested that the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "<u>Bankruptcy Court</u>") enter an order (the "<u>Bidding Procedures Order</u>") approving auction and sale procedures (the "<u>Bidding Procedures</u>")[1] for the Remaining Property.  The Court entered the Bidding Procedures Order on September __, 2010.

3.     The Sale Motion also requests that (a) the Remaining Property be sold free and clear of all liens, claims and encumbrances thereon, with such interests in the Remaining Property to be transferred, and attach, to the sale proceeds; (b) the Debtors be authorized to assume and assign certain executory contracts to the purchaser of any of the Remaining Property to the extent required; and (c) potential purchasers of the Remaining Property to whom any executory contracts are to be assigned be required provide evidence of their ability to provide adequate assurance of future performance of such contracts.  Also, the proposed Bidding Procedures contain certain bidding protections that may be provided to potential bidders for the Remaining Property.

---

[1]     Capitalized terms not otherwise defined herein have the meaning given to them in the proposed Bidding Procedures Order or the Bidding Procedures.

4.	The Bidding Procedures Order provides the following key dates in connection with the sale of the Assets:

| Event | Date[2] |
|---|---|
| Hearing to approve Bid Procedures | September 9, 2010 @ 9:30 a.m. |
| Deadline to File & Serve Notice of Proposed Cure Amounts | September 23, 2010 |
| Deadline to File & Serve Motion Objecting to Credit Bid Right | October 26, 2010 |
| Deadline to File & Serve Response to Motion Objecting to Credit Bid | November 10, 2010 @ 5:00 p.m. |
| Hearing on Motion Objecting To Credit Bid | November 12, 2010 @ 10:00 a.m. |
| Due Diligence Period Ends for Potential Buyers | November 30, 2010 @ 12:00 p.m. |
| Deadline for Potential Buyers to submit Bids | December 1, 2010 @ 10:00 a.m. |
| Deadline to Notify Potential Buyers of Baseline Bid | December 6, 2010 @ 10:00 a.m. |
| Auction | December 9, 2010 @ 10:00 a.m. |
| Deadline to File & Serve Notice of "Highest and Best" Bid(s) | December 10, 2010 @ 5:00 p.m. |
| Deadline to File & Serve Objections to Motion to Sell | December 14, 2010 @ 5:00 p.m. |
| Hearing on Motion to Sell | December 16, 2010 @ 10:00 a.m. |
| Deadline to Close sale(s) transaction | December 28, 2010 @ 9:00 a.m. |

5.	**THESE DATES ARE SUBJECT TO CHANGE BY THE BANKRUPTCY COURT. ALL PARTIES ARE ENCOURAGED TO FREQUENTLY CHECK THE BANKRUPTCY COURT DOCKET FOR CHANGES TO THESE DATES. ALL TIMES ARE CENTRAL TIME.** Copies of the Bidding Procedures Order and the Bidding Procedures may be obtained by written request to counsel to the Debtors, Cole, Schotz, Meisel, Forman & Leonard, P.A., 301 Commerce Street, Suite 1700, Fort Worth, Texas 76102, Attention: Rachel R. Obaldo, Esquire, Email: robaldo@coleschotz.com Fax: (817) 810-5255.

6.	Objections to any sale of Remaining Property to a Successful Bidder, or to the assumption and assignment of any executory contracts in connection therewith, must (a) be in writing, (b) state the basis of such objection with specificity, and (c) be served upon: (i) counsel to the Debtors, Cole, Schotz, Meisel, Forman & Leonard, P.A., 301 Commerce Street, Suite 1700, Fort Worth, Texas 76012 (Attn: Michael D. Warner); (ii) counsel to the Secured Lender, Gardere Wynne Sewell LLP, 1601 Elm Street, Suite 3000, Dallas, Texas 75201-4761 (Attn: Richard M. Roberson) and (iii) the Office of the United States Trustee, 1100 Commerce Street, Room 9C60, Dallas, Texas 75242 (Attn: Nancy Resnick), by the deadline specified by the Court.

---

[2]	These dates are subject to change by the Bankruptcy Court; and all stated times are Central Time.

46460/0001-5367256v5
48467/0001-6948826v7

Dated: _____, 2010

Respectfully submitted,

COLE, SCHOTZ, MEISEL,
FORMAN & LEONARD, P.A.

By: _____
Michael D. Warner (TX Bar No. 792304)
Rachel R. Obaldo (TX Bar No. 24041617)
301 Commerce Street, Suite 1700
Fort Worth, TX 76102
(817) 810-5250
(817) 810-5255 (Fax)
*Counsel for the Debtors*
*and Debtors in Possession*

46460/0001-5367256v5
48467/0001-6948826v7