U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET



**The following constitutes the ruling of the court and has the force and effect therein described.**

_____
**United States Bankruptcy Judge**

**Signed September 20, 2010**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re | Chapter 11 |
| McGinnis Land Partners I, LP, and Canyon Falls Land Partners, LP, | Case No. 10-BK-34654-SGJ<br>CASE NO. 10-bk-34655-SGJ |
| Debtors. | Administratively Consolidated Cases |
| | **Related to Docket No. 37** |

## ORDER (A) APPROVING BIDDING PROCEDURES FOR THE SALE OF ALL OR SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS, (B) SCHEDULING FINAL SALE HEARING (C) APPROVING FORM AND MANNER OF NOTICE THEREOF; AND (D) OTHER RELIEF

This matter coming before the Court on the Motion of the Debtors for (I) Order (A) Approving Bidding Procedures for Sale of All or Substantially all of the Debtors' Assets, (B) Authorizing Debtors to Offer Certain Bid Protections, and (C) Scheduling Final Sale Hearing and Approving Form and Manner of Notice Thereof, and (II) Order Authorizing and Approving (A) the Sale of Such Assets Free and Clear of Liens and Other Interests and (B) the Assumption and Assignment of Executory Contracts to Successful Bidder(s) at Auction [Docket No. 37] (the

"<u>Motion</u>"),[1] filed by the Debtors; the Court having reviewed the Motion and having considered the statements of counsel with respect to the bidding procedures relief requested in the Motion at a hearing before the Court (the "<u>Bid Procedures Hearing</u>");

IT IS HEREBY FOUND AND DETERMINED THAT:

A.    This Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157(b)(1) and 1334(a), and this matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (N) and (O).  Venue of this case and the Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

B.    The Debtors have articulated good and sufficient reasons for, and the best interests of its estates will be served by, this Court granting certain of the relief requested in the Motion, including approval of:  (i) the Bidding Procedures and (ii) the form and manner of notice of the Auction and Hearing Notice described in the Motion.

C.    The proposed notice of the sale of the Assets and the Bidding Procedures, as set forth in the Motion, is good, appropriate, adequate and sufficient, and is reasonably calculated to provide all interested parties with timely and proper notice of the Sale and the Bidding Procedures, and no other or further notice is required for the sale of the Assets to the Successful Bidder(s) and the assumption and assignment of any executory contracts contemplated in the Successful Bid, or the Bidding Procedures, as set forth herein and in the Motion.

D.    The Debtors have articulated good and sufficient reasons for, and the best interests of their estates will be served by, this Court scheduling a subsequent Sale Hearing to consider granting other relief requested in the Motion, including approval of the sale of the Remaining Property to the Successful Bidder(s) free and clear of all liens, claims, interests and

---

[1]    Capitalized terms not otherwise defined herein shall have the meanings given to them in the Motion.

48467/0001-7010212v4

encumbrances pursuant to Section 363(f) of the Bankruptcy Code and the assumption and assignment of any executory contracts contemplated by a Successful Bid pursuant to Section 365 of the Bankruptcy Code.

IT IS HEREBY ORDERED THAT:

1.      The bidding procedures relief requested in the Motion are approved to the extent provided herein.

2.      The Bidding Procedures, attached hereto as **Exhibit 1**, are approved in all respects.  The Debtors are authorized to take any and all actions necessary or appropriate to implement the Bidding Procedures.

3.      The form and service of the Sale Notice, attached as **Exhibit 2,** is approved in all respects.  As soon as practicable, but no later than September 30, 2010, the Debtors shall file on the Court's docket a schedule setting forth the proposed Cure Costs for any executory contracts (the "Cure Schedule") which may be assigned to a Successful Bidder(s) in connection with a sale of the Remaining Property.

4.      Nothing in this Order shall preclude the Debtors from seeking, on an expedited basis and with an opportunity for interested parties to object, on no less than five (5) business days' notice, the entry of an order authorizing the appointment of a "stalking horse" and the payment of a break-up fee.

5.      The form of the Real Estate Purchase and Sale Agreement, attached as **Exhibit 3,** is approved in all respects.

6.      The Auction is scheduled for 10:00 a.m. (Central Time) on  December 6, 2010, at the offices of Cole, Schotz, Meisel, Forman & Leonard, P.A., 301 Commerce Street, Suite,

48467/0001-7010212v4

1700, Fort Worth, Texas 76102, or such other place as the Debtors may designate at least three (3) days prior to the Auction.

7.      The hearing (the "Sale Hearing") to consider approval of the Debtors' entry into and consummation of a transaction with a Successful Bidder shall be held on December 16, 2010 at 9:30 a.m. (Central Time), unless rescheduled to a later date in accordance with the Bidding Procedures; provided, however, that if any Adequate Assurance Objections (defined below) are filed, the Sale Hearing shall be treated as a status conference to determine appropriate discovery issues and the date and time of a final hearing with respect to Adequate Assurance Objections only.

8.      Objections (other than an objection to adequate assurance of future performance for executory contracts and unexpired leases to be assigned in connection with a Successful Bid) to (a) the sale of the Remaining Property to a Successful Bidder(s), or (b) the assumption and assignment of any executory contracts in connection therewith, shall be in writing, shall state the basis of such objection with specificity and shall be filed with the Court, and served so as to be received on or before December 14, 2010 at 5:00 p.m. (Central Time) by: (a) counsel to the Debtors, Cole, Schotz, Meisel, Forman & Leonard, P.A., 301 Commerce Street, Suite, 1700, Fort Worth, Texas 76102 (Attn: Michael D. Warner, Esq.); (b) counsel to the Secured Lender, Gardere Wynne Sewell LLP, 1601 Elm Street, Suite 3000, Dallas, Texas 75201-4761 (Attn: Richard M. Roberson, Esq.) and (f) the Office of the United States Trustee, 1100 Commerce Street, Room 9C60, Dallas, Texas 75242 (Attn: Nancy Resnick, Esq.) (collectively, the "Notice Parties").

9.      Objections to adequate assurance of future performance for the assumption and assignment of executory contracts and unexpired leases to a Successful Bidder(s) shall be in

writing, shall state the basis of such objection with specificity and shall be filed with the Court, and served so as to be received by the Notice Parties on or before December 14, 2010, at 5:00 p.m. (Central Time) ("Adequate Assurance Objections")

10.     This Order does not satisfy and the Court has not determined that the Debtors have satisfied the requirements of Section 365 of the Bankruptcy Code, including those relating to cure of existing default or providing adequate assurance of future performance.  No executory contract will be deemed assumed and assigned until the later of (a) the date the Court has entered an order authorizing the assumption and assignment of a particular executory contract and (b) the date the applicable sale transaction has closed.  However, the failure of any objecting person or entity to timely file its objection in accordance with paragraphs 8 or 9 shall be a bar to the assertion, at the Sale Hearing or thereafter, of any objection to the sale of the Remaining Property (including the transfer free and clear of all liens, claims encumbrances and interests and the assumption and assignment of any executory contracts contemplated by a Successful Bid).

11.     The Secured Lender shall have the right to credit bid at the Auction, pursuant to 11 U.S.C. Section 363(k), for the purchase of the collateral securing the Debtors' obligation to the Secured Lender (the "Secured Debt") in an amount of no less than $19,640,321.50, (which amount constitutes $19,380,000.34, in principal, plus $227,914.11 in interest and $32,407.05 in fees), plus such additional amounts, if any, as the Court shall determine at a hearing to be held on October 28, 2010, at 2:30 p.m. (the "Claim Objection Hearing").

12.     Pursuant to 11 U.S.C. Section 362(d)(3), the Court has determined that the Debtors are single asset real estate debtors, and the Debtors shall make monthly payments to the Secured Lender, each in the amount of $100,000, on the 20th day of September, October, November and December 2010 (each a "Monthly Payment", and collectively, the "Monthly

48467/0001-7010212v4

Payments"); provided however, the Monthly Payment due on September 20, 2010, shall not be due and payable until the 5th business day after the date of entry on the Court's Docket of both (i) this Order, and (ii) *Agreed Interim Order Authorizing Debtors To Incur Administrative Debt Outside The Ordinary Course Of Business Pursuant To 11 U.S.C. § 364(B)*.

13.     Pursuant to the (i) Agreed Order Authorizing and Approving Sale of Certain Real Property to the Texas Department of Transportation Free and Clear of Liens and Other Interests (the "TxDOT Order"); and (ii) the Agreed Order Authorizing the Debtors to Grant an Easement to the Trinity River Authority Free and Clear of Liens and Other Interests (the "TRA Order"); the net proceeds of such transactions contemplated therein (the "TxDOT & TRA Net Proceeds") shall be paid to the Secured Lender.

14.     The order of the application to principal and interest of the Monthly Payments and the TxDOT & TRA Net Proceeds, by the Secured Lender to the Secured Debt, shall also be addressed by the Court at the Claim Objection Hearing.

15.     The automatic stay shall automatically terminate, in favor of the Secured Lender, without further Order of the Court, or notice to the Debtors, as follows:

(a)     On the 5th business day after a Monthly Payment is not made;

(b)     On December 31, 2010, if (i) the entire amount of the obligation due and owing the Secured Lender (as finally determined by the Court at the Claim Objection Hearing) has not been paid in full, or (ii) in the event that such amount has not been finally determined by the Court, and the Secured Lender has not received $19,640,321.50 between the date of this order and such date;

48467/0001-7010212v4

(c)     On December 13, 2010, for the sole purpose of permitting the Secured Lender to post the collateral securing the Secured Debt for a foreclosure sale, with such foreclosure sale to take place no sooner than January 4, 2011;

(d)     Immediately upon either Debtor filing a proposed Plan of Reorganization utilizing the cramdown provisions of 11 U.S.C. Section 1129, absent the written consent of the Secured Lender;

(e)     Immediately upon either Debtor filing any motion seeking to obtain financing which proposes to grant any lien senior to the liens of the Secured Lender; and

(f)     Immediately upon either (i) the conversion of either of the Debtor's Cases to Chapter 7 Cases, or (ii) the appointment of a Trustee or Examiner for either Case.

16.     The Secured Lender shall file a Notice of Withdrawal, without prejudice, of its *Motion to Dismiss, or in the Alternative for a Determination that Debtors are Single Asset Real Estate Debtors* (the "Motion to Dismiss") [Docket No. 28], which Notice will provide, *inter alia*, that the Secured Lender will not re-file the Motion to Dismiss, or a motion or other proceeding, seeking similar relief, including dismissal, relief from the automatic stay, or adequate protection, until on or after December 31, 2010, provided that the Debtors are not in default of any provision of this Order.

17.     The Debtors shall not, absent written consent of the Secured Lender, file a plan or plans of reorganization utilizing the cramdown provisions of 11 U.S.C. Section 1129.

18.     This Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation of this Order.

48467/0001-7010212v4

# Exhibit 1

**[Bidding Procedures]**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re | Chapter 11 |
| McGinnis Land Partners I, LP. and<br>Canyon Falls Land Partners, LP, | Case No. 10-bk-34654-SGJ<br>Case No. 10-bk-34655-SGJ |
| Debtors. | Related to Docket No. 37 |

## BIDDING PROCEDURES

By motion dated August 27, 2010 (Docket No. 37) (the "Motion"), McGinnis Land Partners I, LP and Canyon Falls Land Partners, debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors"), has sought, among other things, approval of the process and procedures through which they will seek proposals for a transaction or transactions that alone or in combination will allow the Debtors to maximize the value of their estates. On September   , 2010, the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Bankruptcy Court") entered its Order (the "Bidding Procedures Order"), which, among other things, authorized and directed the Debtors to market their assets to persons that may be interested in acquiring all or substantially all of their Remaining Property (the "Remaining Property"), consisting of approximately 1,100 acres of land in Denton County, Texas, in the cities of Flower Mound, Northlake and Argyle, through the process and procedures set forth below (the "Bidding Procedures").

## Important Dates

The Debtors shall, in consultation with the Secured Lender:

- Assist Potential Bidders (as defined herein) in conducting their respective due diligence investigations and accept Qualified Bids (as defined herein) from Qualified Bidders (as defined herein);
- Negotiate with Qualified Bidders in preparation for an auction (the "Auction") to be held on December 6, 2010 at 10:00 a.m. Central Time; and
- Select the Successful Bidder(s) (as defined herein) at the conclusion of the Auction and seek authority to sell the Remaining Property to such Successful Bidder(s) at a hearing (the "Sale Hearing") to be held by the Bankruptcy Court on December 14, 2010 at 9:30 a.m. (Central Time).

## Participation Requirements

Any person or entity wishing to bid on some or all of the Remaining Property (each a "Potential Bidder") must deliver (unless previously delivered) to the Debtors (a) an executed confidentiality agreement in form and substance satisfactory to the Debtors and (b) a statement

demonstrating to the Debtors' satisfaction a bona fide interest in purchasing some or all of the Assets and describing the Potential Bidder's proposed transaction.

