Michael D. Warner, Esq. (TX Bar No. 00792304)
Rachel R. Obaldo, Esq. (TX Bar No. 24041617)
Cole, Schotz, Meisel, Forman & Leonard, P.A.
301 Commerce Street, Suite 1700
Fort Worth, Texas 76102
817-810-5250
817-810-5255 Facsimile
Email: mwarner@coleschotz.com
Email: robaldo@coleschotz.com

COUNSEL TO DEBTORS
MCGINNIS LAND PARTNERS I, LP,
AND CANYON FALLS LAND PARTNERS, LP

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **In Re:** | § | **Chapter 11** |
| | § | |
| **McGinnis Land Partners I, LP, and** | § | **Case No. 10-bk-34654-sgj** |
| **Canyon Falls Land Partners, LP,** | § | **Case No. 10-bk-34655-sgj** |
| | § | |
| **Debtors.** | § | **Jointly Administered Under** |
| | § | **Case No. 10-bk-34654** |

**DEBTORS' OBJECTION TO THE PROOFS OF CLAIM
FILED BY SLF IV / HANOVER CANYON FALLS, L.P.**

McGinnis Land Partners I, LP ("**McGinnis**") and Canyon Falls Land Partners, LP

("**Canyon Falls**"), the debtors and debtors in possession (collectively, the "**Debtors**") by their

attorneys, Cole, Schotz, Meisel, Forman & Leonard, P.A., hereby file this Objection to the

Proofs of Claim (defined herein below) filed by SLF IV / Hanover Canyon Falls, L.P. ("**SLF**")

and respectfully represent as follows:

## INTRODUCTION AND SUMMARY OF ARGUMENTS

SLF seeks both prepetition and post-petition interest at the default rate of 18%. This is 14% higher than the non-default rate. The difference between the two is $2,044,192[1]. For the reasons stated herein, the Court should reduce SLF's proofs of claims and allow interest to accrue at the non-default contract rate of 4.25%.

SLF is a real estate developer. On June 16, 2010, SLF purchased the secured loans on the Debtors' property for the sole purpose of foreclosing so it could own and then develop the property. The Debtors filed Chapter 11 to avoid losing their very valuable assets to another developer for less than fair value. Shortly after the Debtors commenced these Chapter 11 cases, SLF filed a motion to dismiss. The Debtors and SLF entered into an agreement to conduct a 363 auction sale at which SLF could credit bid its secured debt. The Debtors are running this sale process to attempt to maximize the value of these assets and their hard earned equity. SLF has filed and inflated its claims to increase its credit bid and chill competition so that it can fulfill its goal to "loan to own" the Debtors' property for less than its fair value.

Although SLF purchased the debt at par and paid accrued interest at the non-default rate of 4.25% for the period from the maturity date of March 23, 2010, through the date SLF acquired the debt of June 16, 2010, SLF is asserting the right to retroactively charge interest at the 18% default rate and to continue to accrue interest at this exorbitant rate. SLF is seeking default interest for the three month period prior to its acquisition of the debt, even though the demand letters served on the Debtors by the true lender, demanded payment of non-default interest. SLF

---

[1] Interest calculated at 18% on a principal balance of $19,380,000.34 from March 23, 2010 (the maturity date of the Loans), through December 28, 2010 (date sale of Remaining Property must close pursuant to the Bid Procedures Order), or 280 days is $2,676,033. Interest calculated at 4.25% on a principal balance of $19,380,000.34 from the March 23, 2010, through December 28, 2010, or 280 days is $631,841. The difference in amount of interest is $2,044,192.

is seeking to impose default interest, even though, upon information and belief, SLF did not itself borrow funds to purchase the debt.

Courts have consistently held that Bankruptcy Courts have the equitable discretion to ignore the default rate and fix the rate of interest payable to an over secured creditor at the non-default rate. There are a number of factors that inform the courts' discretion. Most of those factors are present in this case. In addition to the enormous spread between default and non-default interest, a common factor leading courts away from default interest, courts also reduce the rate of interest where it bears no relationship to the risks associated with the loan, and where the lender has acted in bad faith or attempted to obstruct the bankruptcy process. All of these grounds are present here. This Court should exercise its equitable authority and fix the rate of interest at 4.25% not 18% for purposes of establishing the amount of SLF's credit bid as well as the amount it would be entitled to be paid from the proceeds should it lose out on its goal to own and, despite its efforts to the contrary, the property is sold to another bidder.

The spread between default and non-default interest is well in excess of the differential which has lead other courts to refuse to allow default rate interest. There is no risk that SLF will not get paid. Default interest typically compensates a lender for the added risks associated when a loan is in default. In these cases, SLF has none of a typical lender's risk. SLF is over collateralized. SLF is seeking this exorbitant rate not to compensate for risk but rather so that it can unfairly increase the amount of the debt to enhance its credit bid and chill other bidders from attempting to buy the property. The appraisal recently obtained by the Debtors indicates that the fair market value of the Property is $28,440,000 or almost 40% over the amount of SLF's proofs of claim.

SLF's goal, from the outset, was to "loan to own". The risk SLF most fears is that it will get paid and therefore lose out to another bidder. Even though SLF agreed to an auction sale of the property, it is doing everything it can to subvert the auction process so that it can gain an unfair advantage and assure that there are no competitive bidders.