## Due Diligence

The Debtors will afford any Potential Bidder such due diligence access or additional information as may be reasonably requested by the Potential Bidder that the Debtors, in their business judgment, determine to be reasonable and appropriate. The Debtors will designate a representative to coordinate all reasonable requests for additional information and due diligence access from such Potential Bidders, which representative may be the Debtors' Real Estate Broker. Notwithstanding anything contained herein to the contrary, the Debtors will decide what, if any, diligence information to make available to a particular Potential Bidder in their business judgment, and in consultation with the Secured Lender, and, subject to such consultation requirements, neither the Debtors nor their representatives will be obligated to furnish any information of any kind whatsoever to any party.

Interested persons requesting information about the qualification process, and Potential Bidders requesting information in connection with their due diligence, should contact the Debtors' Real Estate Broker: Lane Bennett Partners, LP, Attn: John Blackburn, 1003 Chimney Hill Trail, Southlake, Texas 76092; telephone: 214-532-8198; facsimile: 469-417-0104.

## Bid Requirements

1.      Delivery of Bids. No later than 5:00 p.m. (Central Time) on November 30, 2010, (such date or the date of the last extension as provided below, the "Bid Deadline"), each Potential Bidder interested in maintaining its participation in the bidding process must deliver copies of the bid and supporting materials described below to Debtors' counsel: Cole, Schotz, Meisel, Forman & Leonard, P.A., 301 Commerce Street, Suite 1700, Fort Worth, Texas 76102 (Attn: Michael D. Warner).

2.      Form and Content of Bid. A bid received from a Potential Bidder will constitute a "Qualified Bid" (the Debtors reserve the right, in their sole and exclusive discretion, after consultation with the Secured Lender, to waive noncompliance with any one or more of these requirements and deem an otherwise not Qualified Bid to be a Qualified Bid. The Debtors will advise all Qualified Bidders of any such waiver and the basis for which it was granted at the Auction) only if it includes all of the following documents (the compliance of which shall be determined by the Debtors in consultation with the Secured Lender) and meets all the Bid Requirements:

    a.      a written acquisition agreement duly executed by the Potential Bidder, together with a copy of such agreement marked to show specific changes to the Real Estate Purchase and Sale Agreement that the Potential Bidder requires (which marked copy shall include an electronic comparison to the Real Estate Purchase and Sale Agreement) The acquisition agreement submitted by a Potential Bidder:

(i)     shall include a complete set of all disclosure schedules and exhibits thereto, if any;

(ii)    shall not contain any financing or due diligence contingencies to closing of the proposed transaction;

(iii)   shall not contain any condition to closing of the transaction on the receipt of any third party approvals (excluding required Bankruptcy Court approval); and

(iv)    shall be irrevocable until two (2) business days after the earlier of: (i) the closing of the sale of the applicable Remaining Property, whether or not to such Potential Bidder; or (ii) 45 days after the Sale Hearing.

b.      written evidence of available cash, or a commitment for financing if selected as the Successful Bidder (as defined below), and such other evidence of ability to consummate the transaction as the Debtors may reasonably request; and

c.      to the extent that the Potential Bidder proposes to condition its bid upon the assumption and assignment of executory contracts, a schedule showing such contracts to be assumed and assigned together with evidence of the Potential Bidder's ability to provide adequate assurance of future performance of such contracts (e.g., audited financial statements of the Potential Bidder, information regarding the capitalization of the Potential Bidder and/or information allowing the Debtors to evaluate the value of any guaranties being provided by affiliates of a Potential Bidder of their obligations under any assumed and assigned executory contracts) (an "Adequate Assurance Package").

3.      Required Good Faith Deposit.  By the Bid Deadline, a Potential Bidder must provide a good faith deposit (the "Good Faith Deposit") equal to ten percent (10%) of such Potential Bidder's purchase price.  The Good Faith Deposit must be made by certified check or wire transfer and will be held by the Debtors in a segregated account. The Secured Lender is not required to provide a Good Faith Deposit.  A Potential Bidder who submits a Qualified Bid and the Good Faith Deposit shall be deemed a Qualified Bidder.

## Conduct and Termination of Bidding Process

The Debtors will, in their reasonable discretion, after consultation with the Secured Lender:  (a) determine whether any Potential Bidder satisfies the requirements specified above to become a Qualified Bidder; (b) coordinate the efforts of Potential Bidders in conducting their respective due diligence investigations regarding the Remaining Property; (c) determine whether to remove any of the Remaining Property from the sale process under these Bidding Procedures; (d) evaluate bids from Potential Bidders and determine whether any such bid is a Qualified Bid; (e) negotiate any bid made to purchase some or all of the Remaining Property and

negotiate any related transaction issues; and (f) make such other determinations as are provided in these Bidding Procedures.

### Auction Participation – Qualified Participants and Baseline Bid

Unless otherwise ordered by the Bankruptcy Court for cause shown, only a Qualified Bidder that has submitted a Qualified Bid is eligible to participate at the Auction. The Debtors will determine, based on the nature of the Qualified Bids received and their reasonable discretion, after consultation with the Secured Lender, whether to (a) conduct separate Auctions for the sale of individual parcels of the Remaining Property and/or (b) conduct a single Auction of all of the Remaining Property. For each such Auction to be conducted, the Debtors will select, in their reasonable discretion, after consultation with the Secured Lender, the highest or otherwise best bid (the "Baseline Bid") to serve as the starting point for the Auction.

### Credit Bid

The Secured Lender shall be entitled (but not obligated) to credit bid to the full extent of its claims on assets being sold at the Auction at any time prior to the close of the Auction. The Secured Lender's bid, if any, will be deemed a Qualified Bid, and the Secured Lender will be deemed a Qualified Bidder under these procedures.

### The Auction

1.    Time and Place. The Auction will be conducted at 10:00 a.m. (Central Time) on December 6, 2010 at the offices of Cole, Schotz, Meisel, Forman & Leonard, P.A., 301 Commerce Street, Suite 1700, Fort Worth, Texas 76102, or such other place as the Debtors may designate at least three (3) days prior to the Auction. Only the Debtors, the Secured Lender, Qualified Bidders and their respective professionals shall be entitled to attend and participate in the Auction.

2.    Competitive Bidding. At the Auction, only Qualified Bidders will be permitted to increase their bids and will be permitted to bid based only upon the terms of the Baseline Bid (except to the extent otherwise authorized by the Debtors). The bidding will start at the purchase price and terms proposed in the Baseline Bid, and continue in increments to be announced on the record at the Auction (or such other increment announced by the Debtors, in consultation with the Secured Lender, during the Auction).

3.    Evaluation of Qualified Bids. For the purpose of determining the Baseline Bid and whether a Qualified Bid submitted at the Auction is higher or otherwise better, the Qualified Bid will be valued based upon factors such as: (a) the purported amount of the Qualified Bid; (b) the fair value to be provided to the Debtors under the Qualified Bid; (c) the risks associated with any non-cash or non-guaranteed consideration in any Qualified Bid; (d) the ability to consummate any proposed sale transaction; and (e) any other factors that the Debtors, in consultation with the Secured Lender, may deem relevant. Upon the submission of any bid at the Auction, the Debtors, after consultation with the Secured Lender, shall announce to all participants whether the bid submitted is higher or otherwise better than the previously submitted bid and the basis for that determination.

48467/0001-7010212v4

4.     Designation of Successful Bidder.  Immediately prior to the conclusion of any Auction, the Debtors, after consultation with the Debtors' Professionals and the Secured Lender, will:  (a) review each bid made at the Auction on the basis of financial and contractual terms and such factors relevant to the sale process, including those factors affecting the speed and certainty of consummating the proposed sale; (b) in their discretion, identify the highest or otherwise best bid for the applicable Remaining Property at the Auction (the "Successful Bid(s)"); and (c) notify all Qualified Bidders participating in the Auction, prior to its adjournment, of the name or names of the Qualified Bidder(s) making the Successful Bid(s) for the applicable Remaining Property (the "Successful Bidder(s)"), and the amount and other material terms of the Successful Bid(s). At the closing of the transaction contemplated by the Successful Bid(s), the Successful Bidder(s) will be entitled to a credit for the amount of its Good Faith Deposit.  Absent irregularities occurring in the course of the Auction, no further bids will be accepted after the close of the Auction.

5.     Presentation of Successful Bids to the Bankruptcy Court.  At the Sale Hearing, the Debtors will present each Successful Bid to the Bankruptcy Court for approval.

## Acceptance of Qualified Bids

The Debtors presently intend to sell the Remaining Property to the Qualified Bidder(s) that submit(s) the highest or otherwise best bid(s).  The Debtors' presentation to the Bankruptcy Court for approval of any Successful Bid does not constitute the Debtors' acceptance of such bid. The Debtors will be deemed to have accepted a bid only when it has been approved by the Bankruptcy Court at the Sale Hearing.

## Return of Good Faith Deposit

The Good Faith Deposit of a Qualified Bidder shall be returned within three (3) business days of the earlier of (a) the closing of a sale transaction on the portion of the Remaining Property on which the Qualified Bidder made a bid or (b) 45 days after the Sale Hearing.  If the Successful Bidder does not close the approved sale, the Debtors will have the right to present any other bid, whether made prior to or at the Auction, to the Bankruptcy Court for approval, and retain the Good Faith Deposit as liquidated damages.

## Modifications

The Debtors may adopt rules for the bidding process at the Auction that, in their discretion, after consultation with the Secured Lender, will best promote the goals of the bidding process. Without limiting the forgoing, the Debtors reserve their rights, in the exercise of their fiduciary obligations, in consultation with the Debtors' Professionals  and the Secured Lender, to modify the Bidding Procedures or impose, at or prior to the Auction, additional customary terms and conditions on the sale of the Remaining Property, including, without limitation, adjourning the Auction at the Auction and/or adjourning the Sale Hearing in open Court without further notice, and withdrawing from the Auction any or all of the Remaining Property at any time prior to or during the Auction or canceling the Auction.

Furthermore, the Debtors, in consultation with the Secured Lender, may:  (1) determine, in their business judgment, which bid or bids, if any, constitute the highest or otherwise best offer for

48467/0001-7010212v4

the applicable Remaining Property; and (2) reject, at any time before entry of an order of the Bankruptcy Court approving any bid as the Successful Bid, any bid that, in the Debtors' sole discretion, is (a) inadequate or insufficient; (b) not in conformity with the requirements of the Bankruptcy Code or the Bidding Procedures; or (c) contrary to the best interests of the Debtors and their estates and creditors. The Debtors may extend or alter any deadline contained herein that will better promote the maximization of their estates.

## The Sale Hearing

The Sale Hearing is scheduled to be conducted on December 14 at 9:30 a.m. (Central Time). If any Successful Bidder is selected by the Debtors, in their discretion after consultation with the Secured Lender, the Debtors will seek the entry of an order from the Bankruptcy Court at the Sale Hearing approving and authorizing the proposed sale to the Successful Bidder on the terms and conditions of the Successful Bid.

48467/0001-7010212v4

# Exhibit 2

**[Sale Notice]**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

|  |  |
|---|---|
| In re | Chapter 11 |
| McGinnis Land Partners I, LP. and<br>Canyon Falls Land Partners, LP, | Case No. 10-bk-34654-SGJ<br>Case No. 10-bk-34655-SGJ |
| Debtors. | |
| | Related to Docket No. 37 |

## NOTICE OF HEARING TO APPROVE THE SALE OF ALL OR SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS AND RELATED OBJECTION DEADLINES

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

1.      By a Motion dated August 27, 2010 (Docket No. 37) (the "<u>Sale Motion</u>"), McGinnis Land Partners I, LP and Canyon Falls Land Partners, LP, debtors and debtors in possession in the above-captioned cases (the "<u>Debtors</u>") sought approval of certain bidding procedures for, and the ultimate sale of all or substantially all of their assets (the "<u>Remaining Property</u>"), consisting of approximately 1,100 acres of land in Denton County, Texas, in the cities of Flower Mound, Northlake and Argyle.  A copy of the Sale Motion may be obtained by written request to counsel to the Debtors, Cole, Schotz, Meisel, Forman & Leonard, P.A., 301 Commerce Street, Suite 1700, Fort Worth, Texas 76102, Attention: Rachel R. Obaldo, Esquire, Email: robaldo@coleschotz.com Fax: (817) 810-5255.

2.      In the Sale Motion, the Debtors requested that the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "<u>Bankruptcy Court</u>") enter an order (the "<u>Bidding Procedures Order</u>") approving auction and sale procedures (the "<u>Bidding Procedures</u>")[1] for the Remaining Property.  The Court entered the Bidding Procedures Order on September __, 2010.

3.      The Sale Motion also requests that (a) the Remaining Property be sold free and clear of all liens, claims and encumbrances thereon, with such interests in the Remaining Property to be transferred, and attach, to the sale proceeds; (b) the Debtors be authorized to assume and assign certain executory contracts to the purchaser of any of the Remaining Property to the extent required; and (c) potential purchasers of the Remaining Property to whom any executory contracts are to be assigned be required provide evidence of their ability to provide adequate assurance of future performance of such contracts.   Also, the proposed Bidding Procedures contain certain bidding protections that may be provided to potential bidders for the Remaining Property.