SLF is not a lender. The purposes of default interest are not served here. Banks charge default interest upon loan maturity so that they will get paid off. The threat of default interest is intended to incentivize borrowers to avoid default. In this case, SLF only purchased the loan because it had already matured and non payment resulted in default. It was only because the loan had matured that SLF could foreclose and own the property. It is respectfully submitted that SLF would not have purchased the loan if it had not matured and was performing since that would preclude them from "loaning to own". Allowing exorbitant default interest in this case turns the concept on its head. It is patently unfair and should not be allowed. This Court should exercise its equitable discretion and refuse to impose a confiscatory rate of interest.

## BACKGROUND

1.      Originally, the Debtors owned two contiguous tracts of vacant land consisting collectively of approximately 1,245 acres in Denton County, Texas in the Towns of Flower Mound, Northlake and Argyle (the "**Property**"). The Property is planned to be developed for both residential and commercial use and is more commonly known in the real estate development community as the "The Canyon Falls Development."

2.      The Debtors' 2006 acquisition and initial development of the Property was financed through two separate loans (the "**Loans**") with American Bank of Texas ("**ABOT**"), secured by the Property and as evidenced by certain documents[2] (the "**Loan Documents**). The

---

[2] These include: Loan Agreement – McGinnis Land Partners I, LP, Dated March 23, 2006; Loan Agreement – Canyon Falls Land Partners, LP, Dated March 23, 2006; Promissory Note – McGinnis Land Partners I, LP, Dated

Loans matured on March 23, 2010. On April 19, 2010, ABOT sent demand letters (both attached hereto as **Exhibit A**) to the Debtors. Each letter demanded payment of the principal along with accrued interest with per diem interest accumulating at a non-default rate of approximately 4.31%[3]. On June 16, 2010, just 16 days prior to the Petition Date, ABOT sold and assigned all of its rights, title and interest in the Loans to SLF for the full face amount plus accrued and unpaid interest (at the non-default rates of interest provided by the Loan Documents not to exceed 4.25%) due and owing by the Debtors on the underlying notes. SLF immediately sent notices of a forbearance sale to be held on July 6, 2010. To avoid loosing the Property to SLF, on July 2, 2010 (the "**Petition Date**"), each of the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.

3.      The Debtors remain in possession of their assets and continue to operate and manage their businesses as debtors in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

4.      No trustee, examiner, or Official Committee of Unsecured Creditors has been appointed in these cases.

5.      On August 11, 2010, SLF filed a motion to dismiss these Chapter 11 cases as bad faith filings. On August 27, 2010, the Debtors filed *Debtors' Motion for (I) Order (A) Approving Bidding Procedures for the Sale of All or Substantially all of Debtors' Assets, (B)*

---

March 23, 2006; Deed of Trust – McGinnis Land Partners I, LP Dated March 23, 2006; Renewal, Extension and Modification of Promissory Note and Lien – McGinnis Land Partners I, LP Dated June 30, 2008; Modification of Loan Agreement – McGinnis Land Partners I, LP Dated June 30, 2008; Second Renewal, Extension and Modification of Promissory Note and Lien – McGinnis Land Partners I, LP Dated June 30, 2009; Security Agreement –McGinnis Land Partners I, LP Dated June 30, 2009; Promissory Note – Canyon Falls Land Partners, LP, Dated March 23, 2006; Deed of Trust – Canyon Falls Land Partners, LP Dated March 23, 2006; Modification of Promissory Note and Lien – Canyon Falls Land Partners, LP Dated March 14, 2008; Modification of Loan Agreement – Canyon Falls Land Partners, LP Dated June 30 2008; Second Modification of Promissory Note and Lien – Canyon Falls Land Partners, LP Dated September 24, 2009; and Security Agreement – Canyon Falls Land Partners, LP Dated September 24, 2009.
[3] Pursuant to the Loan Documents, the non-default interest rate is calculated at prime rate + 1%. Presumably, the prime rate at the time the ABOT demand letters were sent, the prime rate was 3.31%.

*Authorizing Debtors to Offer Certain Bid Protections, and (C) Scheduling Final Sale Hearing and Approving Form and Manner of Notice Thereof, and (II) Order Authorizing and Approving (A) the Sale of Such Assets Free and Clear of Liens and Other Interests And (B) the Assumption and Assignment of Executory Contracts to Successful Bidder(s) at Auction* (the "**Sale Motion**") [Docket No. 37], which sought approval of certain bidding procedures for, and the ultimate sale of, the Remaining Property (as such term is defined in the Sale Motion). In the Sale Motion, the Debtors requested that the Court enter an order approving an auction and sale process for the remaining assets (the "**Bid Procedures Order**").

6.      On September 23, 2010, the Court entered the Bid Procedures Order [Docket No. 78]. The Bid Procedures Order provides dates and deadlines in connection with the sale of the Debtors' remaining assets. The Auction of the Debtors' remaining assets is scheduled for December 9, 2010, at 10:00 a.m., and a hearing to approve the sale is scheduled for December 16, 2010, at 9:30 a.m. The Bid Procedures Order also provides that all sales, ultimately approved by the Court, must close no later than December 28, 2010. These procedures were agreed to by SLF and SLF withdrew its motion to dismiss**.**

7.      The Bid Procedures Order also states:

> [SLF] shall have the right to credit bid at the Auction, pursuant to 11 U.S.C. Section 363(k), for the purchase of the collateral securing the Debtors' obligation to [SLF] … in an amount of no less than **$19,640,321.50** (which amount constitutes $19,380,000.34 in principal, plus $227,914.11 in interest and $32,407.05 in fees), plus such additional amounts, if any, as the Court shall determine at a hearing...