---

[1]      Capitalized terms not otherwise defined herein have the meaning given to them in the proposed Bidding Procedures Order or the Bidding Procedures.

4.     The Bidding Procedures Order provides the following key dates in connection with the sale of the Assets:

| Event | Date[2] |
|---|---|
| Deadline to File & Serve Notice of Proposed Cure Amounts | September 23, 2010 |
| Due Diligence Period Ends for Potential Buyers | November 30, 2010 @ 12:00 p.m. |
| Deadline for Potential Buyers to submit Bids | December 1, 2010 @ 10:00 a.m. |
| Deadline to Notify Potential Buyers of Baseline Bid | December 6, 2010 @ 10:00 a.m. |
| Auction | December 9, 2010 @ 10:00 a.m. |
| Deadline to File & Serve Notice of "Highest and Best" Bid(s) | December 10, 2010 @ 5:00 p.m. |
| Deadline to File & Serve Objections to Motion to Sell | December 14, 2010 @ 5:00 p.m. |
| Hearing on Motion to Sell | December 16, 2010 @ 9:30 a.m. |
| Deadline to Close sale(s) transaction | December 28, 2010 @ 9:00 a.m. |

5.     **THESE DATES ARE SUBJECT TO CHANGE BY THE BANKRUPTCY COURT. ALL PARTIES ARE ENCOURAGED TO FREQUENTLY CHECK THE BANKRUPTCY COURT DOCKET FOR CHANGES TO THESE DATES.  ALL TIMES ARE CENTRAL TIME.**  Copies of the Bidding Procedures Order and the Bidding Procedures may be obtained by written request to counsel to the Debtors, Cole, Schotz, Meisel, Forman & Leonard, P.A., 301 Commerce Street, Suite 1700, Fort Worth, Texas 76102, Attention: Rachel R. Obaldo, Esquire, Email: robaldo@coleschotz.com Fax: (817) 810-5255.

6.     Objections to any sale of Remaining Property to a Successful Bidder(s), or to the assumption and assignment of any executory contracts in connection therewith, must (a) be in writing, (b) state the basis of such objection with specificity, and (c) be served upon: (i) counsel to the Debtors, Cole, Schotz, Meisel, Forman & Leonard, P.A., 301 Commerce Street, Suite 1700, Fort Worth, Texas 76012 (Attn: Michael D. Warner); (ii)  counsel to the Secured Lender, Gardere Wynne Sewell LLP, 1601 Elm Street, Suite 3000, Dallas, Texas 75201-4761  (Attn: Richard M. Roberson) and (iii) the Office of the United States Trustee, 1100 Commerce Street, Room 9C60, Dallas, Texas 75242 (Attn: Nancy Resnick), by the deadline specified by the Court.

Dated: _____, 2010                    Respectfully submitted,

                                         COLE, SCHOTZ, MEISEL,
                                         FORMAN & LEONARD, P.A.

                                         By: _____

---

[2]     These dates are subject to change by the Bankruptcy Court; and all stated times are Central Time.

48467/0001-7010212v4

Michael D. Warner (TX Bar No. 792304)
Rachel R. Obaldo (TX Bar No. 24041617)
301 Commerce Street, Suite 1700
Fort Worth, TX 76102
(817) 810-5250
(817) 810-5255 (Fax)
*Counsel for the Debtors*
*and Debtors in Possession*

# Exhibit 3

**[Real Estate Purchase and Sale Agreement]**

**REAL ESTATE PURCHASE AND SALE AGREEMENT**

**dated as of  _____, 2010**

**by and among**

**Canyon Falls Land Partners, LP**

**And**

**McGinnis Land Partners I, LP**

**Collectively as the Sellers,**

**and**

**[_____],**

**as Purchaser**

# REAL ESTATE PURCHASE AND SALE AGREEMENT

This REAL ESTATE PURCHASE AND SALE AGREEMENT is made and entered into as of [___], 2010 (the "***Execution Date***"), by and between Canyon Falls Land Partners, LP, a Texas limited partnership and McGinnis Land Partners I, LP, a Texas limited partnership (singularly, "**Seller" and** collectively, "**Sellers**"), and [_____], a _____ ("***Purchaser")***.

Capitalized terms used in this Agreement that are not otherwise defined herein shall have the meanings ascribed to those terms in Section 9 below.

## RECITALS

A.     Sellers are debtors and debtors in possession in Chapter 11 proceedings before the Bankruptcy Court and are entering into this Agreement in that capacity.

B.     Sellers have their principal executive offices at Suite 800, 13455 Noel Road, Dallas, Texas 75240.

C.     The Bankruptcy Court has entered an Order *inter alia* approving this form of contract and approving bidding procedures with respect to the sale of the Real Property (as defined below) (the "***Procedures Order***").

D.     Pursuant to the Procedures Order and Sections 363 of the Bankruptcy Code, Sellers wish to sell and transfer to Purchaser, and Purchaser wishes to purchase and acquire from Sellers, the Real Property described herein on the terms and subject to the conditions set forth in this Agreement and the Procedures Order.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound hereby, the parties agree as follows:

1.     <u>Transfer of Assets.</u>

1.1     <u>Purchase and Sale of Assets</u>.  On the terms and subject to the conditions of this Agreement, on the Closing Date, Sellers shall sell and convey to Purchaser, and Purchaser shall purchase and accept from Sellers, good and indefeasible title in fee simple to that certain lot, tract or parcel of land situated in Denton County, Texas containing 1,129.296 gross acres +/- and being more particularly described in <u>Exhibit "A"</u> attached hereto together with any and all rights, benefits, privileges, easements, tenements, riparian rights, hereditaments, appurtenances and interests thereon or in anywise appertaining thereto and with all improvements located thereon, **excluding**,  all oil, gas and other minerals in and under said land (said land, rights, benefits, privileges, easements, tenements, hereditaments, appurtenances, interests and improvements being hereinafter referred to as the "***Real Property***"). **Purchaser acknowledges that Sellers do not own the mineral estate relating to the Property.**

1.2     Instruments of Transfer.  The sale and conveyance of the Real Property to Purchaser shall be made by deed in the form attached hereto as Exhibit "B" (the "**_Deed_**") and consistent with the terms of the Sale Order.  Delivery of a Texas Form Owner Policy of title Insurance ("Title Policy") pursuant to Section 3.4.2 shall be deemed to satisfy for all purposes the Sellers' obligation in the foregoing sentence.

2.     Consideration.

2.1     Purchase Price.  Upon the terms and subject to the conditions contained in this Agreement, as consideration for the purchase of the Real Property contemplated herein, Purchaser shall pay to Sellers cash on the Closing Date of _____ $[_____] (the "**_Purchase Price_**").

2.2     Deposit.  Upon the execution of this Agreement, Purchaser shall furnish to Sellers a cash deposit in the amount of $_____(the "**_Deposit_**"), equal to ten percent (10%) of the Purchase Price.

2.3     Independent Consideration.  Notwithstanding anything herein to the contrary, a portion of the Deposit, in the amount of $100.00, will be retained by the Sellers as full payment and independent consideration for Sellers' performance under this Agreement.  The amount of the remaining Deposit after deduction of the $100.00 is hereby referred to as the "**_Net Deposit_**".

3.     Closing.

3.1     Closing.  The completion of the purchase and sale of the Real Property under this Agreement (the "**_Closing_**") shall take place at the offices of Cole Schotz Meisel Forman & Leonard, 301 Commerce Street, Suite 1700, Fort Worth, Texas 76102.

3.2     Closing Date.  The Closing shall be held no later than the Fourteen (14) Business Days after the Sale Order (the "**_Closing Date_**").

3.3     Closing Actions.  All actions to be taken on the Closing pursuant to this Agreement shall be deemed to have occurred simultaneously, and no act, document or transaction shall be deemed to have been taken, delivered or affected until all such actions, documents and transactions have been taken, delivered or effected.

3.4     Sellers' Deliveries to Purchaser at Closing.  Upon the Closing, Sellers shall deliver to Purchaser the following:

3.4.1   One or more Deeds duly executed by Sellers, pursuant to which Sellers conveys to Purchaser good and indefeasible title to the Real Property free and clear except for the Lien for general real estate taxes for the year of the Closing and the Permitted Exceptions, as defined in Section 5.4 herein.

3.4.2   Payment to Republic Title of Texas, Inc., 2626 Howell St, 10th Floor, Dallas, Texas 75204 (Att'n:  Jeanne Ragland, Senior V.P.)  (the "**_Title Company_**") the base premium for the issuance by the title Company as soon as possible after Closing occurs of a Texas Form Owner Policy of Title Insurance ("**_Title Policy_**") issued by the Title Company in the

2

amount of the Purchase Price, naming Purchaser as the insured, subject only to the Permitted Exceptions and the standard printed exceptions contained in the Texas Standard Form Owner Policy of Title Insurance; provided, however, that, at Purchaser's expense beyond the base premium, the standard exception pertaining to discrepancies, conflicts, or shortages in area shall be deleted.

3.4.3    Certificate confirming each Seller's United States taxpayer identification number(s) and stating that each Seller is not a "foreign person" within the meaning of Section 1445 of the Internal Revenue Code of the United States of America, as amended.

3.4.4    A Bill of Sale conveying personal property, if any, located on the Real Property and owned by the Sellers, free and clear,  subject only to the Permitted Exceptions.

3.4.5    Possession of the Real Property, subject to the Permitted Exceptions and valid existing space leases disclosed in writing by Seller to Purchaser.

3.4.6    An executed assignment of leases which leases were assumed by the Debtor pursuant to Section 365 of the Bankruptcy Code with the approval of the Bankruptcy Court.

3.4.7    Any such other documents or other things reasonably contemplated by this Agreement to be delivered by Sellers to Purchaser at the Closing.


3.5    <u>Purchaser's Deliveries to Seller at Closing</u>.  Upon the Closing, Purchaser shall make or cause to be made the following payments and deliveries to Sellers:

3.5.1    The Purchase Price, less the Net Deposit.

3.5.2    Appropriate evidence of all necessary corporate action by Purchaser in connection with the Contemplated Transaction, including, without limitation: (i) certified copies of resolutions duly adopted by Purchaser's board of  directors approving the Contemplated Transaction and authorizing the execution, delivery, and performance by Purchaser of this Agreement and (ii) a certificate as to the incumbency of the officers of Purchaser executing this Agreement and any instrument or other document delivered in connection with the Contemplated Transaction.

3.5.3    Any such other documents or other things reasonably contemplated by this Agreement to be delivered by Purchaser to Sellers at the Closing.

3.5.4    Payment to the Title Company any amount in excess of the base premium for the Title Policy.

48467/0001-7010212v4

4. **Conditions Precedent to Closing.**

   4.1 <u>Conditions to Sellers' Obligations</u>. Sellers' obligation to make the deliveries required of Sellers at the Closing and otherwise to complete the Contemplated Transaction shall be subject to the satisfaction of each of the following conditions on or before the Closing Date, unless any such unsatisfied condition is waived by Sellers:

      4.1.1 Purchaser shall have performed and complied with, in all material respects, each and every covenant or other obligation required to be performed by it before the Closing.

      4.1.2 All of the representations and warranties of Purchaser contained herein shall continue to be true and correct at the Closing.

      4.1.3 Purchaser shall have paid, delivered or funded all items required under Section 3.5 above of this Agreement to be paid, delivered or funded by Purchaser on or before the Closing.

      4.1.4 The Procedures Order shall not have been stayed, reversed, or vacated.

      4.1.5 The Bankruptcy Court shall have entered the Sale Order in accordance with Section 7.1.2 below by no later than thirty (30) days after the date of the Sale Hearing, and the Sale Order shall not have been stayed, reversed or vacated.

      4.1.6 No action, suit or other proceedings shall be pending before any Government Entity seeking or threatening to restrain or prohibit the consummation of the Contemplated Transaction, or seeking to obtain substantial damages in respect thereof, or involving a claim that consummation thereof would result in the violation of any law, decree or regulation of any Government Entity, or seeking or threatening or asserting a claim to or Lien against the Real Property, other than the assessment of real property Taxes.

      4.1.7 There shall be no injunction or court order restraining consummation of the Contemplated Transaction and there shall not have been adopted any law or regulation making all or any portion of the Contemplated Transaction illegal.

   4.2 <u>Conditions to Purchaser's Obligations</u>. Purchaser's obligation to make the deliveries required of Purchaser at the Closing, and otherwise to close the Contemplated Transaction shall be subject to the satisfaction of each of the following conditions on or before the Closing Date, unless any such unsatisfied condition is waived by Purchaser:

      4.2.1 Sellers shall have performed and complied with, in all material respects, each and every covenant or other obligation required to be performed by it before the Closing.