[emphasis added]. Bid Procedures Order, ¶11. In other words, the amounts of principal, interest, and fees in paragraph 11 of the Bid Procedures Order were agreed to by and among the Debtors and SLF as the *minimum* amount SLF would have the right to credit bid at the Auction, pursuant

to 11 U.S.C. Section 363(k). The amount of interest is calculated based on a **4.25%** interest rate (the non-default contract rate) for the period from March 23, 2010 (the maturity date of the Loans), to the Petition Date.

8.    On September 30, 2010, SLF filed (a) a secured proof of claim assigned number 2 against McGinnis in the amount of $1,760,535.25 (the "**McGinnis Claim**"); and (b) a secured proof of claim assigned number 2 against Canyon Falls in the amount of $18,630,555.09 (the "**Canyon Falls Claim**" and collectively with the McGinnis Claim, the "**Proofs of Claim**"). Both Proofs of Claim are based on "unpaid principal plus accrued but unpaid interest and late fees, and any and all other fees (including attorneys' fees), expenses, costs, charges, and any and all other debts or obligations of [Debtor] to [SLF]…" McGinnis Claim, Exhibit A, ¶2. Canyon Falls Claim, Exhibit A, ¶2.

9.    Upon information and belief, the total amount of the Proofs of Claim of **$20,391,090.34** can be broken down into the following asserted amounts: $19,380,000.34 for principal; $978,682.95 for interest; and $32,407.05 for fees. The Debtors and SLF agree on the amount of principal and fees outstanding and owing as of the Petition Date: $19,380,000.34 and $32,407.05, respectively. However, the Debtors object to SLF's attempt to charge default interest.

10.    SLF asserts it is entitled to prepetition interest based on an **18%**[4] interest rate (the "maturity rate") for the period from March 23, 2010 (the maturity date of the Loans), to the

---

[4] Pursuant to the Loan Documents, there is no "maturity interest" rate defined, notwithstanding SLF's use of the term "maturity interest." The Loan Documents define a interest rate and a "Default Interest" rate. The Promissory Notes, as amended, for each of the Debtors provides that "[a]t maturity, or in the event of default, as defined in the Loan Agreement, interest shall accrue at the Maximum Rate (hereinafter defined)." The "Maximum Rate" is defined as "the lawful rate of interest permitted by applicable usury laws now or hereafter enacted, which interest rate shall change when and as said laws change to the extent permitted by law, effective on the day such change in sad laws become effective." Thus, a clear reading of the Loan Documents reveals only two rates. The concept of "maturity" is an event or a time and not a rate. At the "time" of maturity, the rate is the default rate.

Petition Date, totaling $978,682.95.  Interest for the same period at the non-default rate would instead total $227,914.

11.     SLF also asserts the Debtors are also indebted for certain post-petition claims for:

> all costs and expenses incurred by [SLF] from and after the Petition Date in connection with the claims herein asserted (including, without limitation, legal fees and expenses) and for post-petition interest on all claims of [SLF] in accordance with the terms and provisions of the Loan Documents.  **The loan continues to accrue interest at the maturity rate of 18%.**

[emphasis added].  McGinnis Claim, Exhibit A, ¶4.  Canyon Falls Claim, Exhibit A, ¶4.  At 18% SLF would accrue $2,676,033 in post-petition interest from the Petition Date through a December 28, 2010, closing date.  Interest for the same period at the non-default rate would be $631,841.

12.     For the reasons stated below, the Debtors object to the Proofs of Claim to the extent SLF seeks (a) prepetition interest calculated at a rate exceeding the non-default contract rate of 4.25%; and (b) post-petition interest[5] calculated at a rate exceeding the non-default contract rate of 4.25%.  Moreover, the Debtors reserve their rights to object to any post-petition fees and expenses asserted by SLF for any reason, including, without limitation, the reasonableness and propriety of such amounts.

---

[5] Notwithstanding that the Debtors believe SLF is an over secured creditor, pursuant to Section 506(b) of the Bankruptcy Code, SLF shall only be entitled to post-petition interest, fees, and/or costs if it is determined that SLF is in fact an over secured creditor.  Such determination cannot be made until after the sale of the remaining assets is approved by the Court and closes.  Moreover, the Debtors reserve their rights to assert and recover any amounts that they may be entitled to under Section 506(c).

**OBJECTION**

13.     Pursuant to the Loan Documents, the Loans matured on March 23, 2010.  At that time, the total principal balance outstanding between both Loans was $19,380,000.34.  SLF takes the position that it is entitled to retroactively calculate and demand interest at the "maturity rate" of 18% from March 23, 2010, through the Petition Date, as well as from the Petition Date until SLF is paid in full.  SLF takes this position even though they paid interest to ABOT at the non-default rate and notwithstanding that ABOT's demand letters calculate interest at the non-default rate.