      4.2.2 All representations and warranties of Sellers contained herein shall continue to be true and correct at the Closing.

      4.2.3 Sellers shall have delivered all items required under Section 3.4 above of this Agreement to be delivered by Sellers on or before the Closing.

48467/0001-7010212v4

4.2.4   The Procedures Order shall not have been stayed, reversed, or vacated.

4.2.5   The Bankruptcy Court shall have entered the Sale Order in accordance with Section 7.1.2 below, and the Sale Order shall not have been stayed, reversed or vacated.

4.2.6   No action, suit or other proceedings shall be pending before any Government Entity seeking or threatening to restrain or prohibit the consummation of the Contemplated Transaction, or seeking to obtain substantial damages in respect thereof, or involving a claim that consummation thereof would result in the violation of any law, decree or regulation of any Government Entity, or seeking or threatening or asserting a claim to or Lien against the Real Property other than the assessment of real property Taxes.

4.2.7   There shall be no injunction or court order restraining consummation of the Contemplated Transaction and there shall not have been adopted any law or regulation making all or any portion of the Contemplated Transaction illegal.

5.   Seller's Representations and Warranties.  Each Seller respectively hereby represents and warrants to Purchaser as follows:

5.1   Due Organization.  Each Seller is a limited partnership duly organized and validly existing under the laws of the State of Texas.

5.2   Power and Authority.   Upon obtaining the Sale Order, the Sellers have all requisite power and authority to execute, deliver and perform this Agreement.

5.3   Authorization and Validity of Agreement.  Upon obtaining the Sale Order, (a) all action on the part of  Seller necessary to approve the execution, delivery and performance of this Agreement by Seller will have been duly taken and (b) this Agreement, when executed and delivered by  Seller, shall constitute the valid and binding obligation of Seller enforceable in accordance with its terms.

5.4   Permitted Exceptions.  Schedule 5.4 lists all Exceptions on the Real Property.

5.5   Brokers.  Except for payment to the Broker as contemplated in Section 7.6, no broker, investment banker, financial advisor or other Person is entitled to any broker's, finder's, financial advisor's or other similar fee or commission in connection with the Contemplated Transaction based upon arrangements made by or on behalf of the Sellers.

5.6   Complete Disclosure.  To the best of Sellers' knowledge, no representation or warranty made by the Seller in this Agreement contains or will contain any untrue statement of a material fact or omits a material fact necessary to make the statements contained herein and therein not misleading.

5.7   As Is Transaction.    .  Purchaser acknowledges that except for any express warranties and representations contained in this agreement and seller's special warranty of title contained in the deed, Purchaser accepts the property in its present condition on an "as is" basis and purchaser is not relying on any written, oral, implied or other representations, statements or warranties by Seller or any agent of Seller or any real estate broker or salesman.  All previous

5

written, oral, implied or other statements, representations, warranties or agreements, if any, are merged INTO THIS CONTRACT. Except as expressly set forth herein or in the deed, Seller shall have no liability to Purchaser, and Purchaser HEREBY releaseS Seller from any liability (including contractual and/or statutory actions for contribution or indemnity), for, concerning or regarding (1) the nature and condition of the Property, including the suitability thereof for any activity or use; (2) any improvements or substances located thereon; or (3) the compliance of the Property with any laws, rules, ordinances or regulations of any government or other body. THE FOREGOING INCLUDES A RELEASE OF SELLER FROM CLAIMS BASED ON SELLER'S NEGLIGENCE IN WHOLE OR IN PART AND CLAIMS BASED ON STRICT LIABILITY. SELLER HAS NOT MADE, DOES NOT MAKE AND EXPRESSLY DISCLAIMS, ANY WARRANTIES, REPRESENTATIONS, COVENANTS OR GUARANTEES, EXPRESSED OR IMPLIED, OR ARISING BY OPERATION OF LAW, AS TO THE MERCHANTABILITY, HABITABILITY, QUANTITY, QUALITY OR ENVIRONMENTAL CONDITION OF THE PROPERTY OR ITS SUITABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE OR USE. PURCHASER AFFIRMS THAT PRIOR TO CLOSING PURCHASER SHALL HAVE (I) INVESTIGATED AND INSPECTED THE PROPERTY TO ITS SATISFACTION AND BECOME FAMILIAR AND SATISFIED WITH THE CONDITION OF THE PROPERTY, AND (II) MADE ITS OWN DETERMINATION AS TO (A) THE MERCHANTABILITY, QUANTITY, QUALITY AND CONDITION OF THE PROPERTY, INCLUDING THE POSSIBLE PRESENCE OF TOXIC OR HAZARDOUS SUBSTANCES, MATERIALS OR WASTES OR OTHER ACTUAL OR POTENTIAL ENVIRONMENTAL CONTAMINATES, AND (B) THE PROPERTY'S SUITABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE OR USE. PURCHASER HEREBY ACCEPTS THE PROPERTY IN ITS PRESENT CONDITION ON AN "AS IS", "WHERE IS" AND "WITH ALL FAULTS", INCLUDING ENVIRONMENTAL, BASIS AND ACKNOWLEDGES THAT (1) WITHOUT THIS ACCEPTANCE, THIS SALE WOULD NOT BE MADE, AND (2) THAT SELLER SHALL BE UNDER NO OBLIGATION WHATSOEVER TO UNDERTAKE ANY REPAIR, ALTERATION, REMEDIATION OR OTHER WORK OF ANY KIND WITH RESPECT TO ANY PORTION OF THE PROPERTY. IF THE CLOSING OCCURS, PURCHASER AND ITS SUCCESSORS AND ASSIGNS HAVE, AND SHALL BE DEEMED TO HAVE, ASSUMED ALL RISK AND LIABILITY WITH RESPECT TO THE PRESENCE OF TOXIC OR HAZARDOUS SUBSTANCES, MATERIALS OR WASTES OR OTHER ACTUAL OR POTENTIAL ENVIRONMENTAL CONTAMINATES ON, WITHIN OR UNDER THE SURFACE OF THE PROPERTY, WHETHER KNOWN OR UNKNOWN, APPARENT, NON-APPARENT OR LATENT, AND WHETHER EXISTING PRIOR TO, AT OR SUBSEQUENT TO TRANSFER OF THE PROPERTY TO PURCHASER. SELLER IS HEREBY RELEASED BY PURCHASER AND ITS SUCCESSORS AND ASSIGNS OF AND FROM ANY AND ALL RESPONSIBILITY, LIABILITY, OBLIGATIONS AND CLAIMS, KNOWN OR UNKNOWN, INCLUDING (1) ANY OBLIGATION TO TAKE THE PROPERTY BACK OR REDUCE THE PRICE, OR (2) ACTIONS FOR CONTRIBUTION OR INDEMNITY, THAT PURCHASER OR ITS SUCCESSORS AND ASSIGNS MAY HAVE AGAINST SELLER OR THAT MAY ARISE IN THE FUTURE, BASED IN WHOLE OR IN PART UPON THE PRESENCE OF TOXIC OR HAZARDOUS SUBSTANCES, MATERIALS OR WASTES OR OTHER ACTUAL OR POTENTIAL ENVIRONMENTAL CONTAMINATES ON, WITHIN OR UNDER THE SURFACE OF THE PROPERTY, INCLUDING ALL RESPONSIBILITY, LIABILITY,

48467/0001-7010212v4

OBLIGATIONS AND CLAIMS THAT MAY ARISE UNDER APPLICABLE ENVIRONMENTAL LAWS. PURCHASER FURTHER ACKNOWLEDGES THAT THE PROVISIONS OF THIS PARAGRAPH HAVE BEEN FULLY EXPLAINED TO PURCHASER AND THAT PURCHASER FULLY UNDERSTANDS AND ACCEPTS SAME. THE PROVISIONS OF THIS PARAGRAPH SHALL SURVIVE CLOSING AND SHALL BE INCLUDED IN THE DEED.

5.8    Seller's Knowledge.    As used herein, the term "knowledge" means the present awareness, without inquiry, and does not include constructive knowledge.  To the extent any representation and/or warranty of Sellers set forth herein is made "to Sellers' knowledge," such representation and/or warranty shall be made only on the basis of the actual knowledge of Sellers' "Designated Representatives" (as hereinafter defined), and shall not be construed to refer to the knowledge or any other partner, agent, officer or employee of Sellers or any affiliate thereof.  For purposes of this Agreement, the term Sellers' "***Designated Representatives***" shall refer to _____ and _____.  The Sellers' Designated Representatives shall have no personal Liability for any of the representations, warranties, covenants or obligations of Sellers hereunder.

6.    Purchaser's Warranties and Representations.  Purchaser represents and warrants to Sellers as follows:

6.1    Due Organization.  Purchaser is a _____ duly organized, validly existing and in good standing under the laws of the State of _____.

6.2    Power and Authority.  Purchaser has all requisite power and authority to execute, deliver and perform this Agreement.

6.3    Authorization and Validity of Agreement.  All action on the part of Purchaser necessary to approve the execution, delivery and performance of this Agreement by Purchaser has been taken.  This Agreement, when executed and delivered by Purchaser, shall constitute the valid and binding obligation of Purchaser enforceable in accordance with its terms.

6.4    No Conflicts.  The execution, delivery and performance of this Agreement by Purchaser do not and will not: (i) conflict with or result in a breach of the certificate of formation of Purchaser; (ii) materially violate any material statute, law, rule or regulation, or any order, writ, injunction or decree of any Government Entity binding on Purchaser; or (iii) materially violate or conflict with or constitute a material default under any agreement, instrument or writing of any nature to which Purchaser is a party or by which Purchaser or its assets or properties may be bound.

7.    Bankruptcy Court Approvals.

7.1.1    Procedures Order.  The Procedures Order was entered by the Bankruptcy Court on _____, 2010.  A copy of the proposed Procedures Order is attached hereto as Exhibit 7.1.1 and incorporated herein by this reference.  The sale procedures governing the sale of the Real Property shall be those set forth in the Procedures Order.  In the event of any conflict between the terms and provisions hereof and those of the Procedures Order, the terms and provisions of the Procedures Order shall govern and control.

48467/0001-7010212v4

7.1.2  <u>Sale Order</u>. Both Purchaser's and Sellers' obligations to consummate the Contemplated Transaction shall be conditioned upon the entry by the Bankruptcy Court of an order (the "***Sale Order***"), which Sale Order, among other things, (i) approves the sale of the Real Property to Purchaser on the terms and conditions set forth in this Agreement and authorizes the Sellers to proceed with the Contemplated Transaction, (ii) includes a specific finding that Purchaser is a good faith purchaser of the Real Property, and (iii) states that the sale of the Real Property to Purchaser shall be free and clear of all Liabilities and Liens with all valid Liabilities and Liens to attach to the proceeds of the sale in the order of priority of such Liabilities and Liens.

7.2  <u>Certain Notices</u>.  Sellers shall provide notice of the Sale Motion (as defined in the Procedures Order) to all applicable taxing authorities and to all other parties having Liens of record in the Real Property.

7.3  <u>Pre-Closing Access</u>.  From and after the date of this Agreement until the Closing Date, Sellers shall, upon reasonable advance notice, afford to Purchaser and its Representatives reasonable access during normal business hours to the Real Property.

7.4  <u>Apportionments at Closing</u>.  Real estate taxes, utilities, including but not limited to water charges, sewer rents and fuel, and all other customary items shall be adjusted, apportioned and allowed as of Closing Date, if necessary by an estimated tax bill, with the Closing Date being a day of income and expense to the Purchaser.  Installments allocable to periods prior to the Closing and unpaid as of the closing Date shall be paid by the Sellers or allowed as a reduction in the Purchase Price.

7.5  <u>Tax Effect</u>.  None of the parties (nor such parties' counsel or accountants) has made or is making in this Agreement or otherwise any representation to any other party (or such party's counsel or accountants) concerning any of the Tax effects or consequences on the other party of the transactions provided for in this Agreement.  Each party represents that it has obtained, or may obtain, independent Tax advice with respect thereto and upon which it, if so obtained, has solely relied.

7.6  <u>Brokerage Obligations</u>.  Except for the Broker, which Sellers have engaged in connection with the Contemplated Transaction and whose Broker Compensation Sellers shall be responsible to pay or cause to be paid at Closing out of the Purchase Price, Sellers and the Purchaser each represent and warrant to the other that, such party has incurred no Liability to any broker or agent with respect to the payment of any commission regarding the consummation of the Contemplated Transaction.  Other than any commission payable to the Broker (for which Sellers shall be solely responsible), if any claims for commissions, fees or other compensation, including, without limitation, brokerage fees, finder's fees, or commissions, are ever asserted against Purchaser or the Sellers in connection with the Contemplated Transaction, all such claims shall be handled and paid by the party whose actions form the basis of such claim and such party shall indemnify, defend (with counsel reasonably satisfactory to the party entitled to indemnification), protect and save and hold the other harmless from and against any and all such claims or demands asserted by any Person, firm or corporation in connection with the Contemplated Transaction.