14.     The "maturity rate" asserted by SLF is nothing more than a default rate.  The failure to pay on maturity (an event) is a default.  The purpose of the high rate is to encourage a borrower to pay off a loan when it matures.  See In re DWS Investments, Inc., 121 B.R. 845, 849 (Bankr. C.D. Cal. 1990) (explaining that a default interest rate "should not be a penalty").

**I.  THE COURT SHOULD REDUCE SLF'S PREPETITION CLAIM
FOR INTEREST BY APPLICATION**

15.     With respect to the applicable prepetition interest rate, the Debtors assert that the Court has discretion to impose something other than a debilitating default interest rate.  Generally, courts are reluctant to reduce prepetition interest below the default rate.  However, one court looked at whether the lender was asserting default interest prepetition and considered the fact that the lender had not exercised that right as a factor in favor of continuing non-default interest post petition.  In re Jack Kline Co., Inc., No. 09-36569-H4-7, 2010 WL 3909445 (Bankr. S.D.Tex. 2010).  ABOT, SLF's predecessor, did not accrue interest at the "maturity rate" or default rate.  ABOT did not charge SLF default interest when it sold the loans to SLF.  ABOT expressly demanded that the borrowers pay interest after maturity solely at the non-default rate.  This is a unique situation since SLF is not an institutional lender but a real estate

developer who acquired the Property because of and not in spite of the fact that it was in default, with the intent to foreclose and own the property. In light of these facts, it is inequitable to impose an 18% default rate of interest, especially during the period of time prior to SLF's acquisition of the loan when, based upon ABOT's own letters, the Debtors were told that non-default interest would apply. See In re Cummins Utility, L.P., 279 B.R. 195, 202 (Bankr. N.D. Tex. 2002) (the court explained in its refusal to impose the default rate that it was significant that the banks were ambiguous as to whether they intended to charge the default interest rate and that the banks failed "to put the other parties on notice of invocation of the default rate"). In these cases SLF is retroactively charging default interest contrary to ABOT's letters demanding non-default interest. Allowing SLF to change default interest for the three month period prior to its purchase of the loans would give SLF a windfall, since its agreement with ABOT expressly provides that it was acquiring the loans for the principal balance and accrued interest at the non-default rate.

## II. SLF SHOULD ONLY BE ALLOWED POST-PETITION INTEREST AT THE NON-DEFAULT RATE

16.     "The question whether a secured creditor is entitled to post-petition interest is one of federal law." In re Kalian, 178 B.R. 308, 311 (Bankr. D.R.I. 1995). While the general rule is that interest on a creditor's claim stops accruing on the petition date, post-petition interest continues to accrue on over secured claims until the claim is paid in full or until the effective date of a plan of reorganization. In re Vest Associates, 217 B.R. 696, 701 (Bankr. S.D.N.Y. 1998). Pursuant to § 506(b) of the Bankruptcy Code, a creditor holding an over secured claim is entitled to receive "interest on such claim, and any reasonable fees, costs or charges provided for under the agreement under which such claim arose." 11 U.S.C. § 506(b). Neither the language nor legislative history of §506(b) of the Bankruptcy Code refer to a specific rate of interest to be

applied in the case of over secured claims.  In re Laymon, 958 F.2d 72, 73 (5th Cir. 1992).

However, a litany of courts have held that the bankruptcy court has the equitable discretion to fix

post petition interest at the non-default rate when the facts and circumstances warrant.  Even

prior to the adoption of the Bankruptcy Code,  the courts have fixed a lower rate of interest.  See

id. at 75.

17.    There is a rebuttable presumption in enforcing the contract interest rate that

"impose[s] upon the debtor the burden of proving that the equities favor allowing interest at a

different rate."  In re Ace-Texas, Inc. 217 B.R. 719, 723 (Bankr. D. Del. 1998); see also In re

Cummins, 279 B.R. 195, 202 (Bankr. N.D. Tex. 2002) (citations omitted).  In determining the

appropriate rate of post-petition interest to be applied, courts are concerned with balancing the

"equities between creditor and creditor *or* between creditors and the debtor."    Vanston

Bondholders Protective Committee v. Green et al., 329 U.S. 156, 165 (1946) (emphasis added)

(citing Sexton v. Dreyfus, 219 U.S. 339, 346 (1911)).  A court "presented with a §506(b) motion

is not *required* in all cases to apply a contractual default rate of interest in determining the

amount of an 'allowed secured' claim within the meaning of that section."  In re Sheppley & Co.,

62 B.R. 271, 278 (Bankr. N.D. Iowa 1986).  Rather, the courts recognize that "flexibility is

possible" when determining whether to apply a default interest rate.  See id.  The courts look at a

variety of equitable factors in determining the appropriate interest rate to apply.  See id. at 278-

279.