7.7    Further Assurances.  Each party hereto shall execute, acknowledge and deliver any further assurance, documents and instruments reasonably requested by any other party hereto for the purpose of giving effect to the Contemplated Transaction or the intentions of the parties with respect thereto.  Each party hereto shall act in good faith in connection with the performance of any obligations under this Agreement to the other parties hereto, whether before or after the Closing.

7.8    **Roll-Back Taxes. All ad valorem Taxes relating from the transfer of the Real Property or a change in use of the Real Property shall be the responsibility of the Purchaser.**

8.    Termination.

8.1    Grounds for Termination.  This Agreement may be terminated before Closing, if the terminating party is not in breach of this Agreement, only as follows:

8.1.1    by mutual written consent of Purchaser and Sellers;

8.1.2    by Sellers, at any time that there has been (i) a material breach by Purchaser of any of its representations and warranties herein or (ii) a material failure on the part of Purchaser to comply with its obligations herein;

8.1.3    by Sellers, if any of the conditions in Section 4.1, except the condition set forth in Section 4.1.5,  has not been satisfied (other than by reason of the failure of Sellers to comply with Sellers' obligations under this Agreement) by the date of the Sale Hearing, and Sellers have not waived such condition or the Sale Order has not been entered within thirty (30) days of the Sale Hearing;

8.1.4    by Sellers, in the event of an Alternate Transaction;

8.1.5    by Purchaser, at any time that there has been (i) a material breach by Sellers of any of its representations and warranties herein or (ii) a material failure on the part of Sellers to comply with its obligations herein;

8.1.6    by Purchaser, if any of the conditions in Section 4.2, except the condition set forth in Section 4.2.5, has not been satisfied (other than by reason of the failure of Purchaser to comply with Purchaser's obligations under this Agreement) by the date of the Sale Hearing, and Purchaser has not waived such condition or the Sale Order has not been entered within thirty (30) days of the Sale Hearing;

8.1.7    by Purchaser, in the event of an Alternate Transaction.

8.2    Manner and Effect of Termination.  Any termination of this Agreement pursuant to Section 8 shall be effected by written notice from the terminating party to the other party, which notice shall specify the basis for the termination.  Upon termination of this Agreement, this Agreement shall forthwith become null and void and of no further force and effect and all

rights and obligations of the parties hereunder shall terminate without any Liability by any party to any other party, except for the rights and obligations described in Sections 8.3 and 8.4.

8.3     Sellers' Remedy.  If the Closing does not occur and this Agreement is terminated by Sellers pursuant to Sections 8.1.2 or 8.1.3  then the Seller shall be entitled to retain the Net Deposit and pursue all other remedies to which it is entitled under applicable law. After negotiation, the parties have agreed that, considering all the circumstances existing on the date of this Agreement, the amount of the Net Deposit is a reasonable estimate of the damages that Sellers would incur in such an event and that the aforesaid payment of the Net Deposit is liquidated damages hereunder and not a penalty.

8.4     Purchaser's Remedies.  If the Closing does not occur and this Agreement is terminated by Purchaser pursuant to Sections 8.1.5, 8.1.6 or 8.1.7, then the Purchaser shall be entitled to the return of the Net Deposit and receipt thereof shall be the sole remedy of the Purchaser under this Agreement for any breach by the Sellers of the terms hereof or otherwise and the Purchaser shall have no other recourse against the Sellers under or on account of this Agreement or otherwise in such event.

9.     Definitions.  For purposes of this Agreement, the following terms have the meanings set forth below:

"Affiliate" means a Person that directly, or indirectly through one or more intermediaries, controls, is controlled by or is under common control with the Person specified.  For purposes of this definition, the term "control" of a Person means the possession, direct or indirect, of the power to (i) vote 50% or more of the voting securities of such Person or (ii) direct or cause the direction of the management and policies of such Person, whether by contract or otherwise, and the terms and phrases "controlling," "controlled by" and "under common control with" have correlative meanings.

"Agreement" means this Real Estate Purchase and Sale Agreement. (See also "Purchase Agreement".)

"Alternate Transaction" means that the Bankruptcy Court has approved the sale of the Real Property to a Person other than Purchaser.

"Bankruptcy Code" means title 11 U.S.C. §101, et seq., as now in effect or hereafter amended.

"Bankruptcy Court" means the United States Bankruptcy Court for the Northern District of Texas, Dallas Division having jurisdiction over the Case, or if such Court ceases to exercise jurisdiction over the Case, such other court that exercises jurisdiction over the Case.

"Broker" means Lane Bennett Partners, LLC

"Broker Compensation" means all fees and compensation to which the Broker is entitled from the Seller under its engagement letter with Seller.

48467/0001-7010212v4

"Business Day" means any day of the year on which national banking institutions in the State of Texas are open to the public for conducting business and are not required or authorized to close.

"Case" means those proceedings before the Bankruptcy Court designated as jointly administered under Case No. 10-bk-34654.

"Closing" has the meaning ascribed to that term in Section 3.1.

"Closing Date" has the meaning ascribed to that term in Section 3.2.

"Contemplated Transaction" means the purchase and sale of the Real Estate and all other transactions contemplated by Agreement.

"Government Entity" means any domestic or foreign government or political subdivision thereof, whether on a Federal, state or local level and whether executive, legislative or judicial in nature, including any agency, authority, board, bureau, commission, court, department or other instrumentality thereof.

"Liability" means any claim, debt, liability or obligation of any kind whatsoever, whether arising under contract or applicable law or in connection with a business, and whether conditioned or absolute, liquidated or unliquidated, contingent or non-contingent.

"Lien" means any encumbrance, including without limitation any lien, claim, preference, charge, pledge, hypothecation, trust, equitable interest, encumbrance, security interest, conditional sale agreement or other title retention agreement, mortgage, security interest, option, proxy, right of first refusal, right of first option, preemptive right, community property interest, any financing statement under the Uniform Commercial Code of any jurisdiction; and any restriction on the receipt of any income derived from any asset.

"Person" means an individual, partnership, corporation, limited liability company, limited liability partnership, business trust, joint stock company, trust, unincorporated association, joint venture, Government Entity or other entity of whatever nature.

"Procedures Order" means the Order of the Bankruptcy Court referred to in the recitals to this Agreement and in Section 7.3.1.

"Representatives" of any Person means that Person's officers, independent public accountants, legal counsel, consultants and other representatives.

"Sale Hearing" means the hearing conducted by the Bankruptcy Court at which Seller will seek approval of the sale of the Real Property pursuant to the Procedures Order.

"Sale Order" has the meaning ascribed to that term in Section 7.1.2.

"Tax" and "Taxes" means all taxes, charges, fees, levies, penalties or other assessments imposed by any federal, state, local or foreign governmental authority, including income, gross receipts, excise, property, ad valorem, sales, use, license, custom duty, minimum estimated,

profit, gift, severance, value added, disability, premium, recapture, credit, occupation, service, leasing, employment, stamp and other taxes, any amounts attributable to any failure to comply with any requirement regarding Tax Returns and any transferee or secondary Liability in respect of Taxes, including, in any case, any interest, penalty or addition thereto, whether disputed or not.

9.1    Interpretation.  Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

9.1.1    This Agreement shall not be deemed to have been drafted by either party hereto but rather drafted as the result of extensive negotiations between the parties.

9.1.2    When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded.  If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

9.1.3    Any reference in this Agreement to "$"shall mean U.S. dollars.

9.1.4    The exhibits and schedules to this Agreement are hereby incorporated and made a part hereof and are an integral part of this Agreement.  All exhibits and schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full therein.  Any capitalized terms used in any schedule or exhibit but not otherwise defined herein shall be defined as set forth in this Agreement.

9.1.5    Any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

9.1.6    The division of this Agreement into articles, sections or other subdivisions, and the insertion of captions, titles or headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement.  All references in this Agreement to any "Section" are to the corresponding section or subsection of this Agreement unless otherwise specified.

9.1.7    The words such as "herein," "hereinafter," "hereof," and "hereunder" refer to this Agreement as a whole and not merely to a clause, subsection or subdivision in which such words appear unless the context otherwise requires.

9.1.8    The word "including" or any variation thereof means "including, without limitation" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

10.    Miscellaneous.

10.1    Survival.  Except as set forth in the following sentence, all representations, warranties and covenants of Seller made hereunder or in connection with any of the Transaction Documents shall terminate and expire, and shall cease to be of any force or effect, on the Closing Date and all Liability of Sellers with respect to any such representations, warranties and

covenants shall thereupon be extinguished. All covenants of Sellers or Purchaser that contemplate actions to be taken or obligations in effect after the Closing or termination of this Agreement, as the case may be, shall survive in accordance with their terms and to the extent so contemplated, including those described in Sections 7.1.2, 7.2 and 7.5.

10.2    <u>Liability of the Sellers' Agents</u>. No past, present or future officer, director, employee, stockholder, Affiliate, agent or attorney of the Sellers will have any Liability by reason of the breach of any term, provision or representation set forth in this Agreement, with the Purchaser's recourse, if any, under such circumstances being limited to the assets of the Estate.

10.3    <u>Attorneys' Fees</u>. In the event that either party hereto brings an action or other proceeding to enforce or interpret the terms and provisions of this Agreement, the prevailing party in that action or proceeding shall be entitled to have and recover from the non-prevailing party all such fees, costs and expenses (including, without limitation, all court costs and reasonable attorneys' fees through all levels of appeal) as the prevailing party may suffer or incur in the pursuit or defense of such action or proceeding.

10.4    <u>Notices</u>. All notices, requests, demands, waivers and other communications required or permitted to be given under this Agreement shall be in writing and shall be deemed to have been duly given if (a) delivered personally, (b) mailed by first-class, registered or certified mail, return receipt requested, postage prepaid, (c) sent by reputable next-day or overnight mail or courier or (d) sent by facsimile transmission. All such notices, requests, demands, waivers and other communication shall be deemed to have been received (i) if by personal delivery, upon delivery, (ii) if by certified or registered mail, on the third business day after the mailing thereof, (iii) if by next-day or overnight mail or courier, on the business day after such mailing, (iv) if by facsimile, three hours after the sender receives a fax confirmation, unless the fax is sent after 5:00 p.m. on a business day or on a non-business day, in which case it shall be deemed received on the next business day.

If to Seller:

Canyon Falls Land Partners, LP
c/o Canyon Falls GP, LLC
13455 Noel Road, Suite 800
Dallas, TX 75240
Telephone: _____
Facsimile: 972-628-4147
Attention: Scott Ellington

McGinnis Land Partners I, LP
c/o Canyon Falls Land GP, LLC
13455 Noel Road, Suite 800
Dallas, TX 75240
Telephone: _____
Facsimile: 972-628-4147
Attention: Scott Ellington

With a copy (which shall not constitute notice) to:

> Cole Schotz Meisel Forman & Leonard
> 301 Commerce, Suite 1700
> Ft. Worth, Texas 76102
> Telephone: (817) 810-5275
> Facsimile: (817) 810-5255
> Attention: Michael D. Warner

With a copy (which shall not constitute notice) to:

> Steven J. Kaplan, P.C.
> 3811 Turtle Creek Blvd., Suite 1850
> Dallas, Texas 75219
> Telephone: (214) 651-4060
> Facsimile: (214) 651-4001
> Attention: Steven J. Kaplan

If to Purchaser:

> [Company Name]
> [Street Address]
> City, State, Zip Code
> Attention: [Individual name]

With a copy (which shall not constitute notice) to:

or in each case, to such other address as may be specified in writing to the other parties.

Any party may give any notice, instruction or communication in connection with this Agreement using any other means (including personal delivery, telecopy or ordinary mail), but no such notice, instruction or communication shall be deemed to have been delivered unless and until it is actually received by the party to whom it was sent. Any party may change the address to which notices, instructions, or communications are to be delivered by giving the other parties to this Agreement notice thereof in the manner set forth in this Section.

10.5    Entire Agreement.  This Agreement and the other Transaction Documents (including any schedules or exhibits hereto and thereto) contain the entire understanding and agreement between the parties with respect to the subject matter hereof. All Exhibits and

14

Schedules attached hereto are hereby incorporated into this Agreement and are hereby made a part hereof as if set out in full in this Agreement.

10.6   Amendment.  This Agreement may be amended, modified or supplemented only by a written instrument duly executed by all the parties hereto and, where required, approved by the Bankruptcy Court.

10.7   Assignments.  This Agreement shall not be assigned by either party hereto without the prior written consent of the other party hereto; except that Purchaser shall be permitted to assign its right to purchase all or any portion of the Real Property to any one or more Affiliates of Purchaser and provided further that any such assignment(s) shall in no way release or relieve Purchaser from any Liability under this Agreement.

10.8   Binding Effect.  Subject to any restrictions hereunder on the assignment of this Agreement, this Agreement shall bind and inure to the benefit of the respective heirs, personal Representatives, successors and assigns of the parties.