18.    There is no one set list of equitable factors courts look to, rather, they consider the

particular facts and circumstances of each case.  See In re Southland, 160 F.3d 1054, 1060

(concluding that while the particular factors "militate[d] against a finding of inequity" in

applying the higher interest rate to the specific set of facts, there is no set list of factors); In re

<u>Cummins</u>, 279 B.R. 195, 202. Commonly evaluated factors include whether the debtor is solvent, whether the creditor is over secured, the difference between the non-default and default interest rates, the presence or absence of subordinate creditors and whether any subordinate creditors would receive payment if a default interest rate were applied, whether the reorganization proposal would lead to a quick and orderly resolution, whether there is any risk of non-payment to the creditor, whether distributions would reach down to shareholder interests, bad faith on the creditor's part in obstructing the reorganization process, and prevailing market interest rates at the time of the default. <u>See</u> <u>In re 360 Inns, Ltd.</u>, 76 B.R. 573, 581-582 (Bankr. N.D. Tex. 1987); <u>In re Trinity Meadows Raceway, Inc.</u>, 252 B.R. 660, 669 (Bankr. N.D. 2000); <u>In re Sheppley & Co.</u>, 62 B.R. at 278-279. It is respectfully submitted that most of the factors which favor a reduction are present here and that the Court should therefore refuse to impose the default rate and reduce SLF's claim accordingly[6].

A. **THE SUBSTANTIAL DIFFERENTIAL BETWEEN THE BASE RATE AND DEFAULT RATE WEIGHS IN FAVOR OF APPLYING THE BASE RATE OF INTEREST**

19. As set forth above, one of the equitable factors courts strongly consider in determining what interest rate to apply is the differential between pre-default and post-default interest rates. <u>See</u> <u>In re Trinity Meadows</u>, 252 B.R. 660, 668-669 (Bankr. N.D. Tex. 2000) (citations omitted); <u>In re Ace-Texas, Inc.</u>, 217 B.R. at 723-724 (explaining that a 2% differential between the pre-default and post-default interest rates was "reasonable and appropriate under the circumstances"). Where the differential between the base rate of interest and default rate of

---

[6] Note, however, that the court considered various factors in determining the appropriate rate of interest to be applied, including the harm to junior creditors. <u>See</u> <u>In re Southland</u>, 160 F.3d at 1060. Courts have considered the impact to other creditors as an important factor in deciding whether to lower the interest rate below the default rate. <u>See</u> <u>In re Process Property Corp.</u>, 327 BAR. 603, 609 (Bankr. N.D. Tex. 2005); <u>In re Cummins Utility, L.P.</u>, 279 B.R. 195 (Bankr. N.D. Tex. 2002). Here, there are a small number of other creditors holding a relatively small amount of total claims against the Debtors. However, given the overwhelming presence of the other factors, the Court should reduce the interest rate to the non-default rate.

interest is significant, courts have refused to impose the default rate of interest on a debtor.  In re Boardwalk Partners, 171 B.R. 87, 92 (Bankr. D. Ariz. 1994); In re Ace-Texas, Inc., 217 B.R. at 719 (explaining in that applying the default interest rate that while the 2% differential was acceptable under the particular factual circumstances, courts will decline to apply the default rate where the rate seems excessive).

20.    One court concluded that experts have established that a three percent differential between the contract and default rates is customary.  In re Terry L.P., 27 F.3d 241 at 243 (7th Cir. 1994) (explaining that the 17¼ percent default interest rate was acceptable where the pre-default interest rate was 14¼%).  Default rates between 2½ percent and 4½ percent over the pre-default rates tend to be expected and in these cases, and in such a case, the default rate may be imposed.  See id. at 244; In re Ace-Texas, Inc. 217 B.R. at 723-724.  The courts have even gone as far as to acknowledge that a default rate that is as high as 4.3 points above the non-default rate is still within the acceptable range of interest rates.  See In re Ace-Texas, Inc., 217 B.R. at 724 (citing In re Schaumberg Hotel Owner L.P., 97 B.R. 943, 951 (Bankr. N.D. Ill. 1989) (pointing out that "[o]ne court . . . even  endorsed a default rate 4.3 points above the non-default rate").  See id. (explaining that a 2% differential is not unreasonable under the circumstances); In re Terry L.P., 27 F.3d 241, 244 (7th Cir. 1994) (holding a default interest rate that was 3 points above the pre-default rate to be reasonable).  Furthermore, while default rates may be acceptable where the default rate is not much higher than the pre-default rate, a default rate that is 13 to 14 points above the base rate certainly does not fall into a range where the base and default rates are close to each other.  See In re Ace-Texas, Inc., 217 B.R. at 724.

21.    The Texas Bankruptcy Court has found, in the context of a Chapter 7 trustee's action to "determine the nature, validity, and priority of numerous liens against the bankruptcy

estate[,]" that the equities weighed in favor of the trustee, after considering equitable factors such as "the spread between the contract rate and the default rate; whether the creditor obstructed the reorganization process; whether creditors junior to the secured creditor will be harmed if the court applies the default rate of interest; and whether or not other classes will be impaired." See In re Trinity Meadows, 252 B.R. at 668-669. In applying the lower pre-default contract rate, the court in In re Trinity Meadows found that because there was a large (10%) spread between the contract and default rate, no evidence that the creditor obstructed the liquidation, and because the other creditors would be harmed if the default interest rate were applied, that the lower 8% contract interest rate, as argued by the trustee, should apply, rather than the 18% default interest rate following the date of entry of the Order for Relief by the Court. See id. at 669.