10.9   Severability.  Any term or provision of this Agreement that is invalid or unenforceable shall be ineffective to the extent of such invalidity or unenforceability, without rendering invalid or unenforceable or affecting the validity or enforceability of any of the other terms or provisions of this Agreement.  Any term or provision of this Agreement that is invalid or unenforceable in any jurisdiction shall be ineffective in such jurisdiction, without rendering invalid or unenforceable or effecting the validity or enforceability of any terms or provisions of this Agreement in any other jurisdiction.

10.10   Waiver.  No action taken pursuant to this Agreement, including any investigation by or on behalf of any party, shall be deemed to constitute a waiver by any party taking such action of compliance with any representation, warranty, covenant or agreement contained herein. The waiver by any party hereto of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.  No failure on the part of any party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.

10.11   Bankruptcy Court Jurisdiction.  THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION OVER ALL DISPUTES AND OTHER MATTERS RELATING TO (i) THE INTERPRETATION AND ENFORCEMENT OF THIS AGREEMENT OR ANY ANCILLARY DOCUMENT EXECUTED PURSUANT HERETO; AND/OR (ii) THE REAL PROPERTY AND THE PARTIES EXPRESSLY CONSENT TO AND AGREE NOT TO CONTEST SUCH EXCLUSIVE JURISDICTION.

10.12   Governing Law.  THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED, INTERPRETED AND ENFORCED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS WITHOUT REGARD TO THE CONFLICTS OF LAWS OR CHOICE OF LAWS PRINCIPLES THEREOF THAT WOULD CAUSE THE APPLICATION OF THE LAWS OF ANY JURISDICTION OTHER THAN THE STATE OF TEXAS.

48467/0001-7010212v4

10.13   Waiver Of Jury Trial.  EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE OTHER TRANSACTION DOCUMENTS.  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER TRANSACTION DOCUMENTS, AS APPLICABLE, BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

10.14   Counterparts.  This Agreement may be executed by facsimile signature and in any number of counterparts, each of which shall be deemed an original and all which together shall constitute one and the same instrument.

10.15   Third Party Beneficiaries.  Nothing in this Agreement is intended, nor shall anything herein be construed, to confer any rights, legal or equitable, in any Person other than the parties hereto and their respective successors and permitted assigns.  There are no third party beneficiaries to this Agreement.

10.16   Confidentiality Agreement.  Any confidentiality agreement between Purchaser and Sellers or any of their respective Affiliates executed in connection with this Agreement shall remain in full force and effect during the term specified therein.

10.17   Title Policy or Abstract.  The Texas Real Estate License Act requires written notice to Purchaser that it should have an attorney examine an abstract of title to the property being purchased or obtain a title insurance policy. Notice to that effect is, therefore, hereby given to Purchaser.

10.18   Notice Regarding Possible Annexation.  If the Property that is the subject of this Contract is located outside the limits of a municipality, the Property may now or later be included in the extraterritorial jurisdiction of a municipality and may now or later be subject to annexation by the municipality.  Each municipality maintains a map that depicts its boundaries and extraterritorial jurisdiction.  To determine if the Property is located within a municipality's extraterritorial jurisdiction, contact all municipalities located in the general proximity of the Property for further information.

[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, Purchaser and Sellers have executed this Asset Purchase Agreement as of the day and year first above written.

SELLERS:

CANYON FALLS LAND PARTNERS, LP
a Texas limited partnership

By: Canyon Falls GP, LLC
a Texas limited liability company
Its: General Partner


By: _____
Scott Ellington

_____


McGINNIS LAND PARTNERS I, LP
a Texas limited partnership

By: Canyon Falls Land GP, LLC
a Texas limited liability company
Its: General Partner


By:_____
Scott Ellington

_____


PURCHASER:

[_____]

By :_____
Name:
Title:

48467/0001-7010212v4

# EXHIBIT "A"

## LEGAL DESCRIPTION

FIELD NOTE DESCRIPTION - PARCEL 1B (McGinnis Land Partners I, LP)

STATE OF TEXAS
COUNTY OF DENTON

BEING a tract of land situated in the M.E.P. & P. R.R. SURVEY, Abstract No. 913, J. WILBURN SURVEY, Abstract No. 1416 and the W. LOVE SURVEY, Abstract No. 728 and being a portion of a tract of land described in a deed to McGinnins Land Partners I LP as recorded in Clerk's File No. D200635534 of the Real Property Records of Denton County, Texas ( DRDCT ) and being more particularly described as follows;

COMMENCING at a 1/2 inch iron rod with a red plastic cap stamped "W.A.I." set for the most northeasterly corner of a tract of land described in a deed to La Estancia Investments LP as recorded in Clerk's File No. D2008-137045 of the Real Property Records of Denton County, Texas;

THENCE along the northerly line of said La Estancia Investments LP tract as follows:

North 89 degrees 07 minutes 28 seconds West a distance of 723.46 feet to a 1/2 inch iron rod found with a red plastic cap stamped "W.A.I." for corner;

North 89 degrees 07 minutes 28 seconds West a distance of 899.79 feet to a 1/2 inch iron rod with a red plastic cap stamped W.A.I. found for corner;

South 00 degrees 17 minutes 28 seconds West a distance of 312.00 feet to a 1/2 inch iron rod with a red plastic cap stamped W.A.I. found for corner;

North 89 degrees 31 minutes 32 seconds West a distance of 863.54 feet to a ½ inch iron rod with blue plastic cap stamped ElamPack Surveyors set for the POINT OF BEGINNING;

North 89 degrees 31 mionutes 32 seconds West a distance of 54.44 feet to a 1/2 inch iron rod with a red plastic cap stamped W.A.I. found for corner in the easterly line of a 180 foot Texas Municipal Power Agency Easement as recorded in Volume 1400, Page 820 (DRDCT) and Volume 1406, Page 84 (DRDCT);

THENCE along the easterly line of said 180 foot Texas Municipal Power Agency Easement as follows:

North 47 degrees 40 minutes 17 seconds West a distance of 2461.01 feet to a 1/2 inch

iron rod with a red plastic cap stamped W.A.I. found for corner;

North 23 degrees 32 minutes 55 seconds West a distance of 943.41 feet to a 1/2 inch iron rod with a red plastic cap stamped W.A.I. found for corner;

THENCE departing the easterly line of said 180 foot Texas Municipal Power Agency Easement North 81 degrees 13 minutes 19 seconds East a distance of 406.95 feet to a 1/2 inch iron rod with a red plastic cap stamped W.A.I. found for corner;

THENCE North 68 degrees 23 minutes 58 seconds East a distance of 247.81 feet to a 1/2 inch iron rod with a red plastic cap stamped W.A.I. found for corner;

THENCE South 81 degrees 43 minutes 18 seconds East a distance of 332.85 feet to a 1/2 inch iron rod with a red plastic cap stamped W.A.I. set for the beginning of a non-tangent curve to the left having a radius of 970.00 feet, a chord bearing South 25 degrees 24 minutes 32 seconds East and a chord distance of 1076.04 feet;

THENCE along said non-tangent curve to the left through central angle of 67 degrees 22 minutes 29 seconds for an arc length of 1140.63 feet to a 1/2 inch iron rod with a red plastic cap stamped W.A.I. found for corner;

THENCE South 59 degrees 05 minutes 47 seconds East a distance of 369.39 feet to a 1/2 inch iron rod with a red plastic cap stamped W.A.I. found for corner;

THENCE North 30 degrees 54 minutes 13 seconds East a distance of 60.81 feet to a 1/2 inch iron rod with a red plastic cap stamped W.A.I. set for the beginning of a curve to the right having a radius of 835.00 feet, a chord bearing North 55 degrees 00 minutes 51 seconds East and a chord distance of 682.19 feet;

THENCE along said curve to the right through central angle of 48 degrees 13 minutes 16 seconds for an arc length of 702.75 feet to a 1/2 inch iron rod with a red plastic cap stamped W.A.I. found for corner;

THENCE North 79 degrees 07 minutes 29 seconds East a distance of 5.05 feet to a ½ inch iron rod with blue plastic cap stamped ElamPack Surveyors set for corner in the easterly line of a Proposed 90' Right of Way and the westerly line of a 108.329 acre AISD School Site;

THENCE along the easterly line of a Proposed 90' Right of Way and the westerly line of a 108.329 acre AISD School Site as follows:

South 32 degrees 03 minutes 49 seconds West a distance of 952.62 feet to a ½ inch iron rod with blue plastic cap stamped ElamPack Surveyors set for the beginning of a curve to the left having a radius of 25.00 feet, a chord bearing of South 12 degrees 56 minutes 11 seconds East and a chord length of 35.35 feet;

Along said curve to the left through a central angle of 90 degrees 00 minutes 00 seconds

for an arc length of 39.27 feet to a ½ inch iron rod with blue plastic cap stamped ElamPack Surveyors set for corner in the northeasterly right of way line of a Proposed 60' Right of Way;

THENCE along the westerly line of said AISD School Site and the northeasterly right of way line of said Proposed 60' Right of Way as follows:

South 57 degrees 56 minutes 11 seconds East a distance of 105.62 feet to a 1/2 inch iron rod with blue plastic cap stamped ElamPack Surveyors set for the beginning of a curve to the right having a radius of 575.00 feet, a chord bearing of South 30 degrees 53 minutes 01 seconds East and a chord length of 523.03 feet;

Along said curve to the right through a central angle of 54 degrees 06 minutes 20 seconds for an arc length of 542.99 feet to a 1/2 inch iron rod with blue plastic cap stamped ElamPack Surveyors for corner;

South 03 degrees 49 minutes 51 seconds East a distance of 429.63 feet to a 1/2 inch iron rod with blue plastic cap stamped ElamPack Surveyors set for the beginning of a curve to the left having a radius of 555.00, a chord bearing South 10 degrees 57 minutes 14 seconds East and a chord length of 137.65 feet;

Along said curve to the left through a central angle of 14 degrees 14 minutes 47 seconds for an arc length of 138.00 feet to the POINT OF BEGINNING;

CONTAINING within these metes and bounds 50.672 acres or 2,207,288 square feet of land more or less. Bearings contained within this field note description are based upon an on the ground survey performed in field the month of June, 2009 utilizing G.P.S. Measurements.


FIELD NOTE DESCRIPTION - PARCEL 1A (Canyon Falls Land Partners, LP)

STATE OF TEXAS
COUNTY OF DENTON

BEING a tract of land situated in the M.E.P. & P. R.R. SURVEY, Abstract No. 913, F. THORNTON SURVEY, Abstract No. 1244, J. WILBURN SURVEY, Abstract No. 1416 and the W. LOVE SURVEY, Abstract No. 728 and being a portion of a tract of land described in a deed to Canyon Falls Land Partners LP as recorded in Clerk's File No. D2006-35531of the Real Property Records of Denton County, Texas and being more particularly described as follows;

BEGINNING at a capped 1/2 inch iron rod found at the most northwesterly corner of a tract of land conveyed to Mark Wayne Judge, and wife Mary Abb Judge as recorded in Volume 4144, Page 2082 of the Deed Records of Denton County, Texas ;

THENCE departing the northerly line of said Judge tract North 00 degrees 30 minutes 31 seconds East along a barb wire fence a distance of 2895.65 feet to a wood fence post found for corner, said point being the most northeasterly corner of a tract of land conveyed to D.W. Coin,

and wife Christine Coin as recorded in Volume 1015, Page 432 of the Deed Records of Denton County, Texas;

THENCE along a barb wire fence North 89 degrees 30 minutes 59 seconds West a distance of 2944.98 feet to a 3/8 inch iron rod found for corner in the approximate centerline of CLEVELAND-GIBBS ROAD, said point being the most northwesterly corner of a tract of land conveyed to Elton Dee Gardner, Jr. as recorded in CC# 93-0084282 of the Deed Records of Denton County, Texas;

THENCE along the approximate centerline of as CLEVELAND-GIBBS ROAD as follows;

North 00 degrees 05 minutes 55 seconds West a distance of 1407.56 feet to a 1/2 inch iron rod found with a red plastic cap stamped "W.A.I." for corner;

North 13 degrees 10 minutes 14 seconds West a distance of 622.96 feet to a Pk. Nail set in asphalt pavement for corner, said point being set in the southeasterly right of way of INTERSTATE 35W (variable width right of way);

THENCE departing the approximate centerline of said CLEVELAND-GIBBS ROAD and along the southeasterly right of way line of said INTERSTATE 35W as follows;

North 77 degrees 44 minutes 47 seconds East a distance of 17.12 feet to a TXDOT Concrete Monument found for corner;

North 07 degrees 49 minutes 52 seconds East a distance of 75.37 feet to a 1/2 inch iron rod found with a red plastic cap stamped "W.A.I." for corner;

North 13 degrees 52 minutes 40 seconds West a distance of 160.00 feet to a TXDOT Concrete Monument found for corner;

North 20 degrees 34 minutes 02 seconds West a distance of 217.85 feet to a point for corner in a tree;