22.     Courts refuse to impose default interest rates when they operate as a "sledgehammer" to force debtors to promptly make payments. See In re White, 88 B.R. 498, 511 (Bankr. D. Mass. 1988) (refusing to impose an excessively high post-default interest rate of 48%); see also In re Hollstrom, 133 B.R. 535, 539-540 (Bankr. D. Colo. 1991) (refusing to impose a 36% default interest rate where the over secured creditor received full reimbursement and payment on collection expenses and there was no evidence justifying the rate and no showing of market rates or default rates on similar loans made by the lender); In re Boardwalk Partners, 171 B.R. at 92 (limiting the interest the senior and second lien holders could recover).[7]

23.     For example, the Bankruptcy Court in In re DWS Investments, Inc., 121 B.R. 845 (Bankr. C.D. Cal. 1990), in balancing the equities, determined that applying a post-default interest rate of 25% was inappropriate. See id. at 849. In coming to this conclusion, the court noted that while "[u]sually, the court should apply the contract rate" the 25% rate sought by the

---

[7] While these interest rates are significantly higher than the 18% asserted by SLF, they must be viewed in the context of a higher interest rate environment at that time compared to the current historic low rates.

claimants seemed "excessive" in light of the fact that the claimants did not offer "evidence to justify [the] rate other than [that] it is the rate they use for other transactions." Id. Furthermore, the court refused to impose the post-default rate because there was no evidence that it resembled the market rate for similar loans under similar circumstances. See id. The court also did not impose the market rate because it received no information from the parties showing that the market rate was higher than the pre-default rates, and the pre-default rates at issue were considered high. See id. at 850.

24.     The Bankruptcy Court in In re Kalian, 178 B.R. 308 (Bankr. D. R.I. 1995) also decided not to allow the default interest rate for an over secured senior mortgagee because it found that because the mortgagee had already been paid an 18% base rate on the time value of money it had lent, giving the mortgagee the default interest rate "would compensate it twice." See In re Kalian, 178 B.R. at 316. The court said that this was so because the mortgagee was going to "recover its *reasonable* 'fees, costs and charges.'" Id. (quoting 11 U.S.C. §506(b)). Under those circumstances, the court determined that a default interest rate would be an "unreasonable 'charge.'" See id. at 317.

25.     Here, the differential between the default rate and base rate of interest is approximately 14%. That spread is significantly larger than the range of the increase allowed by the courts in the cases cited above. We are unaware of any court decision imposing default interest where the default rate is four times the base rate. Because courts have refused to impose a default rate that is "nearly three times the contract rate[,]" the court here should similarly refuse to enforce an interest rate that is *greater* than those previously rejected by courts as being too high. See In re Boardwalk Partners, 171 B.R. at 93.

B.   **THE DEFAULT RATE IS NOT JUSTIFIED TO COMPENSATE SLF FOR ANY RISK OF NON-PAYMENT, SINCE SUCH RISK DOES NOT EXIST IN THIS CASE**

26.   Imposing the higher default rate *may* be reasonable to compensate SLF if it were at a risk of not recovering the entire amount due on the Loans.  However, when a creditor is over secured the application of a higher default rate may be inappropriate.  See In re 360 Inns, Ltd. However, there is no such risk here.  The Property is worth considerably more than the debt. The Remaining Property will either be sold to a third party by the end of the year (in which case SLF will be paid off) or SLF will own it – which was their goal all along.  The risk to SLF is that it is out bid and does not accomplish this goal.  This is clearly not a case where a higher rate is warranted because of a risk of loss.

27.   Nor does the higher default interest rate compensate SLF for its costs.  Upon information and belief, SLF incurred no borrowing of its own to purchase the debt.  SLF purchased the Loans from ABOT at par and paid the interest at the non-default rate ABOT was seeking in it demand letters. Moreover, SLF's cost of funds to pay off the loan in no way approaches 18%.

C.   **SLF'S BAD FAITH AND OBSTRUCTIONIST TACTICS ALSO WEIGH IN FAVOR OF APPLYING THE BASE RATE OF INTEREST**

28.   In deciding whether to apply a default interest rate, courts consider whether creditors acted inappropriately in delaying or trying to delay the bankruptcy proceedings.  See In re Sheppley, 62 B.R. at 278; In re Trinity Meadows, 252 B.R. at 669; see also In re Cummins, 279 B.R. 195, 202.  Where there is a delay in the proceedings in part because of a lender or creditor's obstructive acts, such as opposing a debtor's motions merely for the purpose of hindering the reorganization process, these tactics weigh against applying a default interest rate. See In re Sheppley, 62 B.R. at 279.  Here, SLF is not trying to delay the proceedings but it is

trying to subvert the auction process. These tactics, while not obstruction of the reorganization process, nevertheless constituted equitable grounds for denying default interest to SLF. See In re Cummins, 279 B.R. 195, 203. Furthermore, when courts have decided to apply the default interest rate, one of the factors frequently pointed to in coming to that conclusion is the fact that the creditor *did not* unjustly delay the reorganization process. See Ruskin v. Griffiths, 269 F.2d 827 (2d Cir. 1959); see also In re Skyler Ridge, 80 B.R. 500 (Bankr. C.D. Cal. 1987).

29.     SLF is trying to increase its claim in excess of $2 million to stack the deck against competing bids and to give itself an added cushion with a higher credit bid based upon an inflated interest rate. In addition to its attempt to gain this unfair advantage through an inflated claim, SLF has also taken direct actions to discourage other bidders so as to eliminate the competition. See In re Sheppley, 62 B.R. at 279; In re Trinity Meadows, 252 B.R. at 669; see also In re Cummins, 279 B.R. at 202. A debtor should be given an opportunity to reorganize. Upon information and belief, representatives of SLF have intentionally interfered with the Debtors' efforts to market the Remaining Property.