North 89 degrees 26 minutes 40 seconds West a distance of 16.86 feet to a 1/2 inch iron rod found for corner;

North 18 degrees 23 minutes 39 seconds West a distance of 6.22 feet to a TXDOT Concrete Monument found for corner;

North 88 degrees 35 minutes 44 seconds West a distance of 57.52 feet to a TXDOT Concrete Monument found for corner;

North 64 degrees 58 minutes 47 seconds West a distance of 136.61 feet to a TXDOT Concrete Monument found for corner;

North 21 degrees 08 minutes 10 seconds West passing through a TXDOT Concrete

Monument at a distance of 248.70 feet continuing in all a distance of 528.90 feet to a TXDOT Concrete Monument found for corner;

North 24 degrees 05 minutes 25 seconds East a distance of 743.70 feet to a broken TXDOT Concrete Monument found for corner

South 87 degrees 44 minutes 14 seconds East passing through a TXDOT Concrete Monument found at a distance of 95.74 feet departing the southeasterly Right of way line of said INTERSTATE 35W and continuing in all along a barb wire fence a distance of 4847.39 feet to a wood fence post found for corner, said point being found in the southerly line of a tract of land conveyed to Ronald Lee McCutchin as recorded in Volume 527, Page 68 of the Deed Records of Denton County, Texas;

THENCE along the southerly line of said McCutchin tract and along a barb wire fence as follows;

North 01 degrees 02 minutes 25 seconds East a distance of 520.88 feet to a 5/8 inch iron rod found for corner;

South 88 degrees 42 minutes 52 seconds East a distance of 20.24 feet to a wood fence post found for corner;

North 00 degrees 08 minutes 51 seconds East a distance of 1268.91 feet to a 5/8 inch iron rod found for corner;

South 89 degrees 41 minutes 56 seconds East a distance of 1442.20 feet to a 1/2 inch iron rod found for the most southwesterly corner of THE SETTLEMENT II as recorded in Cabinet E, Page 33 of the Plat Records of Denton County, Texas;

THENCE along the southerly line of said THE SETTLEMENT II and along a barb wire feet as follows;

South 89 degrees 42 minutes 54 seconds East a distance of 1607.35 feet to a 1/2 inch iron rod found for corner;

South 88 degrees 29 minutes 54 seconds East passing through a 1/2 inch iron rod found at a distance of 311.48 feet continuing in all a distance of 366.95 feet to a wood fence post found for corner;

South 89 degrees 45 minutes 57 seconds East passing through a 1/2 inch iron rod found at a distance of 119.13 feet and passing through a 1/2 inch iron rod found at a distance of 294.24 feet continuing in all a distance of 732.14 feet to a wood fence post found for the most southeasterly corner of said THE SETTLEMENT II;

THENCE along the easterly line of said THE SETTLEMENT II North 01 degrees 19 minutes 54 seconds East a distance of 83.74 feet to a 1/2 inch iron rod found for corner, said point being the

most southwesterly corner of a tract of land conveyed to Ray Wolfe as recorded in CC#95-R0061399 of the Deed Records of Denton County, Texas;

THENCE along the southerly line of said White tract North 89 degrees 19 minutes 34 seconds East a distance of 658.25 feet to a 1/2 inch iron rod found for the most southeasterly corner of said White tract, said point being found in the approximate centerline of STONECREST ROAD ( variable width right of way );

THENCE along the approximate centerline of said STONECREST ROAD as follows;

South 01 degrees 26 minutes 35 seconds West a distance of 681.53 feet to a Pk. Nail found in asphalt pavement for the most northwesterly corner of the STONECREST ADDITION, as recorded in Volume 5, Page 37;

South 00 degrees 05 minutes 06 seconds West a distance of 1576.97 feet to a Pk. Nail set in asphalt pavement for the most northwesterly corner of the SUNRISE CIRCLE ESTATES, as recorded in Cabinet D, Page 258;

South 00 degrees 21 minutes 22 seconds East a distance of 885.71 feet to a Pk. Nail set in asphalt pavement for the most northwesterly corner of a tract of land conveyed to the Town of Flower Mound as recorded CC# 2005-14711 of the Deed Records of Denton County, Texas;

South 00 degrees 20 minutes 38 seconds East a distance of 426.15 feet to a 5/8 inch iron rod found for the most northwesterly corner of a tract of land conveyed to the Upper Trinity Regional Water District as recorded in Volume 5077, Page 01442 of the Deed Records of Denton County, Texas ;

South 00 degrees 26 minutes 05 seconds East passing through a Pk. Nail found in asphalt pavement for the most northwesterly corner of a tract of land conveyed to Barry Whitworth as recorded in Volume 2668, Page 260 at a distance of 317.32 continuing in all a distance of 634.61 feet to a Pk. Nail found in asphalt pavement for the most northwesterly corner of a tract of land conveyed to Mike Flanagan, and wife Shelia Flanagan as recorded in Volume 863, Page 175 of the Deed Records of Denton County, Texas;

South 00 degrees 22 minutes 08 seconds East a distance of 1182.38 feet to a 1/2 inch iron rod set with a red plastic cap stamped "W.A.I." for corner, said point being set at the most southwesterly corner of a tract of land conveyed to Mike Flanagan, and wife Shelia Flanagan as recorded in Volume 821, Page 256 of the Deed Records of Denton County, Texas  and said point being set in the northwesterly Right of way line of the TEXAS AND PACIFIC RAILROAD (100 feet wide right of way);

THENCE along the northwesterly right of way line of the said TEXAS AND PACIFIC RAILROAD South 22 degrees 04 minutes 40 seconds West a distance of 815.75 feet to a 1/2 inch iron set with a red plastic cap stamped "W.A.I." for corner, said point being the most northeasterly corner of a tract of land described in a deed to La Estancia Investments LP as recorded in Clerk's File No. D2008-137045 of the Real Property Records of Denton County,

Texas;

THENCE along the northerly line of said Ewing tract North 89 degrees 07 minutes 28 seconds West a distance of 75.08 feet to a 1/2 inch iron rod set with a blue plastic cap stamped ElamPack Surveyors for corner in the westerly right of way line of a Proposed 60' Right of Way, said iron rod being the southeasterly corner of a 108.319 acre AISD School Site;

THENCE along said AISD School Site and the proposed 60' Right of Way as follows:

North 22 degrees 04 minutes 40 seconds East a distance of 103.77 feet to an iron rod set with blue plastic cap stamped ElamPack Surveyors for the beginning of a curve to the left having a radius of 520.00, a chord bearing of North 07 degrees 45 minutes 21 seconds East and a chord length of 257.26 feet;

Along said curve to the left through a central angle of 28 degrees 38 minutes 37 seconds for an arc length of 259.96 feet to an iron rod set with blue plastic cap stamped ElamPack Surveyors for corner;

North 06 degrees 33 minutes 57 seconds West a distance of 145.94 feet to an iron rod set with blue plastic cap stamped ElamPack Surveyors for the beginning of a curve to the right having a radius of 580.00 feet, a chord bearing of North 09 degrees 08 minutes 09 seconds East and a chord length of 313.93 feet;

Along said curve to the right through a central angle of 31 degrees 24 minutes 12 seconds for an arc length of 317.89 feet to an iron rod set with blue plastic cap stamped ElamPack Surveyors for corner;

North 24 degrees 50 minutes 15 seconds East a distance of 13.93 feet to an iron rod set with blue plastic cap stamped ElamPack Surveyors for the beginning of a curve to the left having a radius of 25.00 feet, a chord bearing of North 20 degrees 09 minutes 45 seconds West and a chord length of 35.36 feet;

Along said curve to the left through a central angle of 90 degrees 00 minutes 00 seconds for an arc length of 39.27 feet to an iron rod set with blue plastic cap stamped ElamPack Surveyors for corner in the southerly line of a Proposed 90' Right of Way;

THENCE along the northerly line of said AISD School Site and the southerly right of way line of said proposed 90' Right of Way as follows:

North 65 degrees 09 minutes 45 seconds West a distance of 371.14 feet to an iron rod set with blue plastic cap stamped ElamPack Surveyors for the beginning of a curve to the right having a radius of 645.00 feet, a chord bearing of North 47 degrees 37 minutes 32 seconds West and a chord length of 388.71 feet;

Along said curve to the right through a central angle of 35 degrees 04 minutes 26 seconds for an arc length of 394.84 feet to an iron rod set with blue plastic cap stamped ElamPack

Surveyors for corner;

North 30 degrees 05 minutes 19 seconds West a distance of 526.97 feet to an iron rod set with blue plastic cap stamped ElamPack Surveyors for the beginning of a curve to the left having a radius of 855.00 feet, a chord bearing of North 89 degrees 00 minutes 45 seconds West and a chord length of 1464.56 feet;

Along said curve to the left through a central angle of 117 degrees 50 minutes 52 seconds for an arc length of 1758.59 feet to an iron rod set with blue plastic cap stamped ElamPack Surveyors for corner;

South 32 degrees 03 minutes 49 seconds West a distance of 143.47 feet to an iron rod set with blue plastic cap stamped ElamPack Surveyors for corner in the northerly line of a 116.055 acre tract of land described in a deed to McGinnis Land Partners I LP as recorded by Clerk's File No. D2006-35534 of the Real Property Records of Denton County, Texas;

THENCE along the common line of said Canyon Falls Land Partners LP tract and the McGinnis Land Partners I LP tract as follows:

Along said non-tangent curve to the right through central angle of 06 degrees 35 minutes 08 seconds for an arc length of 75.29 feet to a 1/2 inch iron rod with a red plastic cap stamped 'W.A.I.' found for corner;

South 79 degrees 07 minutes 29 seconds West a distance of 518.66 feet to a 1/2 inch iron rod with a red plastic cap stamped 'W.A.I.' found for the beginning of a curve to the left having a radius of 835.00 feet, a chord bearing South 55 degrees 00 minutes 51 seconds West and a chord distance of 682.19 feet;

Along said curve to the left through central angle of 48 degrees 13 minutes 16 seconds for an arc length of 702.75 feet to a 1/2 inch iron rod with a red plastic cap stamped 'W.A.I.' found for corner;

South 30 degrees 54 minutes 13 seconds West a distance of 60.81 feet to a 1/2 inch iron rod with a red plastic cap stamped 'W.A.I.' found for corner;

North 59 degrees 05 minutes 47 seconds West a distance of 369.39 feet to a 1/2 inch iron rod with a red plastic cap stamped 'W.A.I.' found for the beginning of a curve to the right having a radius of 970.00 feet, a chord bearing North 25 degrees 24 minutes 32 seconds West and a chord distance of 1076.04 feet;

Along said curve to the right through central angle of 67 degrees 22 minutes 29 seconds for an arc length of 1140.63 feet to a 1/2 inch iron rod with a red plastic cap stamped 'W.A.I.' found for corner;

North 81 degrees 43 minutes 18 seconds West a distance of 332.85 feet to a 1/2 inch iron rod with a red plastic cap stamped 'W.A.I.' found for corner;

South 68 degrees 23 minutes 58 seconds West a distance of 247.81 feet to a 1/2 inch iron rod with a red plastic cap stamped 'W.A.I.'' found for corner;

South 81 degrees 13 minutes 19 seconds West a distance of 406.95 feet to a 1/2 inch iron rod with a red plastic cap stamped 'W.A.I.'' found for corner in the easterly line of a 180 foot Texas Municipal Power Agency Easement as recorded in Volume 1400, Page 820 (DRDCT) and Volume 1406, Page 84 (DRDCT);

THENCE along the easterly line of said 180 foot Texas Municipal Power Agency Easement as follows:

South 23 degrees 32 minutes 55 seconds East a distance of 943.41 feet to a 1/2 inch iron rod with a red plastic cap stamped 'W.A.I.'' found for corner;

South 47 degrees 40 minutes 17 seconds East a distance of 2461.01 feet to a 1/2 inch iron rod with a red plastic cap stamped 'W.A.I.'' found for corner in the northerly line of said Ewing tract;

THENCE along the northerly line of said Ewing tract as follows:

North 89 degrees 31 minutes 32 seconds West a distance of 1557.81 feet to a wood fence post found for corner;

South 00 degrees 32 minutes 43 seconds West a distance of 2910.30 feet to a 5/8 inch iron rod found for corner, said point being found in the northerly Right of way line of F.M. 1171 ( variable width Right of way );

THENCE along the northerly Right of way line of said F.M. 1171 as follows;

North 71 degrees 41 minutes 34 seconds West a distance of 846.41 feet to a wood TXDOT monument found for corner;

North 40 degrees 46 minutes 38 seconds West a distance of 116.62 feet to a wood TXDOT monument found for corner;

North 71 degrees 44 minutes 28 seconds West passing through a wood TXDOT monument found at a distance of 145.00 feet and passing through a wood TXDOT monument found at a distance of 255.00 feet continuing in all a distance of 500.00 feet to a wood TXDOT monument found for corner;

South 66 degrees 26 minutes 52 seconds West a distance of 75.00 feet to a 1/2 inch iron rod set with a red plastic cap stamped "W.A.I." for the beginning of a non-tangent curve to the left having a radius of 5659.58 feet and having a chord bearing of North 70 degrees 03 minutes 39 seconds West and a chord length of 231.34 feet;

Continuing along said non-tangent curve to the left through a central angle of 02 degrees 20 minutes 32 seconds and an arc length of 231.36 feet to the point of tangency;

North 69 degrees 22 minutes 11 seconds West a distance of 33.82 feet to a capped 1/2 inch iron rod found at the most southeasterly corner of said Judge tract;

THENCE along the easterly line of said Judge tract as follows;

North 00 degrees 54 minutes 19 seconds West a distance of 250.23 feet to a capped 1/2 inch iron rod found for corner;

North 05 degrees 57 minutes 32 seconds West a distance of 225.22 feet to a capped 1/2 inch iron rod found for the most northeasterly corner of said Judge tract;

THENCE along the northerly line of said Judge tract North 89 degrees 24 minutes 30 seconds West a distance of 313.03 feet to the POINT OF BEGINNING;

CONTAINING within these metes and bounds 1073.197 acres or 46,748,404 square feet of land more or less, save and except a 5.000 acre tract as described in a deed to Denton County, Texas and recorded in Document Number 2010-27754 (DRDCT), being a net acreage of 1068.197 acres or 46,530,661 square feet of land.