30.     In the spring of 2010, SLF induced representatives of the Debtors to provide SLF with certain information regarding the Property under the guise of SLF's wanting to purchase a limited number of lots on the Property. Thereafter, when SLF requested more information, that request was refused because it was apparent (based upon their request) that their motivation was more than just to own a few lots.

31.     At or about the time that SLF acquired the Loans, representatives of SLF approached the Town of Flower Mound and induced the Town of Flower Mound to provide a report concerning the plans to deliver water to the Property based upon incomplete and outdated information. As a result, the Town of Flower Mound produced a water report which inaccurately

reflected potential problems in the delivery of water to the Property. Thereafter, SLF either intentionally or recklessly trumpeted the report to the builder community as an indication of problems at the Property. This has resulted in chilling interest of the developer community in either bidding on the Property as a whole or developing portions of the Property. SLF's intentional or reckless conduct, coupled with its consistent attempts to charge default interest, clearly further their efforts to own the Property by removing third parties' interest in the Property. This is clearly consist with its efforts of its "loan to own" strategy. The objective of poisoning the developer community is likewise detrimental to the Debtors as is SLF's attempt to seek interest at the default rate. Both strategies are designed to enhance their ability to accomplish their goal.

32.     SLF is not a typical institutional lender. The general partner of SLF is a real estate developer. SLF bought the existing mortgage debt solely to acquire the Property to develop it. The high default rate of interest is solely intended to give SLF an unfair advantage over any other bidders at the Auction by artificially increasing the base cost at which other can bid. The high rate of interest is therefore intended to discourage other bidders, chill the bidding process, and ensure SLF is the only one who will bid so it can reach its goal of loaning to owning.

33.     Upon information and belief, SLF has told other developers not to bid because SLF is going to get the Property. SLF's improper conduct, which is contrary to the way a legitimate lender would conduct itself, is a factor that should lead the Court to reduce the interest rate because allowing SLF to apply a high default interest rate just rewards its bad conduct.

WHEREFORE, the Debtors respectfully request that the Court (i) deny SLF prepetition interest calculated at a rate exceeding the non-default contract rate of 4.25%; and (ii) deny post-petition interest (should SLF ultimately be deemed over secured) calculated at a rate exceeding the non-default contract rate of 4.25%; (iii) reduce the Proofs of Claim by $737,369[8], and (iv) grant such other relief as is just and proper.

Dated: October 29, 2010

COLE, SCHOTZ, MEISEL,
FORMAN & LEONARD, P.A.

By: /s/ Michael D. Warner
Michael D. Warner (TX Bar No. 00792304)
Rachel R. Obaldo (TX Bar No. 24041617)
301 Commerce Street, Suite 1700
Fort Worth, TX 76102
(817) 810-5250
(817) 810-5255 (Fax)

Counsel for the Debtors
and Debtors in Possession

---

[8] Interest calculated at 18% on a principal balance of $19,380,000.34 from the March 23, 2010 (the maturity date of the Loans), through Petition Date or 101 days is $965,283. Interest calculated at 4.25% on a principal balance of $19,380,000.34 from the March 23, 2010, through Petition Date or 101 days is $227,914. The difference in amount of interest is $737,369.

# **EXHIBIT A**



# AMERICAN BANK
## OF TEXAS

April 19, 2010

Canyon Falls Land Partners, L.P.
Attn: Mr. Stephen C. McGinnis, Manager      **CERTIFIED MAIL#70053110000211861019**
II Stephens/Canyon Falls, LLC               **RETURN RECEIPT REQUSTED**
General Partner                             And Regular U.S. Mail
4500 Sterling Lane
Plano, TX 75093

RE:   Promissory Note dated March 23, 2006, with a current principal balance of
      $18,811,302.00 (the "Note"), executed by Canyon Falls Land Partners, L.P. a Texas
      Limited Partnership ("Borrower"), payable to the order of American Bank of Texas
      ("Lender"), secured by that certain Deed of Trust dated as of March 23, 2006 (the "Deed
      of Trust"), executed by Borrower, covering the property described therein.

Dear Mr. McGinnis,

The purpose of this letter is to notify Borrower that the above referenced loan matured on March
23, 2010 and remains unpaid.   The Note matured with an unpaid principal balance of
$18,811,302.00 and interest continues to accrue at a per diem rate of $2,220.78. **Please make
arrangements to pay the entire principal balance of the Note plus all accrued interest
totaling $82,224.69, in its entirety, by 2:00 P.M., on April 29, 2010.** Payment is to be made
via wire transfer of immediately available funds or cashier's check at Lender's main office in
Sherman, Texas.

If the referenced payment is not made, without further notice, Lender may pursue all legal
remedies available under the Note and Deed of Trust and all documents executed in connection
therewith (collectively, the "Loan Documents").