Bearings contained within this field note description are based upon an on the ground survey performed in field the month of June, 2009 utilizing G.P.S. Measurements.

FIELD NOTE DESCRIPTION
CITY OF NORTHLAKE TRACT 2 (Canyon Falls Land Partners, LP)

STATE OF TEXAS
COUNTY OF DENTON

BEING a tract of land situated in the W. LOVE SURVEY, Abstract No. 728 and being a portion of a tract of land described in a deed to CANYON FALLS LAND PARTNERS L.P. as recorded in Instrument No. 2006-35531 of the Deed Records of Denton County, Texas ( DRDCT ) and being more particularly described as follows;

BEGINNING at a 5/8" iron rod found at the intersection of the common line of a tract of land conveyed as 1% Frances McLendon Ewing as recorded in Volume 1552, Page 949 (DRDCT) and the said Obenchain tract and the southerly Right-of-Way line of F.M. 1171 ( a variable width Right-of-Way );

THENCE along the southerly Right-of-Way line of said F.M. 1171 as follows;

South 69 deg 30 min 13 sec East a distance of 353.33 feet to a wood TXDOT monument found for corner;

South 70 deg 08 min 26 sec East a distance of 235.35 feet to a wood TXDOT monument found for corner;

South 25 deg 13 min 15 sec East a distance of 80.88 feet to a wood TXDOT monument found for corner;

South 71 deg 38 min 42 sec East passing through a wood TXDOT monument found at a distance of 145.00 feet and passing through a wood TXDOT monument found at a distance of 253.46 feet continuing in all a distance of 500.00 feet to a wood TXDOT monument found for corner;

North 77 deg 33 min 25 sec East a distance of 116.11 feet to a wood TXDOT monument found for corner;

South 71 deg 48 min 04 sec East a distance of 593.69 feet to a ½ inch iron rod found for corner, said point being found in the northerly line of said Ewing tract;

THENCE along the northerly line of said Ewing tract and along a barb wire fence as follows;

North 89 deg 25 min 20 sec West a distance of 1739.14 feet to a wood fence post found for corner;

North 00 deg 02 min 00 sec East a distance of 577.16 feet to the POINT OF BEGINNING;

CONTAINING within these metes and bounds 10.427 acres or 454,192 square feet of land more or less. Bearings contained within this field note description are based upon an on the ground survey performed in field on the 19th day of November, 2005 utilizing G.P.S. Measurements.

# SPECIAL WARRANTY DEED

THE STATE OF TEXAS      §
                              §
COUNTY OF _____    §

    **THAT**, _____, and _____ (collectively, "Grantor"), for and in consideration of the sum of $10.00 cash in hand paid by _____, a _____ ("Grantee"), whose address is _____, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by Grantor, has GRANTED, BARGAINED, SOLD and CONVEYED and by these presents does GRANT, BARGAIN, SELL and CONVEY unto Grantee, one or more certain tracts of real property situated in Denton County, Texas, and described in Exhibit "A" attached hereto and made a part hereof for all purposes, together with all and singular the rights, benefits, easements, privileges, hereditaments, appurtenances and interests pertaining to such real property, including any and all improvements and fixtures currently attached to and located thereon (all of the foregoing collectively, the "Property").

    For the same consideration recited above, Grantor hereby BARGAINS, SELLS and TRANSFERS, without warranty, express or implied, all interest, if any, of Grantor in (i) strips or gores, if any, between the Property and abutting or immediately adjacent properties, and (ii) any land lying in or under the bed of any street, alley, road or right-of-way, opened or proposed, abutting or immediately adjacent to the Property.

    **GRANTEE ACKNOWLEDGES THAT EXCEPT FOR ANY EXPRESS WARRANTIES AND REPRESENTATIONS CONTAINED IN THE REAL ESTATE PURCHASE AND SALE AGREEMENT DATED _____ BETWEEN GRANTOR AND GRANTEE (THE "AGREEMENT") AND GRANTOR'S SPECIAL WARRANTY OF TITLE CONTAINED IN THIS DEED, GRANTEE ACCEPTS THE PROPERTY IN ITS PRESENT CONDITION ON AN "AS IS" BASIS AND GRANTEE IS NOT RELYING ON ANY WRITTEN, ORAL, IMPLIED OR OTHER REPRESENTATIONS, STATEMENTS OR WARRANTIES BY GRANTOR OR ANY AGENT OF GRANTOR OR ANY REAL ESTATE BROKER OR SALESMAN. EXCEPT AS EXPRESSLY SET FORTH IN THE AGREEMENT OR IN THIS DEED, GRANTOR SHALL HAVE NO LIABILITY TO GRANTEE, AND GRANTEE HEREBY RELEASES GRANTOR FROM ANY LIABILITY (INCLUDING CONTRACTUAL AND/OR STATUTORY ACTIONS FOR CONTRIBUTION OR INDEMNITY), FOR, CONCERNING OR REGARDING (1) THE NATURE AND CONDITION OF THE PROPERTY, INCLUDING THE SUITABILITY THEREOF FOR ANY ACTIVITY OR USE; (2) ANY IMPROVEMENTS OR SUBSTANCES LOCATED THEREON; OR (3) THE COMPLIANCE OF THE PROPERTY WITH ANY LAWS, RULES, ORDINANCES OR REGULATIONS OF ANY GOVERNMENT OR OTHER BODY. THE FOREGOING INCLUDES A RELEASE OF**

GRANTOR FROM CLAIMS BASED ON GRANTOR'S NEGLIGENCE IN WHOLE OR IN PART AND CLAIMS BASED ON STRICT LIABILITY. GRANTOR HAS NOT MADE, DOES NOT MAKE AND EXPRESSLY DISCLAIMS, ANY WARRANTIES, REPRESENTATIONS, COVENANTS OR GUARANTEES, EXPRESSED OR IMPLIED, OR ARISING BY OPERATION OF LAW, AS TO THE MERCHANTABILITY, HABITABILITY, QUANTITY, QUALITY OR ENVIRONMENTAL CONDITION OF THE PROPERTY OR ITS SUITABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE OR USE. GRANTEE AFFIRMS THAT PRIOR TO THE DATE OF THIS DEED GRANTEE HAS (I) INVESTIGATED AND INSPECTED THE PROPERTY TO ITS SATISFACTION AND BECOME FAMILIAR AND SATISFIED WITH THE CONDITION OF THE PROPERTY, AND (II) MADE ITS OWN DETERMINATION AS TO (A) THE MERCHANTABILITY, QUANTITY, QUALITY AND CONDITION OF THE PROPERTY, INCLUDING THE POSSIBLE PRESENCE OF TOXIC OR HAZARDOUS SUBSTANCES, MATERIALS OR WASTES OR OTHER ACTUAL OR POTENTIAL ENVIRONMENTAL CONTAMINATES, AND (B) THE PROPERTY'S SUITABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE OR USE. GRANTEE HEREBY ACCEPTS THE PROPERTY IN ITS PRESENT CONDITION ON AN "AS IS", "WHERE IS" AND "WITH ALL FAULTS", INCLUDING ENVIRONMENTAL, BASIS AND ACKNOWLEDGES THAT (1) WITHOUT THIS ACCEPTANCE, THIS SALE WOULD NOT BE MADE, AND (2) THAT GRANTOR SHALL BE UNDER NO OBLIGATION WHATSOEVER TO UNDERTAKE ANY REPAIR, ALTERATION, REMEDIATION OR OTHER WORK OF ANY KIND WITH RESPECT TO ANY PORTION OF THE PROPERTY. GRANTEE AND ITS SUCCESSORS AND ASSIGNS HAVE, AND SHALL BE DEEMED TO HAVE, ASSUMED ALL RISK AND LIABILITY WITH RESPECT TO THE PRESENCE OF TOXIC OR HAZARDOUS SUBSTANCES, MATERIALS OR WASTES OR OTHER ACTUAL OR POTENTIAL ENVIRONMENTAL CONTAMINATES ON, WITHIN OR UNDER THE SURFACE OF THE PROPERTY, WHETHER KNOWN OR UNKNOWN, APPARENT, NON-APPARENT OR LATENT, AND WHETHER EXISTING PRIOR TO, AT OR SUBSEQUENT TO TRANSFER OF THE PROPERTY TO GRANTEE. GRANTOR IS HEREBY RELEASED BY GRANTEE AND ITS SUCCESSORS AND ASSIGNS OF AND FROM ANY AND ALL RESPONSIBILITY, LIABILITY, OBLIGATIONS AND CLAIMS, KNOWN OR UNKNOWN, INCLUDING (1) ANY OBLIGATION TO TAKE THE PROPERTY BACK OR REDUCE THE PRICE, OR (2) ACTIONS FOR CONTRIBUTION OR INDEMNITY, THAT GRANTEE OR ITS SUCCESSORS AND ASSIGNS MAY HAVE AGAINST GRANTOR OR THAT MAY ARISE IN THE FUTURE, BASED IN WHOLE OR IN PART UPON THE PRESENCE OF TOXIC OR HAZARDOUS SUBSTANCES, MATERIALS OR WASTES OR OTHER ACTUAL OR POTENTIAL ENVIRONMENTAL CONTAMINATES ON, WITHIN OR UNDER THE SURFACE OF THE PROPERTY, INCLUDING ALL RESPONSIBILITY, LIABILITY, OBLIGATIONS AND CLAIMS THAT MAY ARISE UNDER APPLICABLE ENVIRONMENTAL LAWS. GRANTEE FURTHER ACKNOWLEDGES THAT THE PROVISIONS OF THIS PARAGRAPH HAVE BEEN FULLY EXPLAINED TO GRANTEE AND THAT GRANTEE FULLY UNDERSTANDS AND ACCEPTS SAME.

This conveyance is being made by Grantor and accepted by Grantee subject to all reservations, restrictions, rights, easements, encumbrances and other matters described in the foregoing paragraphs and in Exhibit "B" attached hereto and incorporated herein by reference (collectively, the "Permitted Exceptions").  Grantee acknowledges the Permitted Exceptions and fully understands and accepts same.

**TO HAVE AND TO HOLD** the Property to Grantee and Grantee's successors and assigns forever; and subject to the Permitted Exceptions, and Grantor does hereby bind Grantor and Grantor's successors and assigns to warrant and forever defend, all and singular, the Property unto the Grantee and Grantee's successors and assigns, against every person whomsoever lawfully claiming or to claim the same, or any part thereof by, through or under Grantor, but not otherwise.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

**EXECUTED** to be effective the _____ day of _____, 200_.

GRANTOR:

Date: _____      _____,

By:
Name:
Title:

THE STATE OF TEXAS  §
                    §
COUNTY OF _____ §

This instrument was acknowledged before me on _____, 200_, by
_____, _____ of _____, a
_____, _____, on behalf of said _____.


Notary Public, State of Texas

GRANTEE:

Date: _____          _____,

By:
Name:
Title:

THE STATE OF TEXAS          §
                                          §
COUNTY OF _____     §

        This instrument was acknowledged before me on _____, 200_, by
_____, _____ of _____, a
_____, _____, on behalf of said _____.

                                          Notary Public, State of Texas

# EXHIBIT "A" TO DEED

# LEGAL DESCRIPTION

**EXHIBIT "B" TO DEED**

**PERMITTED EXCEPTIONS**

1.      Standby fees, taxes and assessment by any taxing authority for the year 20__, and subsequent years, and subsequent taxes and assessments by any taxing authority for prior years due to change in land usage or ownership, not yet due and payable.

2.      [Permitted Exceptions as established under the Agreement]

**SCHEDULE 5.4**

**PERMITTED EXCEPTIONS**

**[To be Supplied]**