No delay by Lender in exercising any rights or remedies shall operate as a waiver of any rights or
remedies Lender may have.   Any future negotiations or discussions with any agent or
representative of Lender regarding the Note or the other Loan Documents shall not be binding
upon Lender and until any terms resulting from such negotiations or discussions are reduced to a
written agreement signed by an authorized agent or representative or Lender.  Any and all rights
and remedies available to Lender shall be cumulative and may be exercised separately,
successively, or concurrently at the sole discretion of Lender.

If any party who receives this letter is a debtor in bankruptcy proceeding subject to the provisions of the United States Bankruptcy Code (Title 11 of the United States Code) ("Code"), this letter is merely intended to be written notice that formal demand has been made in compliance with the Loan Documents and applicable law. This letter is not an act to collect, assess, or recover a claim against that party, nor is this letter intended to violate any provisions of the Code. Any and all claims that Lender asserts against that party will be properly asserted in compliance with the Code in the bankruptcy proceeding. In addition, all of Lender's claims, demands, and accruals regarding the Loan Documents, whenever made, and whether for principal, interest or otherwise, are intended to comply in all respects, both independently and collectively, with all applicable usury laws, and are accordingly limited so that all applicable usury laws are not violated.

Please give this matter your immediate attention. Please direct any questions you may have to the undersigned at 972-668-7905.

Sincerely,

Clay Carter
Vice President

CC:    Copy sent Certified Mail and Regular Mail

HCREA Canyon Falls, LP          **CERTIFIED MAIL#70053110000211861026**
Attn: Ted Dameris               **RETURN RECEIPT REQUSTED**
13455 Noel Road, Suite 800      And Regular U.S. Mail
Dallas, TX 75240



# AMERICAN BANK
### OF TEXAS

April 19, 2010

McGinnis Land Partners I, L.P.
Attn: Mr. Stephen C. McGinnis, Manager     **CERTIFIED MAIL #70053110000211860975**
II Stephens/Falls Construction, LLC     <u>**RETURN RECEIPT REQUESTED**</u>
General Partner     And Regular U.S. Mail
4500 Sterling Lane
Plano, TX 75093

RE:     Promissory Note dated March 23, 2006, with a current principal balance of $1,660,481.01 (the "Note"), executed by McGinnis Land Partners I, L.P. a Texas Limited Partnership ("Borrower"), payable to the order of American Bank of Texas ("Lender"), secured by that certain Deed of Trust dated as of March 23, 2006 (the "Deed of Trust"), executed by Borrower, covering the property described therein.

Dear Mr. McGinnis,

The purpose of this letter is to notify Borrower that the above referenced loan matured on March 23, 2010 and remains unpaid. The Note matured with an unpaid principal balance of $1,660,481.01 and interest continues to accrue at a per diem rate of $196.03. **Please make arrangements to pay the entire principal balance of the Note plus all accrued interest totaling $7,253.07, in its entirety, by 2:00 P.M., on April 29, 2010.** Payment is to be made via wire transfer of immediately available funds or cashier's check at Lender's main office in Sherman, Texas.

If the referenced payment is not made, without further notice, Lender may pursue all legal remedies available under the Note and Deed of Trust and all documents executed in connection therewith (collectively, the "Loan Documents").

No delay by Lender in exercising any rights or remedies shall operate as a waiver of any rights or remedies Lender may have. Any future negotiations or discussions with any agent or representative of Lender regarding the Note or the other Loan Documents shall not be binding upon Lender and until any terms resulting from such negotiations or discussions are reduced to a written agreement signed by an authorized agent or representative or Lender. Any and all rights and remedies available to Lender shall be cumulative and may be exercised separately, successively, or concurrently at the sole discretion of Lender.

By copy of this letter, the Guarantors are formally notified that the loan has matured and remains unpaid and Lender's demand for payment of the past due amount including accrued interest.

If any party who receives this letter is a debtor in bankruptcy proceeding subject to the provisions of the United States Bankruptcy Code (Title 11 of the United States Code) ("Code"), this letter is merely intended to be written notice that formal demand has been made in compliance with the Loan Documents and applicable law. This letter is not an act to collect, assess, or recover a claim against that party, nor is this letter intended to violate any provisions of the Code. Any and all claims that Lender asserts against that party will be properly asserted in compliance with the Code in the bankruptcy proceeding. In addition, all of Lender's claims, demands, and accruals regarding the Loan Documents, whenever made, and whether for principal, interest or otherwise, are intended to comply in all respects, both independently and collectively, with all applicable usury laws, and are accordingly limited so that all applicable usury laws are not violated.

Please give this matter your immediate attention. Please direct any questions you may have to the undersigned at 972-668-7905.

Sincerely,

Clay Carter
Vice President

CC:    Copy sent Certified Mail and Regular Mail

HCREA Canyon Falls, LP                 **CERTIFIED MAIL#7005311000211860982**
Attn: Ted Dameris                      **RETURN RECEIPT REQUSTED**
13455 Noel Road, Suite 800             And Regular U.S. Mail
Dallas, TX 75240

Guarantors:

Stephen S. McGinnis                    **CERTIFIED MAIL#7005311000211860999**
4500 Sterling Lane                     **RETURN RECEIPT REQUSTED**
Plano, TX 75093                        And Regular U.S. Mail

Stephen C. McGinnis                    **CERTIFIED MAIL#7005311000211861002**
4500 Sterling Lane                     **RETURN RECEIPT REQUSTED**
Plano, TX 75093                        And Regular U.S. Mail